UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MICHAEL J. FAGO,<br>Plaintiff, | :<br>:<br>: | CIVIL ACTION NO.<br>3:02-cv-1189 (AHN) |
| vs. | :<br>: | |
| CITY OF HARTFORD, ET AL.<br>Defendants. | :<br>: | April 30, 2004 |

## CITY OF HARTFORD, BRUCE MARQUIS, KEVIN JONES, MARK PAWLINA, JOSEPH BUYAK, MARK RUDEWICZ, AND STEPHEN MIELE'S MEMORANDUM OF LAW IN SUPOPRT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants City of Hartford ("City"), Bruce Marquis, Kevin Jones, Mark Pawlina, Joseph Buyak, Mark Rudewicz, Stephen Miele (the "Police Defendants") respectfully submit this Memorandum in Support of their accompanying Motion for Summary Judgment.

**I.      INTRODUCTION**

The plaintiff, Michael J. Fago ("Fago") claims that the City of Hartford, former Hartford Police Chief Bruce Marquis ("Marquis"), Assistant Chief Kevin Jones ("Jones"), former Captain and now-Acting Chief Mark Pawlina ("Pawlina"), Captain Joseph Buyak ("Buyak"), former Lieutenant Mark Rudewicz ("Rudewicz"), and now-Lieutenant Stephen Miele ("Miele") violated his federal civil rights, which he is seeking to vindicate pursuant to 42 U.S.C. Section 1983 ("Section 1983"), and his rights under state common law. In particular, Fago challenges 1) the decision that he did not successfully complete his probationary service as a Lieutenant at the Hartford Police Department ("HPD"), and his subsequent return to the rank of Sergeant; 2) the investigation on which that decision was based; and 3) alleged harassment following the filing of this lawsuit.

Fago's claims against the City and the Police Defendants appear in six counts of his Second Amended Complaint dated July 29, 2003 ("Complaint"). In Count One, Fago claims that he was deprived of his Fourteenth Amendment right to equal protection based on his race. In Count Two, he claims that he was deprived of his Fourteenth Amendment rights to both procedural and substantive due process. Count Three asserts that the Police Defendants retaliated against Fago both for his testimony in other lawsuits involving the HPD and his own efforts to seek redress, depriving him of his First Amendment rights of free speech, freedom of association, and to seek redress. In Count Four, he alleges that the City is liable to him pursuant to both Title VII and Section 1983 for the Police Defendants' alleged conduct. Count Five is a claim that the Police Defendants intentionally caused him emotional distress, and in Count Six Fago alleges that he was defamed. The City and the Police Defendants now move for summary judgment on all six counts.

## II.    FACTS[1]

In 1986, Fago joined the HPD as a cadet. Defendants' 56(a)1 Statement ("Defs.' 56(a)1") ¶ 1. During his service as a cadet, he struck a HPD officer with enough force to knock the officer unconscious. Id. ¶ 2. In 1987, Fago became a sworn HPD officer. Id. ¶ 3. In 1995, Fago was promoted to the rank of Sergeant. Id. ¶ 4. On or about May 27, 2001, Fago began a one-year probationary period at the rank of Lieutenant. Id. ¶ 5.

---

[1] The City and Police Defendants have not included here all of the evidence they may introduce at trial and they do not waive their right to introduce such additional evidence at trial. In describing the events leading up to plaintiff's demotion, the Police Defendants have also included some additional information that is not essential to their Motion for Summary Judgment.

2

The City's Personnel Rules and Regulations govern HPD probationary employees' service and evaluation. Id. ¶ 8. In particular, Rule IX ("Rule IX") requires supervisors to complete interim and final probationary employee performance evaluations. Id. ¶ 72. Rule IX also establishes a process for the dismissal of a probationary employee: an appointing authority, in this case the Chief of Police for the HPD, can recommend in writing to the City's Personnel Director ("Director") that a probationary employee not continue in his or her probationary position "if in his opinion the working test indicates that such employee is unable or unwilling to perform the duties of the position satisfactorily or that his habits and dependability do not merit his continuance in the service." Id. ¶ 11 (emphasis added.) If the Director concurs, the probationary employee is removed from his or her probationary position and, if applicable, returned to his or her former position. Id. ¶ 12.

