their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818.

Even where a plaintiff's federal rights and the scope of an official's permissible conduct are clearly established, qualified immunity protects a government actor if it was "objectively reasonable" for him to believe that his actions were lawful at the time, Anderson v. Creighton, 483 U.S. 635, 641 (1987); the defendant's subjective belief about his conduct is irrelevant. Cerrone v. Brown, 246 F.3d 194, 202 (2nd Cir. 2001). In contrast, a "police officer's actions are objectively unreasonable, and therefore are not entitled to immunity, when 'no officer of reasonable competence could have made the same choice in similar circumstances.'" Anthony v. City of New York, 339 F.3d 129, 138 (2nd Cir. 2003) (quoting Lennon, 66 F.3d at 420-21)).

Courts should address a defendant's qualified immunity claim before trial. Hunter v. Bryant, 502 U.S. 224, 228 (1991). In particular, summary judgment is appropriate where he or she acted reasonably "under the settled law in the circumstances" regardless of whether "another reasonable, or more reasonable, interpretation of the events can be constructed," id., because "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law." Id. at 229 (internal citation omitted); see also Cerrone, 246 F.3d at 203.

As discussed above, Fago cannot show that the Police Defendants violated his Constitutional rights to equal protection or either procedural or substantive due process. Further, even if he had, the Police Defendants are qualifiedly immune from Fago's claims because Pawlina's investigation of the Stairwell Incident, his decision not to include the Fago Documents, Pawlina and Jones' recommendation that Marquis demote Fago, and Marquis' recommendation that Fago be demoted were each objectively reasonable.

31

Pawlina was Fago's supervisor, (Compl. Count One ¶ 14), and HPD policy directs an accused employee's supervisor to investigate allegations of harassment. Defs.' 56(a)1 ¶ 33. Upon receiving McClure's complaint about the Stairwell Incident, Pawlina acted reasonably by investigating her claim. Indeed, together with his knowledge that Rudewicz had documented an allegation of similarly intimidating and/or harassing conduct by Fago, it was objectively reasonable for Pawlina to investigate McClure's claim.

The Police Defendants are similarly entitled to qualified immunity from Fago's claims that Pawlina improperly omitted the Fago Documents from Pawlina's Investigative Packet. Besides there being no constitutional, statutory, or even contractual right to have certain materials included in an HPD internal investigation, cf. Harlow, 457 U.S. at 818 (conduct violating clearly established constitutional or statutory rights not protected), Pawlina acted objectively in doing so. Nothing in the Fago Documents concerned either the Stairwell Incident itself or addressed allegations by Buyak, Miele or Rudewicz, or those by anyone else interviewed by IAD, of Fago's similarly harassing and/or intimidating conduct; Fago's attempt to discredit McClure and Jobes were irrelevant to the investigation.

Jones' review of that investigation and Marquis' later decision to recommend Fago's demotion were also objectively reasonable, principally because the City's Personnel Rules and Regulations and the probationary employee evaluations show that an probationary employee's interpersonal skills and habits were legitimate and significant factors in Marquis' decision regarding Fago's probationary service. Defs.' 56(a)1 ¶¶ 11, 74.

Finally, Marquis' decision to recommend Fago's demotion was objectively reasonable. Marquis was the only person with authority to make that recommendation and was entitled to rely on the report and recommendations of his subordinates. He received a report from an HPD

Captain that was approved by an Assistant Chief of Police that found allegations by several HPD officers that a probationary employee had harassed or intimidated other officers to be credible. Some of this conduct occurred during Fago's probationary period. It is undisputed that a probationary employee's interpersonal skills are an important criterion in evaluating their fitness for higher rank. There is also no evidence that Marquis had any reason to distrust Jones and Pawlina. Marquis ultimately drew his own conclusions, based on the totality of the circumstances and Fago's apparent pattern of harassing and/or intimidating conduct, and decided to recommend Fago's demotion. Even if there were any basis on which Fago could claim that Marquis acted improperly, which the Police Defendants deny, Marquis's decision was objectively reasonable because it cannot be said that "no officer of reasonable competence could have made the same choice in similar circumstances." Anthony v. City of New York, 339 F.3d 129, 138 (2nd Cir. 2003) (internal citation and quotation marks omitted).[17]

### G. Fago's Section 1983 Claims against the Police Defendants in Their Official Capacities Must Fail (Counts One, Two, and Three).

