UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MICHAEL J. FAGO,<br>Plaintiff, | : | |
| | : | CIVIL ACTION NO.<br>3:02-cv-1189 (AHN) |
| vs. | : | |
| | : | |
| CITY OF HARTFORD, ET AL.<br>Defendants. | : | April 30, 2004 |

### CITY OF HARTFORD, BRUCE MARQUIS, KEVIN JONES, MARK PAWLINA, JOSEPH BUYAK, MARK RUDEWICZ AND STEPHEN MIELE'S LOCAL RULE 56(a)1 <u>STATEMENT IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Local Civil Rule 56(a)1 of the United States District Court for the District of Connecticut, defendants City of Hartford ("City"), Bruce Marquis, Kevin Jones, Mark Pawlina, Joseph Buyak, Mark Rudewicz, Stephen Miele (the "Police Defendants") respectfully submit this Statement of Facts Not in Dispute in support of their Motion for Summary Judgment.

1. In 1986, the plaintiff, Michael Fago ("Fago"), joined the City of Hartford Police Department ("HPD") as a cadet. Second Amended Complaint dated July 29, 2003 ("Compl.") Count One ¶ 11; Answer and Affirmative Defenses to Second Amended Complaint, dated August 22, 2003 ("Ans.") Count One ¶ 11.

2. During his service as a cadet, Fago struck a HPD officer with enough force to knock the officer unconscious. Fago Deposition Transcript, May 14, 2003, ("Fago Dep. Vol. I") 20-21, App. A, Tab 1.[1]

3. In 1987, Fago became a sworn HPD officer. Compl. Count One ¶ 13; Ans. Count One ¶ 13.

4. In 1995, Fago was promoted to the rank of Sergeant. Compl. Count One ¶ 13; Ans. Count One ¶ 13.

5. On May 27, 2001, Fago began a one-year probationary period at the rank of Lieutenant. Compl. Count One ¶ 13; Ans. Count One ¶ 13.

6. Exhibit D to the Declaration of Colleen Kenton is a true and accurate copy of the Collective Bargaining Agreement ("CBA") between the City of Hartford and the Hartford Police Union ("Union") that was in effect during 2001 and 2002. Declaration of Colleen Kenton ("Kenton Decl.") ¶ 26, App. B, Tab 1; id. at Exh. D.

7. The CBA states that "no probationary employee in any promotional classification shall have access to the grievance procedure where the issue is one of their demotion." Id. at ¶¶ 26, 39; id. at Exh. D at § 1.8, App. B, Tab 2; id. at Exh. S; see also Fago Dep. Vol. I 30-31, App. A, Tab 1.

---

[1] Fago's deposition was taken in four installments, and all four transcripts are attached in Appendix A ("App. A").

8. Section 1.10 of the CBA states that "[p]robationary status shall be as provided in the Personnel Rules and Regulations ("Personnel Rules")." Kenton Decl. ¶ 26, App. B, Tab 2; id. at Exh. D at § 1.10.

9. Exhibit A to the Declaration of Joyce Chin is a true and accurate copy of the Personnel Rules that were in effect during 2001 and 2002. Declaration of Joyce Chin ("Chin Decl.") ¶ 5, App. B, Tab 1; id. at Exh A; see also Kenton Decl. ¶ 27, App. B, Tab 2; id. at Exh. E.

10. Section 4 of Rule IX of the Personnel Rules ("Rule IX") allows the Chief of Police to recommend the removal of a probationary employee if "in his opinion" the employee will not or cannot continue to perform in the probationary rank or if the employee's "habits and dependability do not merit his [or her] continuance in the service." Chin Decl. ¶ 5, App. B, Tab 1; id. at Exh. A at Rule IX § 4.

11. Rule IX also establishes a process for the dismissal of a probationary employee: an appointing authority can recommend in writing to the City's Personnel Director ("Director") that a probationary employee not continue in his or her probationary position "if in his opinion the working test indicates that such employee is unable or unwilling to perform the duties of the position satisfactorily or that his habits and dependability do not merit his continuance in the service." Id. ¶ 5; id. at Exh. A at Rule IX § 4.

---

The transcripts are as follows: App. A, Tab 1 (Fago Dep. Vol. I); id. at Tab 2 (Fago Deposition Transcript, August 7, 2003 ("Vol. II"); id at Tab 3 (Fago Deposition Transcript, January 22, 2004 ("Vol. III"); id. at Tab 4 (Fago Deposition Transcript, February 4, 2004 ("Vol. IV").

