**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **MICHAEL J. FAGO** | : | **CIVIL ACTION NO.** |
| **Plaintiff,** | : | **3:02CV1189 (AHN)** |
| **v.** | : | |
| | : | |
| **CITY OF HARTFORD, ET AL.** | : | |
| **Defendants.** | : | **AUGUST 6, 2004** |
| _____ | : | |

**STATEMENT OF MATERIAL FACTS IN DISPUTE**

**THE PARTIES**

1.   In 1986, the plaintiff, Michael Fago ("Fago"), a white male, joined the Hartford Police Department ("HPD") as a cadet.  Second Amended Complaint dated July 29, 2003 ("Compl.") Count One ¶ 11. Deposition of Michael Fago at 15-16, 487 ("Fago Dep.")(Exh. 1).

2.   In 1987, Fago became a sworn HPD officer.  Compl., Count One ¶ 13;

3.   In 1995, Fago was promoted to the rank of sergeant.  Compl., Count One ¶ 13;

4.   On May 27, 2001, Fago began a probationary period at the rank of Lieutenant. Compl., Count One ¶ 13.

5.    At times relevant to Plaintiff's Complaint, Bruce Marquis was the Chief of Police in Hartford.  Compl., Count One ¶ 2.

6.    During all times relevant to this action, Kevin Jones was employed as a police officer in the Hartford Police Department.  In or around January of 1999, he was promoted to the rank of Captain and, in July of 2001, he was promoted to the rank of Assistant Chief.  July 30, 2003 Deposition of Kevin Jones at 7 ("Jones Dep.")(Exh. 2).

7.    At times relevant to this action, Mark Pawlina was a police officer employed in the Hartford Police Department and held the rank of Captain.  Compl., Count One ¶ 4.

8.    At all times relevant to this action, Joseph Buyak was a police officer employed in the Hartford Police Department.  He attained the rank of Captain in or around May 13, 2001. September 17, 2003 Deposition of Joseph Buyak at 51 ("Buyak Dep.")(Exh. 3).

9.    At all times relevant to this action, Nancy McClure was a police officer employed in the Hartford Police Department and had attained the rank of lieutenant.  January 29, 2003 Deposition of Nancy McClure at 63 ("McClure Dep.")(Exh. 4).

10. At times relevant to this action, Mark Rudewicz was a police officer employed in the Hartford Police Department and held the rank of sergeant and, subsequently, lieutenant. Compl., Count One ¶ 7.

11. At all times relevant to this action, Stephen Miele was a police officer employed in the Hartford Police Department and held the rank of sergeant, and subsequently lieutenant. Compl., Count One, at ¶ 8.

12. At all times relevant to this action, Patrick Jobes was a police officer employed in the Hartford Police Department and held the rank of sergeant, and subsequently promoted to lieutenant=.  January 9, 2003 Deposition of Patrick Jobes at 7, 9 ("Jobes Dep.")(Exh. 5).

13. At all times relevant to this action, Robert Russell has served as a police officer in the Hartford Police Department.  Compl., Count 1 ¶10.

### SERGEANTS' CASE

14. Patrick Jobes and Robert Russell, along with a number of others, were plaintiffs in an action entitled, <u>Amador et al. v. City of Hartford et al.</u>, 3:96CV01736 (PCD) (otherwise

known as the "Sergeants' case").  The plaintiffs in that case alleged that they were

discriminated against on the basis of their gender in a sergeant's promotional examination

process.  The case went to trial and a jury found in favor of the defendants.  Jobes Dep. at 16-

22 (Exh. 5).

     15. Plaintiff testified as a witness for the defendants in the Sergeants' case on February

8, 2002.  Plaintiff testified that he worked very hard to pass the sergeant's test and related his

personal experience with that testing process; he further testified that he had earned his

promotion and that anyone could pass if they studied.  Fago Dep. at 156-57, 215-216, 516

(Exh. 1); Sergeants' Case Trial Transcript (Exh. 27).

     16. Jobes and Russell blame the loss of their case on Fago and his testimony. Fago

Affid. at ¶2 (Exh. 6). See also May 6, 2003 Deposition of Richard Calderone at 130

("Calderone Dep.)(Calderone knows that Russell was embittered by the loss of the Sergeants

case)(Exh. 7). See also Pawlina Investigative Packet at COH 323-327, 329-330, 335 (Russell

IAD Interview in which Russell explained that he had had no problem with Fago, until he

(Fago) testified in the Sergeants' case)(Jobes IAD Interview in which he stated that he and

Fago had a "friendly working relationship" until Fago testified in the Sergeants' case)(Exh. 13)

**FAGO'S PROMOTION**

17. In or around May of 2001, Plaintiff was promoted to the rank of Lieutenant within the Hartford Police department by then-Chief of Police Bruce Marquis.  Fago Dep. at 17, 166-168 (Exh.1).

18. Under the City of Hartford's Personnel Rules and Regulations, all promotions are subject to a probationary period of three months to one year.  Rule IX §2 of the City of Hartford's Personnel Rules and Regulations (Exh. 8); <u>see also</u> Fago Dep. at 165-168 (Exh. 1). Fago was never told the exact duration of his probationary period. Fago Affid. at ¶4 (Exh. 6).

19. Under Rule IX §3 of the City of Hartford's Personnel Rules and Regulations Fago should have received evaluations every two months, that allowed him to know whether or not he was meeting the working test standards, or if he had areas in which he needed to improve. Plaintiff did not receive these required evaluations—he only received one evaluation. Rule IX §2 of the City of Hartford's Personnel Rules and Regulations (Exh. 8) May 6, 2003 Deposition of Richard Calderone at 31 ("Calderone Dep.)(Exh. 7); Fago Dep. at 255:22-256:25 )(Exh. 1).