### The February 25, 2002 Stairwell Incident

At approximately 1:40 PM on February 25, 2002, HPD Lieutenant Nancy McClure ("McClure") was talking with HPD Sergeant Scott Sansom ("Sansom") in a stairwell at HPD headquarters. Id. ¶ 21. Lieutenant Mark Francis ("Francis") and Detective Thomas Zemienieski ("Zemienieski"), both of the Windsor Police Department, were also in the stairwell at the time, when Fago entered the stairwell and made physical contact with McClure (the "Stairwell Incident"). Id.

### Pawlina's Investigation

After writing a February 26, 2002 memorandum to Pawlina about the Stairwell Incident, id. at ¶ 24, McClure verbally reported her claim to him on March 1, 2002. McClure claimed that Fago shoved her hard enough to knock her pocketbook from her shoulder. Id. ¶ 25. Besides describing the Stairwell Incident, McClure told Pawlina that Fago had previously

3

intimidated and harassed her, that he had done so to other HPD employees, including Buyak, Miele, Rudewicz, Sergeant Patrick Jobes ("Jobes"), and Officers Robert Russell ("Russell") and Steve Maticke, and that Lieutenant Harold Even ("Even") knew of Fago doing so to other HPD officers. Id. ¶ 26. At the time of this conversation with McClure, Pawlina was aware that Rudewicz had reported a similar complaint to him the previous September. In particular, Rudewicz had prepared a memorandum to Pawlina dated September 5, 2001, in which he stated that Fago had cleared his throat as Rudewicz passed the door of the room in which Fago was sitting, that Fago then made an "awkward facial expression," and approached Rudewicz as he stood at a water cooler and began to hum. Id. ¶ 19. Rudewicz wrote that "I believe the Lieutenant[']s intentions were to harass and intimidate me." Id. Pawlina had taken no action in connection with Fago as a result of this Rudewicz memorandum but decided to look into the complaint made by McClure in light of the similarity of her complaint to that made by Rudewicz, the number of people who might be involved, and what might be a pattern of conduct. Id. ¶¶ 20, 36.

Pawlina contacted each of the potential witnesses to the Stairwell Incident. In response, Sansom reported that he saw Fago in the stairwell but did not see any physical contact between Fago and McClure. Id. ¶ 27. Windsor Detective Zemienieski stated that he saw Fago bump into McClure but was unsure whether it was intentional. Id. ¶ 34. Windsor Lieutenant Francis explained that he did not see any physical contact between Fago and McClure because he was walking up the stairs and facing the opposite direction. Id. ¶ 35.

On March 3, 2002, McClure reported to Pawlina that earlier that morning Fago had driven his car past her in the HPD parking lot in a manner that she believed was meant to intimidate her. Id. ¶ 28. Later that day, Pawlina met with Fago to discuss McClure's claims,

4

which he explained he was investigating, in addition to whether there was a pattern of harassing and/or intimidating conduct by Fago.[2] Id.

On March 11, 2002, considering the similarity of McClure and Rudewicz's claims and Fago's alleged harassment of several other officers, Pawlina sent interrogatories to all lieutenants and sergeants working in HPD's Patrol Division.[3] Id. ¶ 36.

In separate replies to these interrogatories dated March 17, 2002, Jobes and Miele reported instances in which Fago harassed or intimidated either them or others. Id. ¶ 39. In an April 2, 2002 memorandum to Pawlina, Even reported that he had observed similar conduct. Id. ¶ 40. Pawlina thereafter asked that HPD's Internal Affairs Division ("IAD") interview Buyak, Rudewicz, Miele, McClure, Russell, Jobes, Even, and Sergeant Arthur Maglieri. Id. ¶ 42. Jones and Marquis approved of Pawlina's request because of both the number of interviews needed and a desire to complete them in timely manner. (Jones Deposition Transcript ("Jones Dep.") 62-65, App. D, Tab 4.) IAD investigators interviewed these individuals between April 8 and 11, 2002. Defs.' 56(a)1 ¶ 43. Meanwhile, between March 1 and April 2, 2002, Pawlina periodically discussed his investigation's status with Jones. Id. ¶ 41.