Fago's claims against the Police Defendants in their official capacities under Section 1983 must be dismissed because public officials acting in their official capacities are not "persons" under Section 1983. Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989); see also Richardson v. Metropolitan Dist. Comm'n, Action No. 3:00-cv-1062(JCH), 2003 U.S. Dist. LEXIS 12757 (D. Conn. July 23, 2003) (recognizing that "an official-capacity suit against a state officer is not a suit against the official but rather is a suit against the official's office" and, as such, "is no different from a suit against the state itself."), App. D, Tab 17.

---

[17] To the extent that Fago makes a Section 1983 claim against Buyak, Rudewicz, and Miele, their actions were at all times objectively reasonable, and therefore they, too, are entitled to qualified immunity.

### H. Fago Cannot Prevail on His Claims against the City (Count Four).

#### 1. Fago's Title VII Claim Fails because He Did Not Exhaust His Administrative Remedies.

Fago's Title VII claim also fails because he did not exhaust his administrative remedies. In particular, he failed to obtain a right to sue letter from the federal Equal Employment Opportunity Commission ("EEOC"). Obtaining a right to sue letter "is a statutory prerequisite to bringing suit in federal court for alleged violations of Title VII." White v. Martin, 23 F. Supp. 2d 203, 205 (D. Conn. 1998) (internal citations omitted) aff'd 198 F.3d 235 (2nd Cir. 1999). This requirement, however, is "subject to waiver, estoppel, and equitable tolling." Id. (citing Zipes v. Trans World Airline, Inc., 455 U.S. 385, 393 (1982).)

Here, Fago testified that he did not know whether he even filed a complaint with the EEOC or the Connecticut Commission on Human Rights and Opportunities ("CHRO") and his counsel stipulated that "there is nothing filed with the EEOC or CHRO for [Fago's] sexual harassment retaliation" or racial complaints. Defs.' 56(a)1 ¶ 167. Moreover, even if he had done so, Fago has neither alleged nor is there any evidence that the principles of waiver, estoppel or equitable tolling apply. (See, e.g., Compl. Count Four ¶¶ 1-7.) The Court should therefore grant summary judgment in the City's favor on Count Four.

#### 2. Fago Also Cannot Prevail on His Section 1983 Claim.

As an initial matter, for the reasons discussed above, Fago cannot establish that any of the individual defendants violated his constitutional rights. Therefore, there is no wrongdoing for which the City can be held liable. However, even if plaintiff could establish that his constitutional rights were violated, the City cannot be held liable for such violations. Under Monell v. New York Department of Social Services, 436 U.S. 658, 694 (1978), a municipality

may only be held liable under 42 U.S.C. § 1983 if a plaintiff proves the existence of: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995) (quoting Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983). Section 1983 does not provide for liability under a theory of respondeat superior. Instead, a municipality is liable only where "deliberate action attributable to the municipality itself is the 'moving force" behind the deprivation of federal rights." Board of County Comm'rs v. Brown, 520 U.S. 397, 400 (1997).

A plaintiff may establish the requisite custom or policy by presenting evidence of: (1) a formal policy found in an ordinance, regulation, or decision officially adopted and promulgated by the [municipality's] officers, Monell, 436 U.S. at 690; (2) actions taken or decisions made by government officials responsible for establishing policy in the particular area of business in which the challenged conduct arises, Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84 (1986); (3) a failure by official policymakers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees come into contact, City of Canton v. Harris, 489 U.S. 378, 388 (1989); and (4) persistent and widespread discriminatory practices which, while not authorized by law, are "so permanent and well-settled as to constitute 'custom or usage' with the force of law." Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68 (1970).