12. If the Director concurs, the probationary employee is removed from his or her probationary position and, if applicable, returned to his or her former position. Id. ¶ 5; id. at Exh. A at Rule IX § 4.

13. If the Director approves of his recommendation that the employee be demoted, the Chief of Police must give the probationary employee both two weeks notice and a copy of his recommendation to the Director of Personnel. Id. ¶ 5; id. at Exh. A at Rule IX §§ 3, 4.

14. Exhibit A to the Declaration of Colleen Kenton is a true and accurate copy of the Certification List from which former Chief Marquis appointed HPD Lieutenants on May 27, 2001 ("May 27, 2001 Certification List"). Kenton Decl. ¶ 22, App. B, Tab 2; id. at Exh. A.

15. The May 27, 2001 Certification List reflects that the following officers were appointed to the rank of Lieutenant on May 27, 2001: John Betz; Daniel Albert; Edward Moehringer III; Brian Heavren; Michael Fago; Joseph Sikora; and Gordon Jones. Id. at ¶ 22; id. at Exh. A. Six of these seven officers are white males; Gordon Jones is an African-American male. Id. at ¶ 22.

16. Pursuant to City of Hartford and HPD policy and practice, Marquis reviewed the list of eligible Sergeants on the May 27, 2001 Certification List and appointed them to the rank of Lieutenant based on their order of appearance on the Certification List: he would select or not select the first individual listed, continuing down the list, until he had appointed a number of individuals equal to the number of positions available. Carlson Decl. ¶¶ 6,7, App. D, Tab 3.

17. Both Fago and Albert were probationary employees during Marquis' tenure. <u>Id.</u> at ¶ 22.

18. Exhibit A to the Declaration of Acting Chief and then-Captain Mark Pawlina ("Pawlina") is a true and accurate copy of the memorandum dated April 25, 2002 and supporting materials ("Investigative Packet") that Pawlina prepared in connection with his investigation of both a February 25, 2002 incident involving Fago and HPD Lieutenant Nancy McClure ("McClure") and an alleged pattern of harassing and intimidating conduct by Fago. Declaration of Mark Pawlina ("Pawlina Decl.") ¶ 6, App. C, Tab 1; <u>id.</u> at Exh. A.[2] This Exhibit includes, among other things, transcripts of several interviews conducted at HPD's Internal Affairs' office. <u>Id.</u> at ¶ 6; <u>id.</u> at Exh. A.

19. In a memorandum to Pawlina dated September 5, 2001, then-Sergeant Mark Rudewicz ("Rudewicz") reported allegedly harassing and intimidating behavior by Fago. Rudewicz stated in this memorandum that Fago had cleared his throat as Rudewicz passed the door of the room in which Fago was sitting, that Fago then made an "awkward facial expression," and approached Rudewicz as he stood at a water cooler and began to hum. <u>Id.</u> at ¶ 6; <u>id.</u> at Exh. A at Pawlina 125. Rudewicz also wrote that "I believe the Lieutenant[']s intentions were to harass and intimidate me." <u>Id.</u> at ¶ 6; <u>id.</u> at Exh. A at Pawlina 125.

---

[2] The pages within the Investigative Packet are Bates stamped Pawlina 33 through Pawlina 261. For convenience, the City and Police Defendants cite to the Bates stamp number, <u>i.e.</u> Pawlina 100, when referring to documents contained in the Investigative Packet.

20. Pawlina took no action against Fago based solely on Rudewicz's September 5, 2001 report. Id. at ¶ 6; id. at Exh. A at Pawlina 36.

### The February 25, 2002 Stairwell Incident

21. At approximately 1:40 PM on February 25, 2002, McClure was talking with HPD Sergeant Scott Sansom ("Sansom") in a stairwell at HPD headquarters. Id. at ¶ 6; id. at Exh. A at Pawlina 33. Lieutenant Mark Francis ("Francis") and Detective Thomas Zemienieski ("Zemienieski"), both of the Windsor Police Department, were also in the stairwell at the time, (Id. at ¶ 6; id. at Exh. A at Pawlina 33-34), when Fago entered the stairwell and made physical contact with McClure (the "Stairwell Incident"). Id. at ¶ 6; id. at Exh. A at Pawlina 33.

22. Fago testified that he does not claim that Marquis, Jones or Pawlina were biased against him before the Stairwell Incident. Fago Dep. Vol. I 44, 47-49.

23. Fago testified that he had not had any confrontations with Jones before the Stairwell Incident. Id. at 41-44, 591.

### Pawlina's Investigation

24. McClure reported the Stairwell Incident to Pawlina in a memorandum dated February 26, 2002, stating that Fago had intentionally made physical contact with her. Pawlina Decl. ¶ 6, App. C, Tab 1; id. at Exh. A at Pawlina 124.