20. Rule IX also establishes a process for the dismissal of a probationary employee; an appointing authority can recommend in writing to the City's Personnel Director ("Director")

that a probationary employee not continue in his or her probationary position "if in his opinion the working test indicates that such employee is unable or unwilling to perform the duties of the position satisfactorily or that this habits and dependability do not merit his continuance in the service."  (Exh. 8).

21.  Fago only received one evaluation in the one-year period.  Fago Dep. at 255:22-256:25 )(Exh. 1)(did not receive 2/22/02 evaluation until day was demoted in May).  Id. at 236 (Dec. 1st evaluation). Plaintiff did not receive two-weeks notice required by Rule IX; he was notified of the demotion the day it was effective, which was less than two weeks prior to the end of a yearly probationary period. Fago Affid. at ¶ 11 (Exh. 6).On that date plaintiff lost all responsibilities and duties related to the position of lieutenant. Id.; see also Rule IX (Exh. 8)

22. The Collective Bargaining Agreement ("CBA") states that "no employee shall be suspended, discharged, demoted or disciplined except for just cause." See CBA at § 2.2 (Exh. 9); see also Fago Dep. at 30-31 (Exh. 1).

23. The CBA states that "no probationary employee in any promotional classification shall have access to the grievance procedure where the issue is one of their demotion." CBA at § 1.8 (Exh. 9); see also Fago Dep. at 30-31 (Exh. 1).

24. Defendants Marquis, Jones and Pawlina wanted to demote Fago before the end of his probationary period in order to avoid the union grievance procedure and having to face the State Labor Board.  July 29, 2003 Deposition of Timothy Hogan at 110:6-112:7 ("If he let's him get off probation, now he's got a union issue and grievance procedure where he goes to the State Labor Board….So you want to end it quick, get it over with. You want to make sure it's not an issue any more, demote him.  He has no redress.")(Exh. 10).

25. Defendants were motivated by racial animus and the desire to replace Fago with black males.  Deposition of Michael Manzi in Cody v. City of Hartford, 3:02CV1798 (On whether Marquis appointment of Gordon Jones was motivated by race, Manzi answered affirmatively (Exh. 23). See also Jones Dep. at 101:19-23. (Jones agreeing that Fago was replaced with a black male)(Exh. 2).

26. When Marquis reviewed the list of eligible Sergeants on the May 27, 2001 Certification List he looked to such standards as loyalty, professionalism, and communication skills in making his appointments, and promoted Fago to Lieutenant. See April 3, 2003 Deposition of Bruce Marquis at 15: 5-22 ("4/3/03 Marquis Dep.")(Exh. 11).

**STAIRWELL INCIDENT**

27. On or about February 25, 2002, McClure claims that an incident allegedly occurred in a hallway/stairwell in the HPD headquarters building.  McClure Dep. at 37 (Exh. 4).

28. On that date, Lieutenant Nancy McClure was standing in the hallway speaking with other officers after she finished her shift.  Id. at 71, 74-77 (Exh. 4); Fago Dep. at 410-411 (Exh. 1).

29. Plaintiff recalls an accidental brush with McClure, and described is as "nothing of any significance, nothing different than if you pass someone in a grocery store in an aisle" Fago Dep. at 448:16-19, 409:16-18, 537:5-6 ("The only thing I do remember is three people in a congested area")(Exh. 1).

30. Detective Zemienieski, who witnessed the incident, believed that the contact was not in anyway purposeful.  Memo from Pawlina to Vega, COH 403 (Exh. 12).

31. Scott Sansom, who witnessed the incident, "did not believe the contact was intentional."  Fago Dep. at 109:17-24 (Exh. 1); See also Pawlina's Investigative Packet COH 306)(Exh. 13).

32. Plaintiff  said "Excuse me" after the accidental contact.  Fago Dep. at 415-416. (Exh. 1).

33. Plaintiff feared having any additional contact with defendant McClure as it could give her the opportunity to conjure up more false statements regarding his character.  Fago Dep. at 424:21-425:21 ("She was going to do it again"; "I'm not going to be a party to giving her more ammunition…it was best to de-escalate it by not having any contact")(Exh. 1).

34. On February 26, 2002, McClure wrote a memo to then-Captain Mark Pawlina. February 9, 2004 Deposition of Mark Pawlina at 66-67 ("Pawlina Dep.")(Exh. 14); see also McClure Dep. at 72 (Exh. 4).

35. McClure acted out of retaliation for the failure of her sexual harassment complaint against Fago, and for his more recent complaint against her. Compl. Count 4 ¶ 5c. Hogan Dep. at 160:15-161:4, 166. ("the investigations showed that [McClure and others] did lie [about the sexual harassment complaint]")(Exh. 10); See also generally 4/3/03 Marquis Dep. at 108-110 (Exh. 11).

36. McClure's statements were so false and misleading that they directly led to plaintiff's demotion. Fago Dep. at 382:7-383:1. See also Id. at 341:12- 342:11(additional examples of McClure's retaliatory behaviors)(Exh. 1).

37. McClure made this false complaint in order to initiate an investigation of Fago. Fago Dep. at 420:17-421: 25 (Exh. 1).

38. McClure's unfounded statements that a brush in the hallway led her to fear for her physical safety was a direct attempt to escalate/make her allegations against Fago appear to be severe enough to warrant investigation. Id. at 462:19-23 (Exh. 1).

**MEETINGS WITH PAWLINA**

39. On or about March 1, 2002, Pawlina met with McClure.  McClure expressed her concerns about the alleged stairwell incident.  Pawlina Investigative Packet at 1, 2 (COH 304-305)(Exh. 13).

40. McClure used this opportunity to tell Pawlina a number of other false allegations in order to create an alleged pattern of negative history.  Because she included baseless accusations that she feared that Fago would act against her physically, she trumped up the

allegations to appear so serious that they had to be investigated. Pawlina Investigative Packet at 1-3 (COH 304-7)(Exh. 13).