### IAD Interviews

On April 8, 2002, Rudewicz met with IAD investigators. Id. ¶ 44. He described how Fago had harassed him after he dated Fago's former and current girlfriend, Laura Buyak.[4] In

---

[2] The Chief of Police has discretion concerning whether HPD's Internal Affairs Division ("IAD") or another HPD division or officer conducts individual investigations. Id. ¶ 30. Pawlina performed his investigation pursuant to HPD's anti-harassment policy, with the help of IAD staff. Id. ¶ 31.
[3] These interrogatories asked, in part: "Have you ever observed, witnessed, or been a victim of any type of harassment, intimidation, or violence in the workplace by Lieutenant Michael Fago? . . . If the answer to [the preceding question] is yes, describe what occurred in detail." Id. ¶ 38. Interrogatories are a standard HPD investigative tool. Id. ¶¶ 37.
[4] Laura Buyak is also a Hartford police officer and the sister of Joseph Buyak, a defendant in this case. Id. ¶ 45.

5

particular, Rudewicz reported ten incidents between 1994 and 2002—including two episodes during Fago's probationary period—in which Fago had allegedly harassed or intimidated him. Id. ¶ 46. He also referred to a 2001 incident in which Fago physically bumped into him in a HPD headquarters hallway. Id.

In his April 10, 2002 interview, Buyak described an April 21, 1993 incident for which he disciplined Fago. Id. ¶ 48. In particular, Buyak reported that Fago "referr[ed] to me as a cunt just went off sort of on a tirade with me. Said he was better than me and my family members. He called my, he referred to my sister as a whore just like [my aunt and fellow police officer Barbara Morriarty] and referred to me as a piece of shit." Id. Buyak also described instances where Fago would "walk by me and grin ear to ear, make these grunts as he walked by, there was one occasion I remember specifically where he did that, he walked by and ma[d]e these grunts and he's groaning sort of sounds, certainly to get my attention." Id. ¶ 49.

When Miele was interviewed by IAD on April 11, 2002, he explained how Fago had harassed and intimidated him because of his prior relationship with Laura Buyak. Id. ¶ 51. For example, Miele described how if "you're in the hallway he'll try steering you down, uh, kind of walk up the hallway towards you and try to make contact with you," id., and reported an incident in which Fago bumped into then-Assistant Chief Ward at a picket line at the Meadows Music Theatre. Id.; see also Pawlina Decl. ¶ 6; id. at Exh. A at Pawlina 60 (Jobes reporting same incident). Miele also stated that Fago would try to provoke him to fight, in part by using profane and derogatory language. Defs.' 56(a)1 ¶ 52.

During their IAD interviews, Russell, Jobes, and McClure also reported that Fago had harassed or intimidated them, and Even reported that Fago had done so to other HPD officers. In particular, Russell stated that Fago made intimidating gestures when Fago and Russell were

6

in a federal court house for a lawsuit involving the process through which the HPD appoints Sergeants ("Sergeants' Case"), id. at ¶ 54, and that Fago had arbitrarily changed Russell's duty assignments and unnecessarily contacted him at home. Id.

Jobes reported that Fago had physically bumped into him on more than one occasion at the federal courthouse during the Sergeants' Case. Id. ¶ 55. According to Jobes, Fago had also bumped into the chair in which Jobes was sitting and leaned on Jobes while McClure was explaining an HPD computer program to him at HPD headquarters. Id. ¶ 56.

Besides reporting that Fago had shoved her during the Stairwell Incident, id. at ¶ 57, McClure described several instances in which she believed Fago had harassed or intimidated her, including two episodes following the Stairwell Incident in which Fago had allegedly stalked her in the HPD parking lot. Id. ¶ 58.

On April 22, 2002, Pawlina interviewed Fago at IAD's office. Id. ¶ 59. IAD's Commander and a Union representative also attended the interview. Id. Pawlina explained that, in addition to the Stairwell Incident, he was investigating whether there was a pattern of harassing and/or intimidating conduct by Fago. Id. Although Fago admitted that he bumped into McClure during the Stairwell Incident, he denied that the contact was intentional. Id. ¶ 60.