> a. **Marquis and His Subordinates Were Not Final Policymakers Because Their Discretion To Make Personnel Decisions Was Constrained By Pre-Existing HPD Policies.**

Fago is precluded, as a matter of law, from demonstrating that the actions of Marquis or his subordinates establish an official policy or custom of the City because neither Marquis nor his subordinates were final policymakers with regard to such actions. Jeffes v. Barnes, 208

F.3d 49, 57-58 (2d Cir.), cert. denied sub nom. County of Schenectady v. Jeffes, 531 U.S. 813 (2000).

Whether a particular municipal employee is a final policymaker depends on the interpretation of relevant state law. See McMillan v. Monroe City, 520 U.S. 781, 786 (1997). The appropriate inquiry looks to whether the government official has final decision making authority with respect to the particular decision that allegedly deprived the plaintiff of his constitutional rights, not whether the government official has final decision making authority for every type of official action he may engage in. Id. at 785.

Of particular relevance to the present case is Looby v. City of Hartford, 152 F. Supp. 2d 181 (D. Conn. 2001), wherein plaintiff sought, inter alia, § 1983 liability against the City because of the Hartford Fire Chief's alleged improper reasons for not promoting the plaintiff from Lieutenant to Fire Captain. Id. at 183-84. The Looby Court held that even though the City Charter gave the Hartford Fire Chief the discretionary authority to select and promote candidates pursuant to municipal policy requiring promotion for merit and fitness, he was not a final policymaker on personnel promotional issues for purposes of imposing Section 1983 liability on the City:

> [N]owhere in the Charter is the Fire Chief given any power to create policy with respect to employment decisions ... Notably, the chief's powers to appoint or remove are expressly 'subject to' the antidiscrimination provisions of Chapter XVI. In contrast, he is given authority to make rules and regulations concerning the operation of the department, the conduct of its employees and giving effect to laws relating to fire prevention and safety. This type of separation of policy-making authority from discretion in making particular employment decisions is precisely the situation contemplated by the Supreme Court in Pembaur v. City of Cincinnati, 473 U.S. 484 n.12 (1986) ... In other words, a grant of discretion in not equivalent to policy-making authority.

Id. at 188-89 (citations omitted). This analysis is equally applicable here: Marquis' discretionary authority to administer personnel policy adopted by others does not render him a

36

final policymaker for purposes of imposing liability under § 1983. Marquis cannot be deemed to be a final policymaker as a matter of law because in taking the action that he did, he was constrained by policies established in the Personnel Rules and by the Court of Common Council (the "Council") and the City Manager (the "Manager"), which Marquis had no ability to alter. Defs.' 56(a)1 ¶¶ 169-75. Indeed, Marquis was only vested with the authority to "recommend" a demotion; he was not delegated with final policy-making authority in the personnel area. Id. ¶¶ 10, 11, 175.

Marquis's powers as Chief were expressly limited by the scope of the Charter of the City (the "Charter"). Id. ¶ 170. The Charter vests final policy-making authority regarding the organization, the conduct and the operation of all City departments (including the creation of personnel policy) with the Council. Id. ¶ 171. As discussed in Looby, Chapter XVI, § 12 of the Charter provides that "no person in the classified service of the city or seeking admission thereto shall be appointed, promoted, reduced, removed or in any way favored or discriminated against because of his race, his national origin or his political or religious opinions or affiliations." Id. ¶ 172. In addition, Chapter XVI, § 2(e) grants the Director of Personnel the authority to "prepare and recommend to the personnel board rules to carry out the provisions of this chapter." Id. ¶ 173. The Personnel Board is granted the authority to adopt or amend rules recommended by the Director. Id. ¶ 174.

Like the Fire Chief, nowhere in the Charter is the Police Chief given any power to create policy with respect to employment decisions. Chapter X, Section 2 provides:

> The chief of police shall ... subject to the provisions of Chapter XVI of this charter ... appoint and remove all other officers and employees of the department. He shall assign all members of the department to their respective posts, shifts, details and duties. He shall make rules and regulations, in conformity with the ordinances of the city, concerning the operation of the department and the conduct of all officers and employees thereof.