25.  On March 1, 2002 McClure verbally reported her claim to Pawlina, claiming that Fago shoved her hard enough to knock her pocketbook from her shoulder. Id. at ¶ 6; id. at Exh. A at Pawlina 124, 138.

26.  Besides describing the Stairwell Incident, McClure told Pawlina that Fago had previously intimidated and harassed her, that he had done so to other HPD officers, including Captain Joseph Buyak ("Buyak"), now-Lieutenant Stephen Miele ("Miele"), Rudewicz, then-Officer Patrick Jobes ("Jobes"), Officer Robert Russell ("Russell") and Officer Steve Maticke, and that Lieutenant Harold Even ("Even") knew of Fago doing so to other HPD officers. Id. at ¶ 6; id. at Exh. A at Pawlina 34, 35-36.

27.  In a memorandum to Pawlina dated March 1, 2002, Sansom reported that he saw Fago in the stairwell on February 25, 2002 but did not see any physical contact between Fago and McClure. Id. at ¶ 6; id. at Exh. A at Pawlina 35, 134.

28.  On March 3, 2002, McClure reported to Pawlina that earlier that morning Fago had driven his car past her in the HPD parking lot in a manner that she believed was meant to intimidate her. Id. at ¶ 6; id. at Exh. A at Pawlina 34. Later that day, Pawlina met with Fago to discuss McClure's claims, at which time Pawlina explained that he was investigating both the Stairwell Incident and whether there was a pattern of harassing and/or intimidating conduct by Fago. Id.

29. Fago testified that he had a professional relationship with Pawlina before the Stairwell Incident and he believed that Pawlina would conduct a fair and thorough investigation. Fago Dep. Vol. I 36-37, 124, App. A, Tab 1.

30. The Chief of Police has discretion concerning whether HPD's Internal Affairs Division ("IAD") or another HPD division or officer conducts individual investigations. Reilly Deposition Transcript ("Reilly Dep.") 28, 29, App. D, Tab 10.

31. Pawlina performed his investigation pursuant to HPD's anti-harassment policy, with the help of IAD staff. Pawlina Decl. ¶¶ 4, 5, App. C, Tab 1; Jones Deposition Transcript ("Jones Dep.") 59-65, 76, App. D, Tab 4; see also Kenton Decl. ¶ 37, App. B, Tab 2; id. at Exh. Q (Anti-harassment policy).

32. Exhibit F to the Declaration of Colleen Kenton is a true and accurate copy of Hartford Police Department Policy and Procedure Order 3-2. Kenton Decl. ¶ 28, App. B, Tab 2; id. at Exh. F.

33. Hartford Police Department Policy and Procedure Order 3-2 III.A.2. (Internal Investigations—Interviewing of Employees) provides that "complaints alleging improper arrest procedures, discourtesy, harassment, neglect of duty, or conduct unbecoming an officer/employee, [are] controlled through the IAD and investigated by supervisory personnel assigned to the subject employee's Division." Id.

34. During a March 5, 2002 interview with Pawlina, Windsor Detective Zemienieski stated that he saw Fago bump into McClure on February 25, 2002 but was unsure whether it was intentional. Pawlina Decl. ¶ 6, App. C, Tab 1; id. at Exh. A at Pawlina 35, 133.

35. During a March 15, 2002 interview with Pawlina, Windsor Lieutenant Francis explained that he did not see any physical contact between Fago and McClure on February 25, 2002 because he was walking up the stairs and facing the opposite direction. Id. at ¶ 6; id. at Exh. A at Pawlina 35.

36. On March 11, 2002, considering the similarity of McClure and Rudewicz's claims and McClure's allegation that Fago had harassed several other officers, Pawlina sent interrogatories to all lieutenants and sergeants working in HPD's Patrol Division. Id. at ¶ 6; id. at Exh. A at Pawlina 36.

37. Interrogatories are a standard HPD investigative tool. Calderone Deposition Transcript ("Calderone Dep.") at 21, App. D, Tab 9; cf. Carlson Deposition Transcript ("Carlson Dep.'") 90-91 (such interrogatories were not unprecedented), App. D, Tab 7.

38. Pawlina's March 11, 2002 interrogatories asked, in part: "Have you ever observed, witnessed, or been a victim of any type of harassment, intimidation, or violence in the workplace by Lieutenant Michael Fago? . . . If the answer to [the preceding question] is yes, describe what occurred in detail." Pawlina Decl. ¶ 6, App. C, Tab 1; id. at Exh. A at Pawlina 37, 135.