41. McClure also reported to Pawlina an incident in which Fago allegedly drove by her slowly in the police headquarters parking lot, in what McClure felt was an intimidating manner. Id. (COH 305).

42. Fago was with Sgt. Martin during McClure's alleged drive-by harassment. Sgt. Martin has stated that the incident in the parking lot did not occur, and that he had eye contact with Fago throughout this alleged event.  Transcript of Fago's Interview by Pawlina at 4 ("Fago/Pawlina Trans.")(Exh. 17). See also Martin Report attached to Fago Memo to Pawlina (Exh. 15)(COH 569-70).

43. In this same meeting with Pawlina, McClure repeated several times the names of the other defendants as people who allegedly experienced similar encounters. She listed Captain Joseph Buyak , now-Lieutenant Stephen Miele, Rudewicz, then-Officer Patrick Jobes, Officer Robert Russell and Officer Steve Maticke, and that Lieutenant Harold Even  knew of Fago doing so to other HPD officers. Pawlina Investigative Packet at 1-3 (COH 304-7)(Exh. 13)

44. On March 2, 2002, Plaintiff submitted a memo to Pawlina regarding Lieutenant McClure's improper conduct." Fago Dep. at 417 (Exh. 1); March 2, 2002 Memorandum from Fago to Pawlina (COH 558-570)(Exh. 15).

45. On March 4, 2002, Pawlina met with Plaintiff and Lieutenant McClure, instructed them on level of conduct expected of lieutenants and informed them that he intended to investigate the allegations thoroughly. Fago Dep. at 118-119, 122 (Exh.1); Memorandum from Pawlina to Vega (Exh. 12).

46. On March 5, 2002, Pawlina wrote a memorandum regarding his conversation on the previous day with Fago and McClure. He stated that "Any allegations that can be proven will lead me to recommend the most severe discipline, including the possibility of demotion of rank, or termination" and that "[a]ny false or baseless accusations that can be proven will be treated with the same severity". March 5, 2002 Memo from Pawlina to Fago and McClure (COH 408)(Exh. 16).

47. Fago was punished severely, with demotion, as a result of allegations later determined to be false. When McClure's allegations were determined to be unsubstantiated, she did not receive similar severity. Fago Affid. at ¶18 (Exh. 6).

**MCCLURE'S ALLEGATIONS UNFOUNDED**

48. As Department Advocate, it was Calderone's job to investigate and prosecute discipline against officers; prior to this position he worked for IAD.  Calderone exonerated Fago, meaning "the actions did not occur at all". Calderone Dep at 14:3-7, 15:8-11, 31 (Exh. 7).

49. All of McClure's alleged incidents of harassment have been determined to be false. Calderone Dep. at 19:20-24 (Exh. 7).

50. Department Advocate Calderone had heard McClure complain about other sergeants and lieutenants and chiefs, and did not believe that she was credible. Calderone Dep. at 81-2 (Exh. 7).

51. In this memo, Pawlina admitted that McClure's original complaint could not be proven to be intentional. Despite the lack of evidence and witness testimony, Pawlina claimed that he personally believed it was intentional.  Pawlina Investigative Packet at COH 392 (Exh. 13).

52. Department Advocate Calderone concluded that McClure "was not telling the truth entirely or at least misleading some of the investigators that were involved….and that this incident, in fact, did not occur" Calderone Dep. at 19 (Exh. 7).

53. There is no proof of the allegations contained in Pawlina's report. Calderone Dep. at 105:1-10 (Exh. 7).

## PAWLINA INTERROGATORIES

54.   On or about March 11, 2002, Pawlina improperly expanded his investigation by sending out interrogatories to all Patrol Sergeants and Patrol Lieutenants.  This amounted to twenty-five HDP personnel.  List of Recipients of  Interrogatories (COH 406)(Exh. 18).

55. In response to Pawlina's interrogatory No.3, "Have you ever observed, witnessed, or been a victim of any type of harassment, intimidation, or violence in the workplace by Lieutenant Michael Fago?",  only Jobes, Miele and Even, all of whom were specifically mentioned by McClure in her meeting with Pawlina, returned interrogatories with allegations against Fago.  Pawlina Interrogatories (COH 405)(Exh. 19); see also Pawlina Investigative Packet at 4 (COH  307)(Exh. 13).

56. Pawlina again improperly expanded his investigation by holding Internal Affairs Division ("IAD") interviews. He interviewed all of those defendants mentioned by McClure, even if interrogatory responses were not received from those individuals. Id. (COH 307-307).

57. Pawlina's investigation went far beyond the proper scope because it encompassed alleged events that took place prior to Fago's promotion to Lieutenant. Fago Dep. at 284:11-285:4 (Exh. 1). See also Calderone Dep. at 206 ("My conclusion was…it was unequivocally clear that this was an insignificant incident that was puffed up and blown out of proportion." (Exh. 7).

58. Pawlina improperly expanded the investigation by sending out interrogatories before first determining whether or not McClure's allegations regarding the Stairwell Incident were true and despite the fact that all investigations into McClure's allegations regarding the stairwell incident were negated by witnesses. Pawlina Investigative Packet at 3 (COH 306)(Witnesses to the Stairwell Incident all agree that either the bump did not occur, or that it was minor and unintentional)(Exh. 13). See also Calderone Dep. at 31-32 (Exh. 7).

59. During his interview with Pawlina, Fago expressed concern that Pawlina, before ever determining the validity of McClure's allegations, widened the scope of the investigation to allow similarly false claims to surface.  Fago/Pawlina Trans. at 5 (Exh. 17).