### Pawlina's Report

On April 25, 2002, Pawlina submitted a memorandum and supporting materials ("Investigative Packet") to Jones regarding the Stairwell Incident. Id. ¶ 61. These materials included typed transcripts of all of the IAD interviews that were conducted at Pawlina's request. Id. ¶ 18. Besides reflecting McClure's claims about the Stairwell Incident and her report that Fago had similarly harassed several other HPD officers, Pawlina's summary report described an apparent pattern of harassing behavior by Fago. In particular, he explained that:

> It is important to note that I did in fact receive a written memorandum during the summer of 2001 [] from Sgt. Mark Rudewicz regarding some unusual conduct regarding Lt. Fago that Sgt. Rudewicz felt was harassing and intimidating. The behavior described was similar to the behavior being described by Lt. McClure. . . . After talking to Sgt. Rudewicz about the incident he stated that Lt. Fago does this regularly to people he does not like. Sgt. Rudewicz stated that he only wished to have the incident documented, and because the incident described appeared vague, and not overtly harassing or intimidating, no further action was taken.
>
> Because the conduct of Lt. Fago described by Lt. McClure was similar to what was described by Sgt. Mark Rudewicz, almost a year apart, and totally independent of each other, I believed it to be an important connection, or pattern, of behavior.

Id. ¶ 64. Considering the IAD statements by Buyak, Miele, Rudewicz, Russell, Jobes, Even, and McClure, Pawlina concluded that "there is sufficient information to corroborate the allegations made of harassment, and intimidation in the workplace by Lt. Michael Fago. I see a clear pattern of intentional, sometimes overt, and sometimes covert, conduct on the part of Lt. Fago." Id. ¶ 65. The consistency of the several officers' reports of specific episodes of harassment over several years led Pawlina to conclude that the allegations were "very believable," and that "Lt. Fago's conduct still continues to recent days, while holding the rank of lieutenant. Id. ¶ 66.

While he could not "determine[] absolutely" that Fago intentionally shoved McClure with enough force to knock her pocketbook from her shoulder, "put together with all the other reported incidents, it clearly shows a continued pattern of harassing and intimidating conduct on the part of Lt. Fago, and I believe the incident set forth by Lt. McClure did occur, and was intentional." Id. ¶ 67. Pawlina therefore recommended that Fago receive an unsatisfactory final probationary performance evaluation and that he not be allowed to continue as a Lieutenant. Id. ¶ 68. The ultimate decision whether to recommend a demotion, however,

8

belonged to Marquis. Id. ¶ 70. Pawlina also indicated in his report that he would prepare disciplinary charges against Fago concerning the Stairwell Incident. Id. ¶ 71.

### Fago's Second Interim Probationary Performance Evaluation

Earlier, on March 22, 2002, Pawlina had initially rated Fago's performance as satisfactory for the period ending February 22, 2002 on an interim Probationary Employee Performance Evaluation ("Second Interim Evaluation").[5] Id. ¶ 75. Pawlina did so despite the investigation he had started but not yet finished because the Stairwell Incident occurred after February 22, 2002—the end of the period to which the Second Interim Evaluation applied. Id. ¶ 76. He then forwarded the Second Interim Evaluation to Jones who, on April 2, 2002, rated Fago as needing improvement.[6] Id. ¶ 77. Marquis also signed the Second Interim Evaluation on April 2, 2002. Id. ¶ 79.

Sometime between April 2 and 25, 2002, Pawlina concurred with Jones' rating on the Second Interim Evaluation after learning of Fago's apparently harassing and intimidating conduct during the evaluation period. Id. ¶ 80. Instead of completing a new evaluation form to show that he, too, believed Fago's performance needed improvement, Pawlina showed his agreement with Jones' rating by 1) crossing out the "X" he had put in the "satisfactory" box on March 22, 2002 and 2) writing his initials "M.P." next to the "X" Jones put in the "needs improvement" box on the Second Interim Evaluation. Id. ¶ 81. Pawlina decided to use the same form, rather than preparing a new evaluation form, "because we didn't want to hide anything. We didn't want to take this form, throw it out. . . [both he and] Jones felt it was important to use this form to show what exactly had happened and why it happened." Id. ¶ 82.