37

Id. ¶ 175. Furthermore, in recommending to the Personnel Director that plaintiff be returned to the rank of sergeant, Marquis was also bound by the anti-discrimination provisions embodied in the policy statements embodied in the City's Affirmative Action and Equal Employment Opportunity Policy[18] and the Personnel Rules.[19] Id. ¶¶ 177, 179.

Based on the foregoing, it is clear that Marquis was not a final policy-maker with respect to Fago's demotion. The provisions of the Charter, the Personnel Rules and the City's Equal Employment Opportunity Policy bound Marquis.[20]

          b.      **There Is No Basis In The Record For Imposing Liability On The City For Any Alleged Failure To Adequately Train Or Supervise.**

In the Fourth Count of the Complaint, it appears that plaintiff attempts to establish a municipal custom or policy by alleging that the City failed to properly supervise its police officers. (Compl. Fourth Count ¶ 6(b).) Fago claims that the various defendants retaliated against him due to his testimony in the various court cases, (see Compl. Count One ¶¶ 16-20, Count Three), and that the City has a history of retaliating against individuals who seek redress from the government. Id. at Count Four ¶¶ 6(c)-(d).

Fago also cannot show that the City's alleged failure to train and/or supervise constituted deliberate indifference to his Constitutional rights. The Supreme Court has ruled that a claim of inadequate training or supervision will trigger municipal liability only where the failure to adequately train or supervise amounts to "deliberate indifference" to the rights of

---

[18] The Affirmative Action and Equal Employment Opportunity Policy states that "it is the policy of the City of Hartford ... to uniformly apply criteria for recruitment, selection, assignment, evaluation, compensation, promotion, discipline and other personnel actions without regard to race, color, sex, religion, national origin, age, mental or physical disability, sexual orientation, marital status or ancestry." Def. 56(a)1 ¶ 178.

[19] Personnel Rule XIV(4) provides that "[n]o person in the classified service of the City or seeking admission thereto shall be favored or discriminated against in any way because of his race, color, national origin, marital status or political or religious opinions...." Def. 56(a)1 ¶ 179.

38

those with whom municipal employees will come into contact. City of Canton v. Harris, 489 U.S. 378, 388 (1989). The phrase "deliberate indifference" means more than "simple or even heightened negligence"; it involves a "conscious disregard [on the part of the municipal employers] for the consequences of their action." Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 407 (1997). Courts hold Section 1983 plaintiffs to such a high standard for establishing "deliberate indifference" because "[i]n virtually every instance where a person has had his or her constitutional rights violated by a [municipal] employee, a Section 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident. Canton, 489 U.S. at 392. Thus, if a Section 1983 plaintiff could establish municipal liability for failure to train by merely showing that the municipality could have done something to prevent the incident in issue, federal courts would be engaged "in an endless exercise of second-guessing municipal employee training programs." Id. Because it is not the court's function to "micro-manage municipal police departments," liability for a municipality's failure to train will not be imposed absent "evidence of a constitutional infirmity." Fincher v. County of Westchester, 979 F. Supp. 989, 1099 (S.D.N.Y. 1997).

The Second Circuit has established a three-prong test that a plaintiff must satisfy in order to prove that a municipality's alleged failure to adequately train or supervise amounted to a deliberate indifference to citizens' constitutional rights. Walker v. City of New York, 974 F.2d 293, 297 (2d Cir.). First, the plaintiff must show that the policymaker knows to a "moral certainty" that his or her employees will confront a given situation. Thus, as the Second Circuit cautioned, a policymaker does not exhibit deliberate indifference by failing to train employees

---

[20] The City's former Personnel Director, Patricia Washington, also could not be considered a policymaker because she too was bound by the Charter, Personnel Rules and Equal Employment Opportunity Policy.

39

for rare or unforeseen events. Id. Second, the plaintiff must establish that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult, or that there is a history of employees mishandling the situation. Id. Finally, the plaintiff must show that the wrong choice by the city employee will frequently result in the deprivation of a citizen's constitutional rights. Id. at 298. This allows "municipal policymakers ... to appropriately concentrate training and supervision resources on those situations where employee misconduct is likely to deprive citizens of constitutional rights." Id.