39. In separate replies to these interrogatories dated March 17, 2002, Jobes and Miele reported instances in which they claimed Fago harassed or intimidated either them or others. Id. at ¶ 6; id. at Exh. A at Pawlina 126-27, 130-32.

40. In an April 2, 2002 memorandum responding to Pawlina's March 11, 2002 interrogatories, Even reported that he had observed Fago harassing and/or intimidated other officers. Id. ¶ 6; id. at Exh. A at Pawlina 128-29.

41. Between March 1 and April 2, 2002, Pawlina periodically discussed his investigation's status with Jones. Pawlina Deposition Transcript ("Pawlina Dep.") 70-74, 76, App. D, Tab 8.

42. Between April 2 and 8, 2002, Pawlina asked that HPD's Internal Affairs Division ("IAD") interview Buyak, Rudewicz, Miele, McClure, Russell, Jobes, Even, and Sergeant Arthur Maglieri ("Maglieri"). Pawlina Decl. ¶ 6, App. C, Tab 1; id. at Exh. A at Pawlina 37; Jones Dep. 59, App. D, Tab 4; see also id. at 62-65.

43. IAD investigators interviewed Buyak, Rudewicz, Miele, McClure, Russell, Jobes, Even, and Maglieri between April 8 and 11, 2002. Pawlina Decl. ¶ 6, App. C, Tab 1; id. at Exh. A at Pawlina 37.

### IAD Interviews

44.     On April 8, 2002, Rudewicz met with IAD investigators. Id. at ¶ 6; id. at Exh. A at Pawlina 39. During this interview he stated that Fago had harassed him after he dated Fago's former and current girlfriend, Laura Buyak. Id.

45.     Laura Buyak is also a Hartford police officer and the sister of Joseph Buyak, a defendant in this case. Buyak Deposition Transcript ("Buyak Dep.") 7, App. D, Tab 13.

46.     Rudewicz reported to IAD investigators ten incidents between 1994 and 2002—including two episodes during Fago's probationary period—in which Fago had allegedly harassed or intimidated him, including one 2001 incident in which Fago physically bumped into him in a HPD headquarters hallway. Pawlina Decl. ¶ 6, App. C, Tab 1; id. at Exh. A at Pawlina 49-50, 125.

47.     During his IAD interview, Rudewicz also referred to Fago as "cunning like a fox," "a very calculating person" and "devious." Id. at ¶ 6; id. at Exh. A at Pawlina 39.

48.     In his April 10, 2002 IAD interview, Buyak described an April 21, 1993 incident for which he disciplined Fago. Id. at ¶ 6; id. at Exh. A at Pawlina 99. In particular, Buyak reported that Fago "referr[ed] to me as a cunt just went off sort of on a tirade with me. Said he was better than me and my family members. He called my, he referred to my sister as a whore just like [my aunt and fellow police officer Barbara Morriarty] and referred to me as a piece of shit." Id.

49.     During his IAD interview, Buyak also described instances where Fago would "walk by me and grin ear to ear, make these grunts as he walked by, there was one occasion I remember specifically where he did that, he walked by and ma[d]e these grunts and he's groaning sort of sounds, certainly to get my attention." Id. at ¶ 6; id. at Exh. A at Pawlina 100.

50.     Buyak also told IAD investigators that "I deem [Fago] . . . a loose cannon. He's the type of guy who I think someday will go on the roof of a building with a weapon and start taking shots at people. I see him as unstable. And have always seen him as unstable." Id. at ¶ 6; id. at Exh. A at Pawlina 100.

51.     During his April 11, 2002 IAD interview, Miele stated that Fago had harassed and intimidated him because of his prior relationship with Laura Buyak. Id. at ¶ 6; id. at Exh. A at Pawlina 94. For example, Miele described how if "you're in the hallway he'll try steering you down, uh, kind of walk up the hallway towards you and try to make contact with you," id., and reported an incident in which Fago bumped into then-Assistant Chief Ward at a picket line at the Meadows Music Theatre. Id.; see also id. at Exh. A at Pawlina 60 (Jobes reporting same incident).

52.     During his IAD interview, Miele also stated that Fago would try to provoke him to fight, in part by using profane and derogatory language. Id. at ¶ 6; id. at Exh. A at Pawlina 94, 97.