60. Fago's only opportunity to respond to the allegations against him was in this his interview with Pawlina on April 22, 2002.  In this interview he denied all of the allegations offered against him by the defendants.  August 21, 2003 Deposition of William Reilly at 38:16-17  ("Reilly Dep.") (Exh. 20).  See generally Fago/Pawlina Trans. (Exh. 17)

61. At or around the time of Pawlina's investigation and interrogatories, Jobes and Fago had verbal confrontation when Jobes, a sergeant, refused to complete a task that then Lieutenant Fago had requested that he complete by the end of his shift, Jobes said if Fago wanted the memo, he should get it himself. Fago Dep. at 145:14-18 (Exh. 1).

62. When confronted with Fago's testimony contradicting Jobe's false allegations, Pawlina disregarded Fago's version of the facts, despite the fact that witnesses supported Fago's version.   Fago/Pawlina Trans. at 7. ("Pat Jobes is a liar…Pat Jobes [is] making that statement contrary to a Sergeant.")(COH 396-7)(Exh. 17).

**IAD INTERVIEWS**

63. Pawlina improperly expanded his investigation by interviewing all of the parties named by McClure.  He utilized the HPD's Internal Affairs Division ("IAD").  Fago Dep. at 386-387 (Exh. 1); Jones Dep. at 65 ("Chief Marquis authorized IAD investigators to assist Captain Pawlina …")(Exh. 2).

64. IAD investigators did not interview Fago.  The only opportunity that Fago had to present information regarding his version of the events, or even to be made aware of the allegations against him in order to deny them, was the April 22, 2003 interview with Pawlina. COH 307-308. See generally Fago/Pawlina Trans. (Exh. 17).

65. In a memorandum to Pawlina dated September 5, 2001, then-Sergeant Mark Rudewicz ("Rudewicz") reported allegedly harassing and intimidating behavior by Fago. Rudewicz stated in this memorandum that Fago had cleared his throat as Rudewicz passed the door of the room in which Fago was sitting, that Fago then made an "awkward facial expression," and approached Rudewicz as he stood at a water cooler and began to hum. Pawlina Investigative Packet at 4 (COH 307)(Exh. 13)

66. Rudewicz reported a variety of alleged incidents, but only one allegedly intentional bumping occurred during Fago's probationary period. Pawlina Investigative Packet (COH 310-321)(Exh. 12).

67. During his IAD interview, Rudewicz also referred to Fago as "a very calculating person" and "devious." Id.

68. In his April 10, 2002 IAD interview, Buyak described an April 21, 1993 incident for which he disciplined Fago.  This allegation derived from a very specific and personal issue based upon Buyak's dislike of the relationship between Fago and his sister.  Id. at COH 369-373. See also Hogan Dep. at 132:5-10 ("[Buyak] was paranoid about Mike Fago.  He was concerned about [Fago's] involvement with his sister…")(Exh. 10).

69. Buyak made defamatory statements to IAD investigators that "I deem [Fago] . . . a loose cannon.  He's the type of guy who I think someday will go on the roof of a building with a weapon and start taking shots at people.  I see him as unstable.  And have always seen him as unstable." Pawlina Investigative Packet at COH 371 (Exh. 13).

70. During his April 11, 2002, IAD interview, Miele only related alleged events that occurred prior to Fago's promotion to Lieutenant and general hearsay regarding other people's experiences with Fago.  Miele never reported any of these alleged events or made formal complaints about Fago when they allegedly occurred.  Id. at COH 364-368.

71. Miele made defamatory statements, such as referring to Fago as "a dangerous guy," Id.

72. During his April 8, 2002, IAD interview, Russell explained that he had had no problem with Fago, until he (Fago) testified in the Sergeants' case.  Russell's only alleged complaints against Fago stemmed from actions surrounding the Sergeants' Case.; he did not report any of these alleged events at the times that they allegedly occurred. Id. at COH 323-327 (Exh. 13).

73. During his April 8, 2002 IAD interview, Jobes stated that up until Fago testified in the Sergeants' case, he and Fago had a "friendly working relationship". Jobes claimed that Fago had physically bumped into him at the courthouse during the Sergeants case, that Fago had disciplined him for being late because he did not know Jobes had previously discussed this

with another lieutenant, and described a time when Fago bumped into his chair . Jobes never reported these alleged incidents at the times they allegedly occurred  <u>Id.</u> COH 329-330, 335.

74. Jobes made defamatory statements such as claiming that Fago "has a screw loose". <u>Id.</u>

75. Jobes alleged in his IAD Interview that he and Fago collided twice during the Sergeants case. Jobes Dep. at 30-32, 36, 38 (Exh. 5).  Once was in the entrance to the court room, and one was in a crowded bathroom. <u>Id.</u> <u>See also</u> Pawlina Investigative Packet at COH 329-335.

76. During her April 11, 2002 IAD interview, McClure repeated the allegation that Fago had deliberately bumped her, and also described several instances in which she believed Fago had harassed or intimidated her, including two episodes following the Stairwell.  <u>Id.</u> at COH.

77. McClure also repeated allegations that had been proven to be unfounded regarding a sexual harassment complaint by her against Fago.  <u>Id.</u> at COH 356.

78. McClure admits to having been "pissed" over the stairwell incident.  <u>Id</u>.

79. All of McClure's alleged incidents of harassment have been determined to be false. Calderone Dep. at 19:20-24 (Exh. 7).

## PAWLINA'S INVESTIGATIVE PACKET

80. On or about April 25, 2002, Pawlina submitted a memo to Assistant Chief Kevin Jones regarding his investigation and the conclusions he reached.  <u>See generally</u> Pawlina Investigative Package (Exh. 13).

81. Pawlina only included documents which supported his conclusion that there was evidence of a pattern of harassing and intimidating conduct by Fago.  Department Advocate Calderone explained that when completing an investigation all interrogatory responses and other exculpatory evidence must be included; he characterized Pawlina's omissions as "improper", "unethical" and potentially "illegal"   Calderone Dep. at 24:14-24, 26:7-12 (Exh. 7).