---

[5] Pawlina completed initial and interim probationary employee evaluations of Fago's performance on August 8 and December 1, 2001, respectively. (Fago. Dep. Vol. II 234-36, App. A, Tab 2.) Fago does not challenge these evaluations. Id.

[6] As Pawlina's superior, Jones was entitled to rate Fago differently than Pawlina had. Defs.' 56(a)1 ¶ 78.
9

(Fago received a copy of the Second Interim Evaluation, together with his final probationary employee evaluation, at a May 16, 2002 meeting with Marquis, id. at ¶ 83; he never received a copy of the Second Interim Evaluation when it reflected only Pawlina's initial "satisfactory" rating. Id.)

Thereafter, Carlson wrote on the Second Interim Evaluation "see the April 25, 2002 memo from Capt[.] Pawlina to [Assistant Chief] Jones and attachments." Id. ¶ 84. This was intended to respond to the Second Interim Evaluation's instruction that a reviewer should use a separate sheet if necessary to explain the basis for an unsatisfactory rating. Id. ¶ 85.

### Consideration of Fago's Probationary Performance

After receiving Pawlina's Investigative Packet, Marquis discussed Fago's possible demotion with his senior staff—Jones, Assistant Chief William Reilly ("Reilly"), Assistant Chief Lester McCoy, ("McKoy") and Rae Ann Palmer ("Palmer"), a civilian who was then responsible for, among other things, HPD's youth initiatives and was Fago's immediate supervisor. Id. ¶ 86. In response to Marquis' solicitation and based on Pawlina's Investigative Packet, Jones recommended that Fago not pass his probationary period. Id. ¶ 87. Marquis also had separate discussions with Palmer and Elizabeth Dunn of the City's Personnel Office regarding the possibilities of demoting Fago or proposing to extend his probationary period. Id. ¶ 89.

### May 16, 2002 Meeting Regarding Fago's Demotion

The decision about whether to recommend that a probationary employee should continue in his or her rank is made solely by the Chief of Police. Id. ¶ 70.

On May 15, 2002, Jones and Pawlina completed a Final Probationary Employee Performance Evaluation indicating that Fago's performance needed improvement. Id. ¶ 92.

10

Also on May 15, 2002, Marquis wrote to Fago, ordering him to attend a May 16, 2002 meeting. Id. ¶ 91.

During the May 16, 2002 meeting among Marquis, Jones, Carlson, Fago, and the Union President, Marquis told Fago that he (Marquis) had determined that Fago's probationary performance was unsatisfactory and that he was returning Fago to his rank of Sergeant. Id. ¶ 93. In particular, Marquis based his decision on the totality of the circumstances and Fago's apparent pattern of intimidating behavior. Id. ¶ 94.

### Pawlina's Recommended Discipline of Fago

Consistent with his April 25, 2002 report indicating that he would prepare a HPD recommended discipline form, or Form 90, Pawlina submitted a Form 90 to Jones on June 20, 2002, Id. ¶ 100, who approved of and forwarded it to Reilly.[7] Id. ¶ 101. Fago was not, however, disciplined in connection with the Stairwell Incident. Id. ¶ 103.

On July 11, 2002, Fago filed his original complaint in this case. Id. ¶ 104.

### III.   LAW AND ARGUMENT

Summary judgment is only appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2nd Cir. 2000). The moving party bears the burden of showing that no genuine factual dispute exists. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2nd Cir. 2000) (internal citation omitted).

---

[7] Pawlina's Form 90 initiated a disciplinary process entirely separate from the issue of Fago's demotion and focused solely on McClure's allegation involving the Stairwell Incident. Id. ¶ 102.

11

However, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (internal citation and quotation marks omitted). Indeed, there is no genuine issue of material fact and summary judgment may be appropriate if little or no evidence supports the non-moving party's case. Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223-24 (2nd Cir. 1994).

### A. There is No Evidence That the Police Defendants Treated Fago Differently Because He is White, Or Because of Any Other Improper Motive, in Violation of His Fourteenth Amendment Right to Equal Protection (Count One).