Plaintiff cannot satisfy any of the three factors under Walker. Specifically, plaintiff cannot establish that the failure to train police officers not to retaliate against their colleagues based on speech protected under the First Amendment would likely result in such retaliation not being carried out. Put another way, simple common sense instructs that a police officer entrusted with public safety should not be devoting his energy to retaliating against another police officer. Any police officer should be acutely aware of this fact. As such, training and/or supervision with respect to this issue would be utterly superfluous: "Where the proper response ... is obvious to all without training or supervision, then [any alleged failure to train or supervise is generally not 'so likely' to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise." Walker, 974 F.2d at 299-300.

Furthermore, there is no evidence in the record to establish that the City policymakers – specifically, the Manager or the Council – were aware of a pattern of First Amendment retaliation being carried out by police officers against their colleagues or subordinates, so as to make readily apparent the need for training and/or supervision in this area. Plaintiff alleges that, upon information and belief, the City has retaliated against Detectives Michael Perodeau,

Nicholas Russo and John Murdock for seeking redress from the government. (Compl. Count Four ¶ 6(d).) While all of these individuals brought lawsuits against the City, <u>none</u> of them has resulted in a finding of retaliation. Defs.' 56(a)1 ¶¶ 180-82. In fact, Perodeau and Murdock have had their claims against the City and various police officials dismissed, while Russo's lawsuits are still pending.[21] Accordingly, plaintiff has no admissible evidence to establish that there was a history of police officers retaliating against other officers, much less that the City policymakers were aware of such a history. Plaintiff's § 1983 claim against the City should be dismissed.

### I. Fago's State Common Law Claims Must Fail as a Matter of Law (Counts Five and Six).

Fago claims in Count Five of his Complaint that the "defendants, each and all of them, intended to inflict severe emotional distress upon the plaintiff [and that their] acts and omissions . . . were extreme and outrageous." (Compl. Count Five ¶¶ 3, 4.)[22] In Count Six, Fago claims that Buyak, Rudewicz, and Miele defamed him by "intentionally making false

---

[21] On March 31, 2004, this Court dismissed Perodeau's claims against the City and various police officials. Defs.' 56(a)1 ¶ 180. With respect to the <u>Murdock</u> case, on April 27, 2004, the Connecticut Supreme Court affirmed the judgment of the trial Court setting aside a jury verdict in favor of the plaintiff and rendering judgment for the defendant notwithstanding the verdict. <u>Id.</u> ¶ 181. Russo has three lawsuits currently pending against the City of Hartford and various police officials. <u>Russo v. City of Hartford</u>, Civil No. 3:97-cv-2380, <u>Russo v. Bailey</u>, Civil No. 3:00-cv-1794(JCH), and <u>Russo v. Marquis</u>, Civil No. 3:00-cv-2382(JCH). Summary judgment motions are pending in all three cases. <u>Id.</u> ¶182.

[22] Fago's intentional infliction of emotional distress claim is actually against Buyak, Miele, and Rudewicz only. Defs.' 56(a)1 ¶ 183; <u>cf.</u> Fago Dep. Vol. IV 531-33, App. A, Tab 4 (Fago unable to identify specific acts by Police Defendants purportedly supporting his claim).) Initially, therefore, the Court should grant summary judgment in favor of Marquis, Jones, and Pawlina on Count Five.

Even assuming <u>arguendo</u> that Fago had made this allegation against Marquis, Jones, and Pawlina for what he claims was a malicious and incomplete investigation leading to his demotion, (see Compl. Count One ¶ 25, Count Two ¶ 2, Count Three ¶ 3) the Court should still dismiss the claim. <u>Cf.</u> <u>Carrol v. Allstate Ins. Co.</u>, 262 Conn. 433, 444, 815 A.2d 119 (2003) ("The plaintiff produced evidence that the defendant did not conduct a thorough or reasoned investigation and may have decided too quickly that the fire had been set deliberately. As distressing as this insurance investigation may have been to the plaintiff, however, it simply was not so atrocious as to trigger liability for intentional infliction of emotional distress."); <u>Parsons v. United Tech. Corp.</u>, 243 Conn. 66, 89, 700 A.2d 655 (1997) ("The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior.")

misstatements and omissions of material facts" in their IAD interviews. (Compl. Count Six ¶ 3; Defs.' 56(a)1 ¶ 184.)