53.     Miele also stated during his IAD interview that Fago would "try to bully you," (Id. at ¶ 6; id. at Exh. A at Pawlina 94) referred to Fago as "a dangerous guy," (id. at Exh. A at

Pawlina 95), and explained that Fago was earlier "trying to intimidate me trying to entice me into fights." Id. at ¶ 6; id. at Exh. A at Pawlina 97.

54. During his April 8, 2002 IAD interview, Russell stated that Fago made intimidating gestures when Fago and Russell were in a federal court house for a lawsuit involving the process through which the HPD appoints Sergeants ("Sergeants' Case"), (Id. at ¶ 6; id. at Exh. A at Pawlina 52, 55), and that Fago had arbitrarily changed Russell's duty assignments and unnecessarily contacted him at home. Id. at ¶ 6; id. at Exh. A at Pawlina 53.

55. During his April 8, 2002 IAD interview, Jobes reported that Fago had physically bumped into him on more than one occasion at the federal courthouse during the Sergeants Case. Id. at ¶ 6; id. at Exh. A at Pawlina 58-59, 68.

56. Jobes also said during his IAD interview that Fago had bumped into the chair in which Jobes was sitting and leaned on Jobes while McClure was explaining a HPD computer program to him at HPD headquarters. Id. at ¶ 6; id. at Exh. A at Pawlina 64.

57. During her April 11, 2002 IAD interview, McClure stated that Fago had shoved her during the Stairwell Incident. Id. at ¶ 6; id. at Exh. A at Pawlina 84.

58. McClure also described several instances in which she believed Fago had harassed or intimidated her, including two episodes following the Stairwell Incident in which Fago had allegedly stalked her in the HPD parking lot. Id. at ¶ 6; id. at Exh. A at Pawlina 91;

see also id. at Exh A at Pawlina 85-86 (episodes of Fago walking repeatedly and unnecessarily past the doorway to "608", the office where McClure was working).

59. On April 22, 2002, Pawlina interviewed Fago at the IAD office. Id. at ¶ 6; id. at Exh. A at Pawlina 105. IAD's Commander and a Union representative also attended the interview. Id. Pawlina explained that he was investigating both the Stairwell Incident and whether there was a pattern of harassing and/or intimidating conduct by Fago. Id. at ¶ 6; id. at Exh. A at Pawlina 108.

60. Although Fago admitted that he bumped into McClure during the Stairwell Incident, he denied that the contact was intentional. Id. at ¶ 6; id. at Exh. A at Pawlina 106.

### Pawlina's Report

61. On April 25, 2002, Pawlina submitted his Investigative Packet to Jones regarding the Stairwell Incident. id. at ¶ 6; id. at Exh. A at Pawlina 1-261; Jones Dep. 50 App. D, Tab 4.

62. Although Fago had given Pawlina certain documents during Pawlina's investigation (Fago Documents"), Pawlina excluded these documents from his Investigative Packet because they did not prove or disprove McClure's allegation about the Stairwell Incident or allegations by other HPD officers of Fago's harassing conduct. Pawlina Decl. ¶ 7, App. C, Tab 1.

63. Pawlina interpreted the documents Fago had given him as Fago's attempt to generally discredit McClure. Id.

64. Pawlina's report, in part, stated that:

> It is important to note that I did in fact receive a written memorandum during the summer of 2001 [] from Sgt. Mark Rudewicz regarding some unusual conduct regarding Lt. Fago that Sgt. Rudewicz felt was harassing and intimidating. The behavior described was similar to the behavior being described by Lt. McClure. . . . After talking to Sgt. Rudewicz about the incident he stated that Lt. Fago does this regularly to people he does not like. Sgt. Rudewicz stated that he only wished to have the incident documented, and because the incident described appeared vague, and not overtly harassing or intimidating, no further action was taken.
>
> Because the conduct of Lt. Fago described by Lt. McClure was similar to what was described by Sgt. Mark Rudewicz, almost a year apart, and totally independent of each other, I believed it to be an important connection, or pattern, of behavior.

Id. at ¶ 6; id. at Exh. A at Pawlina 36.

65. In his report, Pawlina wrote that "there is sufficient information to corroborate the allegations made of harassment, and intimidation in the workplace by Lt. Michael Fago. I see a clear pattern of intentional, sometimes overt, and sometimes covert, conduct on the part of Lt. Fago," based on the IAD statements by Buyak, Miele, Rudewicz, Russell, Jobes, Even, and McClure. Id. at ¶ 6; id. at Exh. A at Pawlina 121.

66. Pawlina stated in his report that the allegations by these officers were "very believable" because they were consistent reports of specific episodes of harassment over several years, and that "Lt. Fago's conduct still continues to recent days, while holding the rank