82. In this memo to Jones, Pawlina concluded that Fago had a "history of violence in the work place."  However the only evidence of violent behavior by Fago in the work place

dated from more than fifteen years prior during his time as a cadet.  Pawlina Investigative

Packet at COH 392 (Exh. 13); Fago Dep. at 20-21 (Exh. 1). <u>See also</u> 4/3/03 Marquis Dep at 105

(cadet incident was the only confirmed instance of physical intimidation by Fago)(Exh. 11).

83. In this memo, Pawlina admitted that McClure's original complaint could not be

proven to be intentional. Despite the lack of evidence and witness testimony, Pawlina

personally believed it was intentional.  Pawlina Investigative Packet at COH 392 (Exh. 13).

84. Department Advocate Calderone concluded that McClure "was not telling the truth

entirely or at least misleading some of the investigators that were involved….and that this

incident, in fact, did not occur" Calderone Dep. at 19 (Exh. 7).

85. Despite the lack of real evidence in support of his conclusion, Pawlina's

recommendation was to "give an unsatisfactory performance evaluation to Lt. Fago, who is a

probationary employee, and to not allow him to continue as a lieutenant in the Hartford Police

Department."  Pawlina Investigative Packet at COH 392 (Exh. 13).

86. Three Defendant's were aware that Marquis and his administration were open to the

idea of demoting Lieutenants based on complaints by subordinates. Fago Dep. at 76:1-5.

("complaints could be made and they could be taken by he administration, and a demotion, which has seldom occurred in the police department, maybe less than two or three in 30 years or so, 40 years, could happen")(Exh. 1).

87. Pawlina periodically discussed the status of his investigation into the plaintiff with Jones.  Pawlina Dep. at 70-74, 76 (Exh. 7).

88.  Reilly and Jones discussed the possibility of Fago's demotion.  Jones first raised the idea of demotion, said he supported Fago's demotion on more than one occasion, and expressed this same belief to Marquis. Reilly Dep.  at 9:5-6, 12:7-9,17:24-18:4, 24:8-9; 25:10-19 (Exh. 20).

89. Prior to Fago's Demotion, Reilly and Jones met with Marquis for no more than two hours.  Reilly Dep. at 20:19-21:1, 23:14-17. (Exh. 20).

90.  On April 25, 2002, Pawlina submitted his Investigative Packet to Jones regarding the Stairwell Incident.  Jones Dep. at 50 (Exh. 2).

91. Pawlina believed that the events alleged by the defendants in their IAD interviews were consistent, thereby ignoring the fact that this consistency pointed to collusion on their part. Pawlina Dep. 244 (Exh. 14).

92. Pawlina based his recommendation that Fago be demoted on the false allegations made by defendants Jobes, McClure, Russell, Buyak, Rudewitz, and Miele and on hearsay regarding events that occurred before Fago was promoted. Calderone Dep. at 41 (Exh. 7)

93. There is no proof of the allegations contained in Pawlina's report. Calderone Dep. at 105:1-10 (Exh. 7).

94. Written reprimands can stay in an officer's file for 'quite some time' but can only be used for future discipline for two years. Reilly Dep. at 133:19-23 (Exh. 20). However the information in Pawlina's Investigative Packet used to demote Fago dated back as far as almost twenty years prior to the demotion. 4/3/03 Marquis Dep. at 105: 17-23 (Exh. 11).

95. Since Fago's demotion there have been no further complaints about his behavior. Reilly Dep. at 148:13-149:3 (Exh 20). There have been no civilian complaints against Fago in his 18 years of service. Id.at 149:22-24.

**FAGO'S SECOND INTERIM PERFORMANCE EVALUATION**

96. Rule IX of the City's Personnel Rules and Regulations requires supervisors to complete interim and final probationary employee performance evaluations.  (Exh. 8).

97. Defendants, Marquis, the City and plaintiff's supervisors violated Rule IX because Fago never received the interim evaluation for the period ending February 22, 2002. Prior to his demotion, Fago had never been told that his performance was below satisfactory, or that his superiors were considering his demotion without learning his side of the various defamations remarks made by defendants Fago Dep at 256: 3-8; 266:13-22 (Exh. 1).

98. On March 22, 2002, Pawlina rated Fago's performance as satisfactory for the period ending February 22, 2002 on the Second Interim Evaluation.  Pawlina Dep. 240 (Exh. 14).

99. On April 2, 2002, before Pawlina had completed his investigation, and before Fago had even been interviewed, Jones rated Fago as needing improvement.  Jones Dep. 162-64 (Exh. 2).

100.    Sometime between April 2 and 25, 2002, Pawlina improperly altered Fago's Second Interim Evaluation. Based upon historical information and unproven hearsay, he crossed out the "X" he had put in the Second Interim Evaluation's "satisfactory" box and wrote his initials "M.P." next to the "X" Jones put in the "needs improvement" box.  Pawlina Dep. 242, 246, 259-60, 263 (Exh. 14); Calderone Dep. at 41 (There was a great deal of hearsay and history that should not have been included in the packet)(Exh. 7).

101.    Former Assistant Chief and Captain Hogan explained that going back and changing an evaluation "would not be kosher".  Hogan Dep. at 98:10-11, 98:22-99:4 ("It's nonsensical to go back and change the one that occurred before unless you were trying to cover something up")(There is no "legitimate reason to go back and check" what happened before a sergeant became a lieutenant)(Exh. 10).

102.    Carlson claims that he is the one who attached Pawlina's Investigative Packet sometime after April 25 and before Fago's demotion. Carlson Dep. 160 (Exh. 21).

### CONSIDERATION OF FAGO'S PROBATIONARY PERFORMANCE

103.    Under the City's Personnel Rules and Regulations, Rule IX, 4:  Marquis, as the appointing authority, could "recommend in writing to the Director of Personnel the removal of an employee". (Exh. 8).