In Count One, Fago alleges that he "was not treated the same as similarly situated officers due to race." (Compl. Count One ¶ 34.) In particular, he claims that Marquis appointed African-Americans to the rank of Lieutenant to fill the positions vacated by both Fago and another white male after Marquis demoted them. See id. Count One ¶¶ 35, 36; Fago Dep. Vol. II 299, App. A, Tab 2; see also Fago Dep. Vol. I at 172, 174-75, App. A, Tab 1; cf. Defs.' 56(a)1 ¶ 114. (Fago concedes Marquis promoted both white and black Sergeants to Lieutenant following Fago's demotion). Fago also claims that the Police Defendants "have not expressed any legitimate reason for singling him out and discriminating against" him. (Compl. Count One ¶ 42.) Liberally construed, Fago's Complaint could therefore be read to allege either of two types of equal protection claims: disparate treatment based on race or disparate treatment based on an irrational or arbitrary basis. The Court should dismiss Fago's equal protection claim because he cannot show either type of disparate treatment.

"The Equal Protection Clause requires that the government treat all similarly situated people alike." Harlen Assoc. v. Village of Mineola, 273 F.3d 494, 499 (2nd Cir. 2001) (citing

City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)). Traditional equal protection claims are based on allegedly disparate treatment based on some suspect classification, like race. See, e.g., Jackson v. Burke, 256 F.3d 93, 96 (2nd Cir. 2001). A plaintiff must demonstrate that "similarly situated" persons are similarly situated in all material respects. Lyon v. Jones, 260 F. Supp. 2d 507, 513 (D. Conn. 2003) (citing Shumway v. United Parcel Service, Inc., 118 F.3d 60, 64 (2nd Cir. 1997)).

"Successful equal protection claims may [also] be brought by a 'class of one' where the plaintiff alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Russo v. City of Hartford, 184 F. Supp. 2d 169, 190 (2002) (citing Village of Willowbrook v. Olech, 528 U.S. 562, 564-65 (2000)). To survive a motion for summary judgment, a plaintiff must show that:

> (1) a group of similarly situated individuals exists; (2) she was treated differently than the group; (3) the decision maker intentionally treated her differently; and (4) the motivation for the disparate treatment was: (a) based on impermissible reasons such as race; (b) based on ill-will or personal animosity; or (c) made for wholly arbitrary reasons lacking any rational basis.

Payne v. Huntington Union Free Sch. Dist., 219 F. Supp. 2d 273, 278 (E.D.N.Y. 2002).[8]

---

[8] Courts apply the same analysis to alleged violations of the Fourteenth Amendment Equal Protection clause and Title VII. See, e.g., Sorlucco v. New York City Police Dep't, 888 F.2d 4, 7 (2nd Cir. 1989); Jenkins v. Area Cooperative Educ. Servs., 248 F. Supp. 2d 117, 124 (D. Conn. 2003). In particular, courts apply the burden shifting test from McDonnell Douglass Corp. v. Green, 411, U.S. 792 (1973).
"To establish a prima facie case, a plaintiff must show (1) that he belongs to a protected class, (2) that he was qualified for the position, (3) that he was discharged, and (4) that his discharge occurred in circumstances giving rise to an inference of discrimination." Jenkins, 248 F. Supp. 2d at 124 (citing McDonnell Douglas, 411 U.S. at 802). If he or she does so, the defendant then must "offer a legitimate, nondiscriminatory rationale for its actions." Id. If the defendant does offer a non-discriminatory reason for its decision, the burden shifts back to the plaintiff to show that the defendant's stated reason is a mere pretext for discrimination. Id. (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-10 (1993)).
Even assuming arguendo that Fago had presented a prima facie case, as discussed below the Court should dismiss Fago's equal protection claim because Marquis recommended Fago's demotion based on the totality of the circumstances and a pattern of alleged harassing and/or intimidating conduct by Fago, Defs.' 56(a)1 ¶ 94, and Fago has no evidence that this reason was pretextual. (See Fago Dep. IV 600-01, 602-03, App. A, Tab 4.)