### 1. There Is No Support for Fago's Intentional Infliction of Emotional Distress Claim (Count Five).

Here, Fago claims that a portion of Buyak's IAD statement was extreme and outrageous and that Miele and Rudewicz "lied in concert to get language written down to seem like a pattern." App. D, Tab 14 at No. 11 (Pl.'s Resps. To City & Police Defs.' First Set of Interrogs.). The Court should nevertheless grant summary judgment to Buyak, Miele, and Rudewicz because there is no evidence of three essential facts: (1) that Buyak, Miele or Rudewicz's alleged conduct was extreme or outrageous; (2), that they intended to inflict such distress on Fago; and (3) that Fago's distress was severe.

To prevail on this claim Fago must prove: (1) that these defendants intended to inflict emotional distress or knew or should have known that emotional distress was a likely result of their conduct; (2) that the conduct was extreme and outrageous;[23] (3) that their conduct was the cause of Fago's distress; and (4) that Fago's emotional distress was severe. See Appleton v. Bd. of Educ., 254 Conn. 205, 210, 757 A.2d 1059 (2000) (citing Petyan v. Ellis, 200 Conn. 243, 253 (1986)). "Whether the [defendants'] conduct is sufficient to satisfy the elements of extreme and outrageous conduct is a question, in the first instance, for the Court." Stack v.

---

[23] "Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society" so as to be "regarded as atrocious, and utterly intolerable in a civilized community." Appleton v. Bd. of Educ., 254 Conn. 205, 211, 757 A.2d 1059 (2000) (internal citations omitted). In other words, it is generally the case where "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Id.; see also Keene v. Hartford Hosp., 208 F. Supp. 2d 238, 247-48 (D. Conn. 2002) (internal quotation marks and citations omitted).
    In particular, the plaintiff "must prove conduct considerably more egregious than that experienced in the rough and tumble of everyday life[;] . . . [l]iability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions or other trivialities." Appleton, 254 Conn. at 211. The standard in Connecticut to demonstrate extreme and outrageous conduct is stringent. Russo v. City of Hartford, 184 F. Supp. 2d 169, 188 (D. Conn. 2002) (internal citation omitted).

Perez, 248 F. Supp. 2d. 106, 110 (D. Conn. 2003). "Only where reasonable minds would differ, does it become a question for the jury." Id. (internal citations omitted).

During his IAD interview, Buyak told IAD investigators, among other things, that "I deem [Fago] . . . a loose cannon. He's the type of guy who I think someday will go on the roof of a building with a weapon and start taking shots at people. I see him as unstable. And have always seen him as unstable." Pawlina Decl. ¶ 6, id. at Exh. A at Pawlina 100. Miele and Rudewicz reported to IAD investigators that Fago had harassed or intimidated them. Id. at Exh. A at Pawlina 38-50 (Rudewicz), 93-97 (Miele). These statements are not intolerable to civil society. Cf. Appleton v. Bd. of Educ., 254 Conn. 205, 211, 757 A.2d 1059 (2000) (conduct must be atrocious and utterly intolerable) (internal citations omitted). While Fago may find them insulting or an indignity, they are not the type of statement that is so outside the rough and tumble of everyday life—especially life in a police department. Cf. id. More specifically, it is not extreme or outrageous for police officers directed to participate in a HPD internal investigation of Fago's conduct to report their observations and beliefs about Fago's allegedly harassing and intimidating behavior. Indeed, considering society's decision, or public policy, recognized by the absolute privilege (discussed below) protecting such statements, Fago's claim that these statements were beyond all bounds tolerated by decent society is baseless and must fail. There is also no evidence that Buyak, Miele or Rudewicz intended to cause him emotional distress. Indeed, Fago failed to even depose Miele and Rudewicz in this case.