104.     Then-Chief Marquis discussed Fago's demotion with Assistant Chiefs Jones and Reilly prior to demoting him.  Reilly Dep. at 20-24 (Exh. 20); Jones Dep. at 93 (Exh. 2); 4/03/03 Marquis Dep. at 68-69 (Exh. 11).

105.     Jones based his opinion that Fago should be demoted on Pawlina's Investigative Packet, and his personal relationships with defendants Russell and McClure. Jones Dep. 86:16-24, 93, 94-97, 146, 148 (Exh. 2). Jones believed that Pawlina's memo was a "truthful version of the facts" Id. at 69:13-15.

106.     Though Reilly stated that he is "not certain what was in the investigative package" he also stated that he based his opinion that Fago should be demoted on Pawlina's Investigative Package. Reilly Dep. at 37: 4-5; 90:1-3 (Exh. 20).

107.     Though Marquis claims that his decision was made on the "totality of the things" he also states that he made his decision based upon Pawlina's flawed investigation. 4/3/03 Marquis Dep. at 44-48, 75 (Exh. 11); Calderone Dep. at 24:14-24, 26:7-12, 39 (Pawlina's investigation was "improper", "unethical", potentially "illegal", and "Shoddy at best")(Exh. 7).

108.    Marquis relies on his staff to present the facts, and weighs the recommendations of his staff. Jones Dep. At 71:18-23; 72:17 (Exh. 2).

109.    Marquis did not confirm any of the allegations of physical intimidation against Fago before deciding to demote him. 4/3/03 Marquis Dep. 105: 4-9 (Exh. 11). The only confirmed event was one from when Fago was a cadet. Id. at 105: 17-23.

110.    Marquis did not attempt to determine the relationship between McClure and Fago that put at issue the truthfulness of her allegations.  Marquis did not attempt to determine the fact that McClure had previously made an allegation of sexual discrimination against Fago, which was subsequently determined to be unfounded.  4/3/03 Marquis Dep at 106: 23-107:19 (Exh. 11). Marquis was also unsure whether he knew that Fago had filed a sexual harassment claim against McClure in March 2002. Id. generally at 109-111 (Exh. 11).

111.    Marquis did not consider the information from Sgt. Calderone, who would investigate McClure's complaint independently from Pawlina's investigation. 4/3/03 Marquis Dep. at 50:6-13 (Exh. 11). Sgt. Calderone did not sustain McClures accusations. Id. at 65:12-18.

112.    Marquis claims he was not aware that prior to Fago's demotion, no other Lieutenants had been demoted. Id. at 89:22-90:23.

113.    Though training programs existed, Fago was not sent to any of them for his alleged inappropriate conduct.  Reilly Dep. at 113:16-114:4 (Exh. 20).  See also Carlson Dep. at 134 (Fago went to 'some kind' of training but it was not related to interpersonal skills and behaviors)(Exh. 21)

114.    Fago was allegedly demoted for conduct which was unprofessional, but no steps were taken to train him or let him improve.  Reilly Dep. at 114:13-115:2 (Exh. 20).

115.    After his demotion Fago remained with the Hartford Police Department in the capacity of Sergeant, of which is required the same level of professionalism. Sergeants have a lot of responsibility in the Hartford PD and act as supervisors. Reilly Dep. at108:7-109:2115:23-116:4 (Exh. 20).

116.    After Fago was demoted, allegedly because of a "history of violence", he was then assigned to work with children as part of the Youth Initiative program.  Reilly Dep. at 117:19-119:24 (Exh. 20). See also Pawlina Investigative Packet at COH 392 (Exh.13)

117.    The reason why Fago was demoted, instead of being trained or disciplined, for the issues surrounding the hallway incident was because they were not looking to discipline him, only to demote him. Reilly Dep. 109:2-10 (Exh. 20).  In addition, the charges against him were not sustained, and he was not even given a written reprimand or disciplined in any way. Id. 109:24-110:7

## RETALIATORY DISCIPLINARY CHARGES

118.    On July 11, 2002, Fago filed the present lawsuit.  Compl. Count Three ¶ 6.

119.    On July 29, 2002, Jones received Pawlina's Form 90, which initiated HPD's disciplinary process, and then forwarded it to Reilly. Jones Dep. 211-13 (Exh. 2). Calderone Dep. 70 (Exh. 7).

120.    Calderone never has received a form 90 regarding an incident that occurred as long ago as four months prior. Calderone Dep. at 36 (Exh. 7).  Usually a month between an incident and the completion of the Form 90 would be the maximum; Calderone found this time frame inappropriate. Id.  Calderone received the Form 90 after the filing of Fago's  lawsuit.  Id at 30.

121.    Calderone was concerned with Pawlina's investigation because exculpatory

evidence was omitted and much of the evidence was hearsay. Id at 49, 206 ("my

conclusion was I thought it was unequivocally clear that this was an insignificant

incident that was puffed up and blown out ot proportion and I brought it back to

reality.)(Exh. 7)

122.    Calderone explained that if you want to get rid of the hassle of union procedure,

you should demote someone when they are on probation and at the whim of the

administration. Id. 111.

### DISPARATE TREATMENT

123.    To support his equal protection claim that he was treated differently because he

is white, Fago claims that the following HPD officers were similarly situated: "Lt.

Antonio Cancel; Off. Tracey Carter; Det. Beaz/F. Ortiz; Lt. Jose Lopez; Off. Nestor

Caraballo; Capt. Buyak; Sgt. O'Donnell; Acting Chief Rudewicz; Dep. Chief

Casati; Lt. Kemmett; Sgt. Cherniak; Capt. Jesse Campbell; Assist./Chief Vega;

Assist/Chief McKoy; Det. Lawlor/Edelwich." Fago Dep. Exh. 9 at no. 9, App. D,

Tab 14.

124.    Plaintiff has stated that the above list is just a few of those who have been

treated differently. Fago Dep at 305:2-6. ("so many people have done so many

things wrong in the police department and the way the way they've been

treated")(Exh. 1).