### 1.   There Is No Similarly Situated Group.

Fago's equal protection claim must fail because there is no similarly situated group of HPD officers. At the time of his demotion, Fago, a white male, was a probationary Lieutenant. Defs.' 56(a)1 ¶ 107. Pawlina, Jones, and Marquis were his supervisors. Id. ¶ 122. To support his claim of unequal treatment because of his race, Fago alleges that seventeen HPD employees ("Other Officers") were similarly situated and treated differently.[9] Id. ¶ 105.

Eight of the Other Officers, however, are white, and cannot be a group from which Fago was allegedly treated differently because of his race. Id. ¶ 113. Similarly, seven of the remaining nine Other Officers completed probationary periods during the tenure of other Chiefs of Police. Id. ¶ 123. They, too, cannot be a class against which Fago may compare his situation. Cf. Shumway, 118 F.3d at 64 (only employees caught violating company's anti-fraternization policy by new division manager, who enforced policy against plaintiff, provided relevant class of individuals, not those caught but not disciplined by prior division manager).

The remaining officers are former Assistant Chief Vega, a Hispanic, and Assistant Chief McKoy, an African-American. Vega allegedly used slurs relating to other officers' sexual orientation and McKoy allegedly passed through a tollbooth without paying a toll. Defs.' 56(a)1 ¶¶ 124, 125. Although both officers completed probationary periods under Marquis, Vega and McKoy, however, did so at the rank of Assistant Chief of Police, not Lieutenant.[10] Id. ¶ 126. Further, their alleged acts are dissimilar to Fago's alleged physical harassment and intimidation of other officers. Fago has no evidence that their alleged acts even

---

[9] In particular: "Lt. Antonio Cancel; Off. Tracey Carter; Det. Baez/F. Ortiz; Lt. Jose Lopez; Off. Nestor Caraballo; Capt. Buyak; Sgt. O'Donnell; Acting Chief Rudewicz; Dep. Chief Casati; Lt. Kemmett; Sgt. Cherniak; Capt. Jesse Campbell; Assist./Chief Vega; Assist/Chief McKoy; Det. Lawlor/Edelwich." Id. ¶ 105.

[10] The duties and requisite skills and knowledge of an Assistant Chief of Police and a Lieutenant at HPD are very different. See id. at ¶ 128.

occurred, or that they occurred during their probationary periods. Id. ¶ 127. None of the Other Officers, therefore, were similarly situated.

More recently, Fago has claimed that four other African-American HPD employees—John Jones, Paul West ("West"), Chris White ("White"), and Lieutenant Henry Martin ("Martin")—were similarly situated. Id. ¶ 106. They were not. For example, while Fago was a probationary Lieutenant, West and White were probationary police officers, and John Jones was a police cadet; none of them was in a supervisory position. Id. ¶ 129. Their alleged misconduct was also dissimilar to Fago's harassment and intimidation of his colleagues. In particular, Jones was found to have backed an HPD car into another vehicle (for which he was orally reprimanded), id. at ¶¶ 131, 132, West was found to have spit on Windsor Lieutenant's unmarked police car, id. at ¶ 133, and HPD's IAD is currently investigating the incident leading to White's November 30, 2003 arrest involving an alleged domestic dispute, id. at ¶¶ 134, 138, and Lieutenant Martin received an unsatisfactory interim probationary employee evaluation for using 31 sick days during a seven-month period. Id. ¶ 141. Consequently, none of these officers was similarly situated.

Fago's equal protection claim also fails because he cannot show that he was treated worse than the one officer who was in a situation most similar to his own. In particular, Marquis appointed Fago and Sergeant Daniel Albert ("Albert") to the rank of Lieutenant on the same date, May 27, 2001. Id. ¶ 15. Both Fago and Albert were probationary employees during Marquis' tenure. Id. ¶ 17. Marquis later recommended that both Fago and Albert be demoted. Id. ¶¶ 94, 108. Even though they are not similar in every material respect (they reported directly to different Captains, id. at ¶ 110), Fago and Albert's situations are the most similar. Assuming arguendo that they were similarly situated, they were treated similarly. Moreover,