Finally, Fago cannot show that his claimed emotional distress was severe. Cf. Appleton, 254 Conn. at 210 (plaintiff must prove he suffered severe emotional distress). In particular, Fago saw Dr. Mark Hall, a psychologist, six times between June and November

2002. Defs.' 56(a)1 ¶ 185. This is the only treatment Fago sought for his claimed emotional distress. (See Fago Dep. Vol. II 229, App. A, Tab 2.) Over the course of their six sessions, Dr. Hall repeatedly described Fago's apparent and reported symptoms as "mild". Defs.' 56(a)1 ¶ 187. He also noted that Fago did not "report symptoms of significant depression [or] suicidal thoughts," and that Fago had, because of his "changing schedule[,] some long-standing sleep problems."[24] Id. The undisputed evidence therefore shows that Fago did not suffer severe emotional distress and the Court should consequently grant summary judgment in favor of the Police Defendants on Count Five.

### 2. Buyak, Miele, and Rudewicz Cannot be Held Liable for Stating Their Opinions about Fago (Count Six).

Fago's defamation claim must also fail because Buyak, Miele, and Rudewicz's statements to IAD investigators were statements of opinion. In particular, Fago claims that "each defendant made statements to [IAD investigators] that [Fago] was intimidating, harassing and physically threatening." (Compl. Count Six ¶ 3; see also Fago Dep. Vol. III 354-57, 367-68, App. A, Tab 3 (statements to IAD investigators and interrogatory responses are only bases for defamation claim).)

"To prevail on a common-law defamation claim, a plaintiff must prove that the defendant published false statements about her that caused pecuniary harm. To be actionable, the statement in question must convey an objective fact, as generally, a defendant cannot be held liable for expressing a mere opinion." Daley v. Aetna Life & Cas. Co., 249 Conn. 766, 796-797, 734 A.2d 112 (1999); see also Hotchner v. Castillo-Puche, 551 F.2d 910, 913 (2nd Cir.1977) ("[a] writer cannot be sued for simply expressing his opinion of another person,

---

[24] Dr. Hall's conclusions were similar to those of Dr. Kenneth Selig, a psychiatrist to whom Fago was referred by Marquis for a May 6, 2002 fitness for duty examination. Defs.' 56(a)1 ¶ 188. In particular, Dr. Selig observed that there was no "evidence of major mental illness . . . [or] depression, or undue anxiety." Id. ¶ 190.

44

however unreasonable the opinion or vituperous the expressing of it may be."). However much Fago may contest the veracity of or the motivation for Buyak, Miele, and Rudewicz's statements described above, these defendants "cannot be sued for simply expressing [their] opinion . . . however unreasonable the opinion or vituperous the expressing of it may be." Hotchner, 551 F.2d at 913. The Court should therefore dismiss Count Six.

### 3. Connecticut's Absolute Privilege for Statements Made in Quasi-Judicial Proceedings Bar Both Fago's Intentional Infliction of Emotional Distress and Defamation Claims (Counts Five and Six).

Moreover, Connecticut's absolute privilege for statements made in quasi-judicial proceedings entitle the Police Defendants to summary judgment on both Fago's intentional infliction of emotional distress and defamation claims. See Petyan v. Ellis, 200 Conn. 243, 246-47, 254, 510 A.2d 1337 (1986) (recognizing privilege bars both types of claims); Alexandru v. Dowd, 79 Conn. App. 434, 438 & n.4, 830 A.2d 352 (Conn. App. 2003) (same) appeal denied by 266 Conn. 925, 835 A.2d 471 (2003).

In Craig v. Stafford Const., Inc., 78 Conn. App. 549, 827 A.2d 793 (Conn. App. 2003) (Peters, J.) cert. granted 266 Conn. 916 (2003), the court considered "whether an internal affairs investigation conducted by the Hartford police department is a quasi-judicial proceeding so that statements made in the course of such a proceeding are entitled to an absolute privilege." Id. at 550. There, the plaintiff police officer claimed that, during an IAD investigation, two individual defendants "knowingly and falsely had accused him of having made derogatory racial comments." Id. The court affirmed the lower court's ruling granting summary judgment to the defendants for two reasons.

First, the IAD investigative process resembled a judicial proceeding. In particular, its witness interviews, investigators' ability to compel an accused officer to submit a report,