125.    For example, Fago has also included Miele, Muroy and Rethis as members of

the HPD who had been treated differently from him. Id. at 302:8-16, 368: 7-19,

569:3-17, 579-582, 583-584. (Rethis was given the opportunity to have additional

training after having his performance rated unsatisfactory)( Miele was promoted to

Lieutenant after a long history of false statements etc.)(Muroy was intoxicated when

investigating a crime).

126.    After his demotion, Fago was replaced with African Americans. 4/3/03 Marquis

Dep. at 79:13-81:15 (Exh. 11). See also Jones Dep. at 101:19-23. (Jones agreeing

that Fago was replaced with a black male)(Exh. 2).

127.    Marquis never demoted a black person. 4/3/03 Marquis Dep. at 81:7-13

(Exh.11).

128.    During former Assistant Chief Hogan's thirty-year HPD career, he never heard
        of a lieutenant being demoted during their probationary period. Hogan Dep. at 7:13-
        8:15, 101:15-18 (Exh. 10). Marquis was not concerned with the past practices of
        other chiefs. Marquis Dep. at 91:11-12.

### RETALIATION

129.    Fago has been retaliated against for the filing of this lawsuit as well as for his
        "whistle blowing" testimony and affidavits in the Russo cases, 3:97CV2380;
        3:00CV01794; 3:00CV02382, Perodeau v. City of Hartford, 3:99CV807, Stack v.
        City of Hartford, 3:01 CV 0260, and Murdock v. City of Hartford, 3:01 CV 0774,
        by being threatened with transfer on two separate occasions: once to booking and
        once to communications.  Fago Dep. at 335-338 (Exh. 1) Fago Affid at ¶19.

130.    Since filing his complaint, plaintiff has been verbally retalitated against by
        Jobes, Russell and McClure. Fago Dep. at 524:13-526:19; and *generally* 524-531.
        (Exh. 1).

131.    When Fago became aware of questionable behavior by Miele, in the form of a
        sexually explicit voice mail, and by McClure, in the form of lying in order to obtain
        vacation time, he brought these concerns to Jones.  Fago Affid. at ¶11 (Exh. 6).

Jones dismissed his concerns and initiated a retaliatory investigation and subsequent

discipline: on July 15, 2004 scheduled Fago for conflict resolution training. Id.

## HOSTILE WORK EVIRONMENT AND EMOTIONAL DISTRESS

132.    Someone left an anonymous letter in Fago's mail box which said "Beat up any

girls lately? Fuck you asshole". This letter was never investigated, despite its

appearance only one week after the Stairwell Incident with McClure. Fago Dep. at

310:19-20 (Exh. 1). As a department advocate, Calderone believes that in his

training and experience the "fuck you" note is a serious matter than should be

investigate because it is a form of intimidation that creates a hostile work

environment. Calderone Dep. at 66-7 (Exh. 7).

133.    Fago's  sexual harassment claim against McClure was not properly investigated

or even acknowledged.  "Q: If a sexual harassment complaint was made against

McClure, it has to be investigated." " A: Correct" Jones Dep. At 77:21-24 (Exh. 2).

See also 4/3/03 Marquis Dep at 109:18-112:23 (Not aware of the complaint being

investigated)(Exh. 11).

134.    Despite his statements in his initial meeting with McClure and Fago, Pawlina

and the other supervisors failed to discipline McClure for her unsubstantiated false

allegations. <u>See</u> Pawlina Memo of 3/5/02: "Any false or baseless accusations that

can be proven will be treated with the same severity" See also Pawlina Investigative

Package at COH 408. (Exh. 13).


135.    Defendant Buyak's IAD statements were more than merely false, they were

offensive and "very strong accusation". Calderon Dep. at 42-43 (Exh. 7).

Calderone, the department advocate at the time in question, could have been told of

the accusations and investigated them, but he never was. <u>Id.</u> at 43-44 (Calderone

found no evidence to substantiate that Fago was emotionally disturbed).


136.    Plaintiff's emotional distress claim includes all defendants.  Compl. Count 5.

<u>See also</u> Fago. Dep. at 308:4-14 ("It is very stressful and creates a hostile work

environment when you know you are doing our job and you have some facts to

corroborate that the allegations against you are untrue and unfounded and you

present them and they ignore them.")(speaking of Marquis)(Exh. 1);

137.    Being demoted is "mortifying" and "embarrassing". Demoting someone for the

wrong reasons is "diabolical and devious".  "If you want to embarrass the bejesus

out of somebody, promote them and then just say 'You're done.'" Hogan Dep. at

105: 12-106:5 (Exh. 10). In addition, plaintiff has continued to see psychologist Dr.

Hall, and has now met with him somewhere between twenty-five and thirty times.

Since the more recent retaliatory actions of defendants, plaintiff has begun to see

Dr. Goodwin, a psychiatrist.  He has met with Dr. Goodwin four or five times since

February. Fago Affid. at ¶ 21.


138.    Pawlina, purposefully and maliciously didn't not complete a full and just

investigation. Fago. Dep. at 308:18-23 (Exh. 1). Jones created hostile environment

by allowing unethical behavior to continue and having a biased view. Id. at 309:2-3.


139.    Buyak made comments that Fago was capable of "shooting and killing

somebody" and thus fears for his safety, but he himself was once arrested and

suspended for a year because of violent behavior while on duty. Pawlina

Investigative Packet at COH 371; Buyak Dep. at 26:18-24, 209:14-16 (Exh. 3). The

plaintiff was never arrested and does not have a history of violent behavior. Fago

Affid. at ¶20 (Exh. 6).

140.    Meile and Rudewicz made false allegations against Fago for the purpose of

purposefully causing him emotional harm and distress. Fago Dep. at 309:19-20,

310:4


141.    Fago told Rae Ann Palmer, his former supervisor, that he was humiliated by the

situation. January 30, 2004 Deposition of Rae Ann Palmer at 50:24-51:3 ("Palmer

Dep.")(Exh. 22).  He told her that it was difficult to "go to his parents and his family

and explain what happened; he also told her that he was upset about the impact on

his financial future and his career, and his status in the police department. Id. at

50:18-23.


142.    After being demoted, Fago still did the work that was asked of him in a very

professional manner.  Id. at 51:6-10.


143.    In being demoted, Fago lost his base pay, his rank, as well as his uniform—

making it obvious to all of his coworkers that he had been demoted and humiliated.

Carlson Dep. at 97-98 (Exh. 21).

## CREDIBILTIY

144.    Credibility is an issue in any investigation. Jones Dep. At 73:14-17 (Exh .2).

145.    Marquis stated that he did not believe that Jobes is an honest person. 4/3/03

Marquis Dep. at 24:3 (Exh. 11).

146.    Jobes has had several "red flags" regarding his abuse of worker's compensation,

specifically in regards to the 'Spaghetti Incident', where he claims Fago dropped a

book on his desk and cause sauce to injure his eye to such an extent that he took

Worker's Compensation. Calderone Dep. at 83 (Exh. 7). Calderone stated that the

incident did not occur the way Jobes claimed. Id. at 47.

147.    "Patrick's [Jobes] career has not been unblemished" Hogan Dep. at 138:12

(Exh. 10)

148.    The South Windsor police have come to Jobe's house because of domestic

disputes "more than once". Jobes Dep. at 74 (Exh. 5).

149.    Jobes refused direct orders from Fago when Fago was a lieutenant.  Id. at 93:12-

19, 125 (refusing to put on tie and refusing to locate document).

150.   McClure has a history and "practice and pattern" of being untruthful.  Fago Dep.

at 427:11-428:3 (Exh.1).


151.   McClure has a pattern of harassing plaintiff, even after her false complaint. Id. at

120:14-122:19. Department Advocate Calderone had heard McClure complain

about other sergeants and lieutenants and chiefs, and did not believe that she was

credible. Calderone Dep. at 81-2 (Exh. 7). See also Hogan Dep at 165-6 ("The

investigations showed that [McClure and others] did lie")(Exh. 10).

152.   Plaintiff, as lieutenant, would not let McClure and her friends gossip and talk

when they were supposed to be working. Fago Dep. at 106: 1-10 ("I just simply

would not allow sergeants who were supposed to be on the street to banter and

relish in the fact that they could sit around and talk")(Exh. 1).


153.   Prior to McClure's complaint and subsequent to her complaint, Fago has

informed his superiors when she "was not acting in accordance with proper

procedures or not doing her job properly" Id. at 112:9-113:14, 120:14-121:24.


154.   Because McClure has made similar complaints against other white males, the

pattern of her behavior could lead to the reasonable inference that she has racial

animus. Id. at 487: 18-21. Because McClure knew of the practices of the

department, when she made her complaint against him, she knew it would be fully

investigated because he was white.  Id. at 508:5-25 ("Are you aware of any

facts…to support the contention that Nancy McClure treated you differently based

on your race…" "A. Yes….If you make a complaint against a member of a

protected class, it may not go anywhere…I was treated much differently from those

persons").

155.    Most recently, McClure lied in order to obtain otherwise unavailable funeral

leave.  Fago Affid. at ¶11 (Exh. 6).

156.    Buyak is known to be very angry about Fago dating his sister. Hogan Dep. at

130:12-132:15 ("Joe was paranoid about Mike Fago.  He was concerned about

Mike's involvement with his sister and Mike's knowledge about anything that

occurred in his life.")(Exh. 10).

157.    Jobes, Russell, McClure and Jones had a "friendship" and a "closeness" and

McClure and Jones had had a "sexual relationship" Fago Dep at 159:18-160:1 (Exh.

1).  Jones and Russell had a social relationship outside of work. Id. at 161:18-22.

158.    After groping a stripper, Miele was charged with conduct unbecoming an

officer; however, he was not demoted, merely given a written reprimand. Calderone

at 97, et seq.  See also Jones Dep. at 149 (Exh. 2); Reilly Dep at 90-96 (Exh. 20).


159.    Miele has been challenged regarding his illegal use of racial profiling, his

subordinate claims that he said "if they aren't white andthey aren't wearing a suit, I

better have them in the back of my car, and find something to arrest them for."

Brown, Tina "City Police Probe Racial Issue", The Hartford Courant, July 2,

2004.(Exh. 30)

160.    Russel "spearheaded the Sergeants' case and was embittered by the loss of the

case. Calderone Dep. at 130 (Exh. 7); Jobes Dep. at 18:8-11 (Exh. 5).

161.    Jones has a personal relationship with Russell and Jobes.  Jones Dep. at 86:16-

24, 87: 3-6 (Exh. 2).


162.    Sergeant Rudewicz has been the subject of criminal charges stemming from a

complaint by Cheryl Lynch a resident of Columbia, CT, who was intimidated and

harassed by both Lt. Manzi and Sergeant Rudewicz on September 13, 2000.  Lt.

Manzi and Sergeant Rudewicz stole her horse and harassed her at her home.  Ms.

Lynch's allegations against Manzi and Sergeant Rudewicz include: " I have found

witnesses that during the day of 9/13/00, Manzi and Rudewicz visited 17 farms (in uniform in my area, showing a picture of myself and this horse telling people I had 'stolen a horse!' Lt. Manzi has also called me at my home, harassing and threatening me. Prior to 9/13/00, Lt. Manzi had full knowledge and acknowledged that this horse had been given to me by Sgt. Hammick and Capt. Jones.  Therefore he knowingly and blatantly lied on 9/13/00 in an effort to exact a personal vendetta against me and to slander my reputation." (Exh. 25).