## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MICHAEL J. FAGO | : | CIVIL ACTION NO. |
| | : | |
| PLAINTIFF, | : | NO.: 3:02CV1189(AHN) |
| | : | |
| v. | : | |
| | : | |
| CITY OF HARTFORD; ET AL., | : | |
| | : | |
| DEFENDANTS. | : | AUGUST 6, 2004 |

### JOINT MEMORADUM IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff, Michael Fago, submits this Joint Memorandum in Opposition to Defendants' City of Hartford, Bruce Marquis, Kevin Jones, Mark Pawlina, Joseph Buyak, Mark Rudewicz and Stephen Miele (hereinafter "Police Defendants") Motion for Summary Judgment and defendants' McClure, Jobes and Russell (hereinafter "Three Defendants") Motion for Summary Judgment. Defendants' Motions for summary judgment should be denied as there are genuine issues of material fact. Defendant is not entitled to judgment as a matter of law.

## I. BACKGROUND

This action arises under Title 42 U.S.C. § 1983; the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("hereinafter Title VII"), the First and Fourteenth Amendments to the United States Constitution; and state common law claims of defamation and intentional infliction of emotional distress. Defendants, acting under color of state and federal law, charter, ordinance, regulation, custom or usage, have unlawfully violated plaintiff's Fourteenth Amendment rights to equal protection and due process and plaintiff's First Amendment right to free speech by retaliating against him and depriving plaintiff of his liberty without due process of law.

## II. FACTS

In 1986, the plaintiff, Michael Fago (hereinafter, "Fago"), joined the Hartford Police Department ("HPD") as a cadet. Statement of Facts in Dispute ("SFID") ¶1. In 1987, Fago became a sworn HPD officer, and in 1995, was promoted to sergeant. Id. ¶ 2, 3. On May 27, 2001, Fago began a probationary period at the rank of Lieutenant. Id. ¶ 4. Bruce Marquis (hereinafter, "Marquis") was the Chief of Police throughout Fago's time as a Lieutenant. Id. ¶ 5. Kevin Jones (hereinafter, "Jones") was Assistant Chief, and Mark Pawlina (hereinafter, "Pawlina") was a Captain during this same time frame. Id. ¶ 6, 7. Throughout Fago's time as a Lieutenant, Joseph Buyak, (hereinafter, "Buyak") was a Captain, Nancy McClure (hereinafter, "McClure") was a Lieutenant and Mark Rudewicz (hereinafter, "Rudewicz") was a Sergeant. Id. ¶ 8, 9, 10. During the relevant time period, Stephen Miele (hereinafter, "Miele") and Patrick Jobes (hereinafter, "Jobes") held the rank of Sergeant while Robert Russell (hereinafter, "Russell") served as a Police Officer. Id. ¶ 11, 12, 13.

### SERGEANTS' CASE

Jobes, Russell and others were plaintiffs in an action entitled, Amador et al. v. City of Hartford et al., 3:96CV01736 ("Sergeants' case"). The plaintiffs in that case alleged that they were discriminated against on the basis of their gender in a sergeant's promotional examination process. The case went to trial and a jury found in favor of the defendants. Id. ¶14. Fago testified as a witness for the defendants in the Sergeants' case on February 8, 2002 that he worked hard to pass the sergeant's test and related his personal experience with that testing process. Id. ¶ 15. Russell 'spearheaded' the Sergeants' case and was known to have been very embittered by the loss of this case. Id. ¶ 16, 154. Jobes and Russell blame the loss of their case

on Fago and Fago's testimony. Both admit that prior to Fago's testimony; they had enjoyed friendly and professional relations with plaintiff. <u>Id.</u> ¶16.

## FAGO'S PROMOTION

In May of 2001, plaintiff was promoted to the rank of Lieutenant within the HPD by then-Chief of Police Marquis.  <u>Id</u>. ¶ 17.  When Marquis reviewed the list of eligible Sergeants on the May 27, 2001 Certification List he looked to such standards as loyalty, professionalism, and communication skills, and promoted Fago to Lieutenant.  <u>Id</u>. ¶26.  Fago's probationary period could have lasted anywhere from three months to one year, however, Fago was not told how long his would last.  <u>Id</u>. ¶ 18.  Fago should have received evaluations every two months to advise him whether or not he was meeting the working test standards, or if he had areas in which he needed improvement, however, however, Fago only received one evaluation. <u>Id</u>. ¶ 19, 21.

Defendants Marquis, Jones and Pawlina wanted to demote Fago before the end of his probationary period in order to avoid the union grievance procedure and having to face the State Labor Board.  <u>Id</u>. ¶ 24.  Defendants exploited the loop hole within the Collective Bargaining Agreement states, "no probationary employee in any promotional classification shall have access to the grievance procedure where the issue is one of their demotion" in order to deny Fago his due process rights.  <u>Id</u>. ¶ 23.  Defendants were motivated by racial animus and the desire to replace Fago with a black male.  <u>Id</u>. ¶ 25.

## STAIRWELL INCIDENT

On or about February 25, 2002, McClure and plaintiff brushed against each other in a crowded stairwell.  <u>Id.</u> ¶ 27, 28, 29.  Plaintiff recalls an accidental brush with McClure, and described it as "nothing of any significance, nothing different than if you pass someone in a

grocery store in an aisle." Id. ¶ 29.  Detective Zemienieski and Scott Sansom both witnessed the incident, and believed that the contact was not in anyway purposeful or intentional. Id. ¶ 30, 31. Fago said "excuse me" after the accidental contact. Id. ¶ 32.  McClure wrote a memorandum to Pawlina claiming that the accidental brush was violent and intentional. Id. ¶ 34.

McClure deliberately made this false allegation in retaliation for the failure of her sexual harassment complaint against Fago, for his complaint against her, and in order to initiate an investigation against Fago.  Id. ¶ 35, 37.  McClure's unfounded statements that a brush in the hallway led her to fear for her physical safety was a direct attempt to make her allegations against Fago appear to be severe enough to warrant investigation. Id. ¶ 38.  McClure's false and misleading statements led directly to plaintiff's demotion.  Id. ¶ 36.

## MEETINGS WITH PAWLINA

On or about March 1, 2002, Pawlina met with McClure under the guise of discussing her alleged concerns regarding Fago.  Id. ¶ 39.  McClure used this opportunity to tell Pawlina a number of other false allegations in order to create an alleged negative pattern.  Id. ¶ 40.

Additionally, McClure reported to Pawlina an alleged incident in which Fago allegedly drove by her slowly in the police headquarters parking lot, in what McClure described as an intimidating manner.  Id. ¶ 41.  Fago was with Sgt. Martin, who denied that the incident in the parking lot did not occur, and that he had eye contact with Fago throughout this alleged event. Id. ¶ 42.

McClure repeated several times the names of the other defendants as people who allegedly experienced similar encounters.  Id. ¶ 43.  She listed Buyak, Miele, Rudewicz, Jobes, and Russell. Id. ¶ 43.

On or about March 2, 2002, plaintiff submitted a memorandum to Pawlina regarding McClure's improper conduct. Id. ¶ 44.  On or about March 4, 2002, Pawlina met with plaintiff and McClure.  Pawlina summarizing the meeting wrote "Any allegations that can be proven will lead me to recommend the most severe discipline, including the possibility of demotion of rank, or termination" and that "[a]ny false or baseless accusations that can be proven will be treated with the same severity."  Id. ¶ 45, 46.  Fago was demoted as a result of allegations that were false.  Id. ¶ 47.  When McClure's allegations were determined to be unsubstantiated, she did not receive similar severe discipline.  Id. ¶47.  Calderone, whose job it was to investigate and prosecute discipline against officers, determined that "the actions did not occur at all" and exonerated Fago.  Id. ¶ 48.

## PAWLINA INTERROGATORIES

On or about March 11, 2002, Pawlina improperly expanded his investigation by sending out interrogatories to twenty-five HDP personnel.  Id. ¶ 54.  In response to Pawlina's interrogatories, only Jobes, Miele and Even, all of whom were specifically mentioned by McClure in her meeting with Pawlina, returned interrogatories with allegations against Fago.  Id. ¶ 55.  Pawlina sent out interrogatories prior to determining whether or not McClure's Stairwell Incident allegations were true and despite that all investigations into McClure's allegations were negated by witnesses.  Id. ¶ 57, 58.  Calderone concluded that "it was unequivocally clear that this was an insignificant incident that was puffed up and blown out of proportion."  Id. ¶ 57.

## IAD INTERVIEWS

Pawlina improperly expanded his investigation to include Internal Affairs Division ("IAD") interviews.  Furthermore, he interviewed all of those officers mentioned by McClure,

even if interrogatory responses were not received from those individuals. <u>Id</u>. ¶ 55.  Pawlina's investigation went beyond the proper scope because it encompassed alleged events that took place prior to Fago's promotion. <u>Id</u>. ¶ 57.  IAD investigators did not interview Fago, and the only opportunity that he had to present his version of the events, or even to be made aware of the allegations against him, was the April 22, 2003 interview with Pawlina. <u>Id</u>. ¶¶ 57, 64.

During Fago's interview with Pawlina, Fago expressed concern that Pawlina improperly widened the scope of the investigation to allow similarly false claims to be investigated.  <u>Id</u>. ¶ 59.  In this interview Fago denied all of the allegations offered against him by the defendants. <u>Id</u>. ¶60.  When confronted with Fago's testimony contradicting the allegations, Pawlina disregarded the facts presented by Fago despite other witnesses' statements supporting Fago.  <u>Id</u>. ¶ 62.

Rudewicz reported other alleged incidents, however, only the alleged intentional bumping occurred during Fago's probationary period.  <u>Id</u>. ¶ 66.  During his IAD interview, Rudewicz also referred to Fago as "a very calculating person" and "devious."  <u>Id.</u> ¶ 67.

In his April 10, 2002 IAD interview, Buyak described an incident that occurred on or about April 21, 1993 for which Buyak disciplined Fago.  <u>Id</u>. ¶ 68.  This allegation derived from a very specific and personal issue based upon Buyak's dislike of the relationship between Fago and Buyak's sister.  Buyak made defamatory statements in his IAD interview, such as: "I deem [Fago] . . . a loose cannon.  He's the type of guy who I think someday will go on the roof of a building with a weapon and start taking shots at people.  I see him as unstable.  And have always seen him as unstable."  <u>Id.</u> ¶ 69.

During his April 11, 2002, IAD interview, Miele related alleged events that occurred prior to Fago's promotion to Lieutenant and general hearsay. Miele did not relate any allegations in which he had personal knowledge. Id. ¶ 70. Miele never reported any of these alleged events or made formal complaints about Fago at the time when they allegedly occurred. Id. ¶ 70. Miele made defamatory statements including referring to Fago as "a dangerous guy". Id. ¶ 71.

During his April 8, 2002, IAD interview, Russell stated that he had had no problem with Fago, until Fago testified in the Sergeants' Case. Id. ¶ 72. Russell's alleged complaints against Fago stemmed from actions surrounding the Sergeants' case. Russell did not report any of these alleged events at the times that Russell alleged they occurred. Id. ¶72.

Jobes made numerous false allegations. He admitted that he never reported these alleged incidents at the times they allegedly occurred during his April 8, 2002 IAD interview. Id. ¶73. Jobes made defamatory statements against Fago including that Fago "has a screw loose". Id. ¶74. Jobes alleged that he and Fago collided twice during the Sergeants' Case; however, both alleged incidents were in crowded spaces. Id. ¶75.

During her April 11, 2002 IAD interview, McClure repeated the allegation that Fago had deliberately bumped her and also described several instances in which she alleged that Fago had harassed or intimidated her. Id. ¶ 76. McClure made allegations that had previously been proven to be unfounded regarding a sexual harassment complaint by her against Fago. Id. ¶ 77. McClure admitted to having been "pissed" over the stairwell incident. Id. ¶ 78. All of McClure's alleged incidents of harassment have been proven false. Id. ¶ 79.

**PAWLINA'S INVESTIGATIVE PACKET**

On or about April 25, 2002, Pawlina submitted a memorandum to Assistant Chief Kevin Jones regarding his investigation. Id. ¶ 80. Pawlina only included documents that supported his conclusion. Id. ¶ 81. Department Advocate Calderone testified that when completing an investigation all interrogatory responses and other exculpatory evidence must be included. Furthermore, Calderone characterized Pawlina's omissions as "improper", "unethical" and potentially "illegal". Id. ¶ 81.

Pawlina claimed that the events alleged by the defendants in their IAD interviews were consistent, and ignored the fact that this consistency pointed to collusion. Id. ¶891. Pawlina based his recommendation that Fago be demoted on the false allegations made by defendants Jobes, McClure, Russell, Buyak, Rudewicz, and Miele and on hearsay regarding events that occurred before Fago was promoted. Id. ¶ 92. There is no proof of these allegations. Id. ¶ 93.

In his memorandum to Jones, Pawlina concluded that Fago had a "history of violence in the work place"; however, the only evidence of violent behavior by Fago in the work place is dated more than fifteen years ago during his time as a cadet. Id. ¶ 82. Although, written reprimands may remain in an officer's file for 'quite some time' the reprimand may only be taken into consideration as to discipline for two years; however, Pawlina used written reprimands over two years old to demote. Id. ¶ 94.

Pawlina testified that McClure's original complaint regarding the accidental bumping was not proven to be intentional. Id. ¶ 83. Calderone concluded that McClure was "misleading some of the investigators that were involved….and that this incident, in fact, did not occur". Id. ¶ 84. Despite the lack of evidence in support of Pawlina's conclusion, Pawlina recommended Fago's demotion. Id. ¶ 85.

Three Defendants were aware that Marquis and his administration were open to the idea of demoting Lieutenants based on complaints by subordinates. Id.¶ 86. No civilian complaints have been filed against Fago in his seventeen years of service. Id. ¶ 95.

**FAGO'S SECOND INTERIM PROBATIONARY PERFORMANCE EVALUATION**

Rule IX of the City's Personnel Rules and Regulations requires supervisors to complete interim and final probationary employee performance evaluations.  Id. ¶ 96.  The HPD violated Rule IX in that Fago never received his interim evaluation for the period ending February 22, 2002, although it appears that the evaluation had been written.  Id. ¶ 97, 98.  Prior to his demotion, Fago had never been advised that his performance was below satisfactory standards. Id. ¶ 97.

On March 22, 2002, Pawlina rated Fago's performance as satisfactory for the period ending February 22, 2002 on the Second Interim Evaluation.  Id. ¶ 98. On April 2, 2002, prior to Pawlina completing his investigation, and prior to Fago having been interviewed, Jones rated Fago's performance as needing improvement in Fago's evaluation.  Id. ¶ 99.  Sometime between April 2nd and 25th, 2002, Pawlina improperly altered Fago's Second Interim Evaluation. Id. ¶100.  Pawlina testified that his motivations stemmed from alleged events uncovered during his investigation, however, the Department Advocate determined that the alleged events in Pawlina's Investigative Packet included irrelevant hearsay and history that should not have been included in the investigation. Id. ¶ 100.  Former Assistant Chief Hogan testified that going back and changing an evaluation "would not be kosher" because "[i]t's nonsensical to go back and change the one that occurred before unless you were trying to cover something up" and there is no "legitimate reason to go back and check" what happened before a Sergeant became a

Lieutenant. <u>Id.</u> ¶ 101.

## FAGO'S PROBATIONARY PERFORMANCE

Marquis discussed Fago's demotion with Jones and William Reilly (hereinafter, "Reilly") prior to taking action. <u>Id.</u> ¶ 104. Jones based his opinion that Fago should be demoted on Pawlina's flawed Investigative Packet, and his personal relationships with defendants Russell and McClure; Jones believed that Pawlina's memorandum was a "truthful version of the facts". <u>Id.</u> ¶ 105. Though Reilly testified that he is "not certain what was in the Investigative Package" he also testified that he based his opinion that Fago should be demoted on Pawlina's flawed investigation. <u>Id.</u> ¶ 106.

Marquis testified that he made his decision based upon Pawlina's flawed investigation and that he relied on his staff to present the facts, then weighed their recommendations heavily. <u>Id.</u> ¶¶ 107, 108. Marquis testified that he was not aware that prior to Fago's demotion, no other Probationary Lieutenant had been demoted. <u>Id.</u> ¶ 112. Marquis did not confirm any of the allegations of physical intimidation against Fago before deciding to demote him. <u>Id.</u> ¶109. Marquis did not consider the relationship between McClure and Fago that put at issue the truthfulness of her allegations. <u>Id.</u> ¶110. Marquis did not rely on any information from Calderone, who would investigate McClure's complaint independently from Pawlina. <u>Id.</u> ¶ 111.

Fago was allegedly demoted for conduct which was unprofessional; however, no steps were taken to train him properly. <u>Id.</u> ¶ 114. Subsequent to Fago's demotion, he remained with the HPD with the rank of Sergeant which is requires the same level of professionalism as a Lieutenant. <u>Id.</u> ¶115. After Fago was demoted, allegedly because of a "history of violence", he was assigned to work with children as part of the Youth Initiative. <u>Id.</u> ¶ 116.

The reason why Fago was demoted, instead of disciplined, for the issues surrounding the hallway incident was because the defendants were not looking to discipline him, only to demote him. Id. ¶ 117. The retaliatory disciplinary charges against him were not sustained, and Fago was never given a written reprimand or disciplined in any way. Id. ¶ 117.

## RETALIATORY DISCIPLINARY CHARGES

On or about July 11, 2002, Fago filed the present lawsuit. Id. ¶ 118. On July 29, 2002, Jones received Pawlina's Form 90, which initiated HPD's disciplinary process, and then forwarded it to Reilly. Id. ¶ 119. Calderone has never received a Form 90 regarding an incident that occurred as long ago as four months prior. Id. ¶ 120. Generally, a Form 90 is completed within one month of an incident occurring. Calderone found this time frame inappropriate. Id. Calderone concluded it "was unequivocally clear that this was an insignificant incident that was puffed up and blown out of proportion". Id. ¶ 121. Calderone further explained that if you want to avoid the hassle of union procedure, you should demote someone when they are on probation and at the whim of the administration, and when the employee has no grievance process available. Id. ¶ 122.

## DISPARATE TREATMENT

Subsequent to his demotion, Fago was replaced with an African American. Id. ¶ 126. Marquis never demoted a person that was an African American. Id. ¶ 127. During former Assistant Chief Hogan's thirty-year HPD career, he never heard of a Lieutenant being demoted during their probationary period. Id. ¶ 128. To support plaintiff's equal protection claim that he was treated differently than others in a similar position because he is white, Fago has named a number of similarly situated HPD officers. Id. ¶ 123.

## RETALIATION

Fago has been retaliated against for the filing of above-captioned action as well as for his "whistle blowing" testimony by being threatened with transfer on two occasions: once to booking and once to communications.  Id. ¶ 129.  On July 15, 2004, Fago was scheduled for conflict resolution training by Jones in retaliation for this action, and his other 'whistle-blowing' activities.  Id. ¶ 131.

## HOSTILE WORK EVIRONMENT AND EMOTIONAL DISTRESS

Someone left an anonymous letter in Fago's mail box which said "Beat up any girls lately?  Fuck you asshole".  This letter was never investigated, despite its appearance only one week after the Stairwell Incident. Id. ¶ 132.  Calderone believes that the "fuck you" note is a serious matter that should have been investigated because it is a form of intimidation that creates a hostile work environment. Id.

Being demoted is "mortifying" and "embarrassing". Demoting someone for the wrong reasons is "diabolical and devious".  "If you want to embarrass the bejesus out of somebody, promote them and then just say 'You're done.'" Id. ¶ 137. In being demoted, Fago lost his base pay, his rank, as well as his uniform—making it obvious to all of his coworkers that he had been demoted and humiliated. Id. ¶ 143.  Fago told his supervisor, Rae Ann Palmer that he was humiliated by the situation; he also told her that he was upset about the impact on his financial future and his career, and his status in the police department. Id. ¶ 141.

Plaintiff fears having any additional contact with defendant McClure as it could give her the opportunity to conjure up more false statements regarding his character.  Id. ¶ 33.  Fago's sexual harassment claim against McClure was not properly investigated or even acknowledged.

Id. 133.  Despite his statements in his meeting with McClure and Fago, Pawlina and the other

supervisors failed to discipline McClure for her false allegations. Id. ¶ 134.

Buyak made comments that Fago was capable of "shooting and killing somebody" and

thus fears for his safety, but he himself was once arrested and suspended for a year because of

violent behavior while on duty. Id. ¶139.  Buyak's IAD statements were more than merely false,

they were offensive and "very strong accusation"; Calderone could have been told of the

accusations and investigated them, but he never was. Id. ¶ 135.

## CREDIBILTIY

At or around the time of Pawlina's investigation and interrogatories, Jobes and Fago had

verbal confrontation when Jobes, a sergeant, refused to complete a task that then Lieutenant

Fago has requested that he complete by the end of his shift, Jobes said if Fago wanted the memo,

he should get it himself. Id. ¶ 56, 149.  Marquis stated that he did not believe that Jobes is an

honest person. Id. ¶145. Jobes has had several "red flags" regarding his abuse of worker's

compensation, specifically in regards to the 'Spaghetti Incident', where he claims Fago dropped

a book on his desk and caused sauce to injure his eye to such an extent that he took Worker's

Compensation. Id. ¶. 146. The South Windsor police have come to Jobe's house because of

domestic disputes "more than once". Id. ¶ 148.

McClure has a history and "practice and pattern" of being untruthful and harassing

plaintiff.  Id. ¶¶ 150, 151. Department Advocate Calderone had heard McClure complain about

other sergeants and lieutenants and chiefs, and did not believe that she was credible. Id.  Because

McClure has made similar complaints against other white males, the pattern of her behavior

could lead to the reasonable inference that she has racial animus. Id. ¶ 154. Because McClure

knew of the practices of the HPD, when she made her complaint against him, she knew it would be fully investigated because he was white.  Id.  Most recently, McClure lied in order to obtain otherwise unavailable funeral leave.  Id. ¶ 155.

Buyak is known to be very angry about Fago dating his sister. Id. ¶ 156. Jobes, Russell, McClure and Jones had a "friendship" and a "closeness" and McClure and Jones had had a "sexual relationship" Id. ¶ 157. After groping a stripper, Miele was charged with conduct unbecoming an officer; however, he was not demoted, merely given a written reprimand. Id. ¶ 158.  Miele has been challenged regarding his illegal use of racial profiling, his subordinate claims that he said "if they aren't white and they aren't wearing a suit, I better have them in the back of my car, and find something to arrest them for." Id. ¶ 159.

Russell "spearheaded the Sergeants' case and was embittered by the loss of the case. Id. ¶ 160.  Sergeant Rudewicz has been the subject of criminal charges stemming from a complaint by Cheryl Lynch a resident of Columbia, CT, who was intimidated and harassed by both Lt. Manzi and Sergeant Rudewicz on September 13, 2000;  Lt. Manzi and Sergeant Rudewicz stole her horse and harassed her at her home.  Id. ¶ 162.

**III. LAW AND ARGUMENT**

**A. STANDARD OF REVIEW**

A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure should be granted only when the "pleadings, depositions, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

Before a court can rule on a motion for summary judgment, the moving party must satisfy

its burden of production, by either "putting evidence into the record which affirmatively disproves an element of the non-moving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim". Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986).   Once the moving party has met its burden of production, the non-moving must provide specific facts showing a genuine issue for trial.  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992).The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Id. Thus "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.) cert. denied, 502 U.S. 849 (1991).   Moreover, not only must there be no genuine issue as to the evidentiary facts, but there must also be no controversy regarding the inferences to be drawn from them.  Diamontopulos v. Brookside Corp., 683 F. Supp. 322, 325 (D.Conn. 1988), citing Donohue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 57-58 (2d Cir. 1987).

## B.    SUMMARY JUDGMENT STANDARD UNDER § 1983.

To state a cause of action under §§ 1983, the plaintiff must show (1) that the defendants deprived him of a right "secured by the Constitution or laws of the United States"; and (2) that they did so "under color of state law." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999); accord Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999); Dwares v. City of New York, 985 F.2d 94, 98 (2d Cir. 1993). The elements of a plaintiff's case are the same under Section

1981, Section 1983, or Title VII. Direct evidence is not necessary to prove employer acted with discriminatory motive. <u>Randle v. City of Aurora</u>, 69 F.3d 441 (10th Cir. 1995). A showing of pretext is evidence which allows a jury to infer discriminatory intent. <u>Randle v. City of Aurora</u>, 69 F.3d 441 (10th Cir. 1995). Because a jury may find illegal discrimination upon nothing more than a prima facie case and pretext, such a showing at the summary judgment state is sufficient to get the case to the jury. <u>Randle v. City of Aurora</u>, 69 F.3d 441 (10th Cir. 1995).  Procedural irregularities can provide sufficient evidence of pretext to defeat summary judgment where the disregarded procedures directly and uniquely disadvantage a minority employee," <u>Randle v. City of Aurora</u>, 69 F.3d 441 (10th Cir. 1995).

Due to the difficulty of proving a subjective state of mind, cases involving motivation and intent are usually inappropriate for summary judgment.  <u>Lac Du Flambeau Indians v. Stop Treaty Abuse-Wis.</u>, 991 F.2d 1249 (7th Cir. 1993). Evidence of mixed motives is "ordinarily not the gist for the summary judgment mill." <u>Lac Du Flambeau Indians v. Stop Treaty Abuse-Wis.</u>, 991 F.2d 1249 (7th Cir. 1993). Trier of fact may consider the same evidence introduced to prove prima facie case in determining whether discipline was pretextual.  <u>Lowe v. City of Monrovia</u>, 775 F.2d 998 (9th Cir. 1985) Decision as to employer's motive is almost always for the trier of fact to determine at trial.  <u>Lowe v. City of Monrovia</u>, 775 F.2d 998 (9th Cir. 1985).

Plaintiff may defeat summary judgment in a discrimination or retaliation case if he or she can present evidence that the proffered reason for the adverse action was pretextual or "unworthy of belief" or if he or she can otherwise introduce evidence of illegal motive.  <u>Beaird v. Seagate Technology, Inc.</u>, 145 F.3d 1159 (10th Cir. 1998)**.** To survive summary judgment, a plaintiff will prevail "by either a) discrediting the employer's proffered reasons, either circumstantially or

directly or b) by adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determining cause of the adverse employment action." Torres v. Casio Inc., 42 F.3d 825 (3d Cir. 1994).

### C. DEFENDANTS TREATED FAGO DIFFERENTY BECAUSE HE IS WHITE, IN VIOLATION OF HIS FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION.

In Count One of his complaint, plaintiff claims a violation of his Fourteenth Amendment Right to Equal Protection by all defendants. Questions of material fact remain at issue regarding this claim, and summary judgment is not applicable.

"Equal Protection means simply that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc, 473 U.S. 432 439 (1985). To prove a Fourteenth Amendment Equal Protection violation, "the plaintiff must prove that (1) in comparison with others similarly situated, he was selectively treated, and (2) such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12, 16 (2d Cir. 1999).

#### 1. Fago Can Establish a Prima Facie Case

"[A] plaintiff's burden of establishing a prima facie case in the context of employment discrimination law is 'minimal.' McGuinness v. Lincoln Hall, 263 F.3d 49, 52 (2d Cir. 2001).

The same burden shifting analysis set forth by the U.S. Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) for claims brought under Title VII apply to employment discrimination cases under § 1983. See Sorlucco v. New York City Police Dep't, 888 F.2d 4, 7 (2d Cir. 1989). In this test, the initial burden is on the plaintiff to establish a prima

facie case by showing that he  (1)  belongs to a protected class, (2) was qualified for the position,

(3) was discharged, and (4) that his discharge occurred in "circumstances giving rise to an

inference of discrimination". See McDonnell Douglas, 411 U.S. at 802.

First, Fago belongs to a protected class because of his race; he is a white male. Statement

of Material Facts in Dispute ¶1 ("SFID").  Second, Fago was qualified for the position of

lieutenant because he was promoted by Marquis originally because of his as loyalty,

professionalism, and communication skills. SFID ¶¶4, 26.  Third, plaintiff was demoted. Id.

¶104. Fourth, the circumstances surrounding Fago's demotion "give rise to an inference of

discrimination" because no other probationary lieutenant had ever been demoted, Fago was

replaced with a black male, and Marquis has never demoted a black male. Id. ¶¶25,126, 127,

128; McDonnell Douglas, 411 U.S. at 802. Defendant McClure has made similar complaints

against other white males, which indicates racial animus. Id. ¶¶154.  In addition, the instances of

disparate treatment are so numerous as to indicate an improper motivation for Fago's demotion.

Id. ¶¶ 123-125.

Additionally, plaintiff fulfills the first prong of the McDonnell Douglass test because

although the prototypical equal protection claim involves discrimination against people based on

their membership in a vulnerable class, the Second Circuit has long recognized that the equal

protection guarantee also extends to individuals who allege no specific class membership but are

nonetheless subjected to invidious discrimination at the hands of government officials.  Harlan

Assoc. v. Incorporated Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2000).   In Village of

Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam), "the Supreme Court affirmed the

validity of such class of one claims where the plaintiff alleges that she has been intentionally

treated differently from others similarly situated and that there is no rational basis for the difference in treatment. To prevail on a class of one equal-protection claim, plaintiff must show, not only irrational and wholly arbitrary acts, but also intentional disparate treatment." Barstow v. Shea, 196 F. Supp. 2d 141, 148 (D. Conn. 2002) (citing Olech, 528 U.S. at 564); see also Russo v.City of Hartford, Docket No. 3-97-CV-2380 (D. Conn. 2001) (stating, "successful equal protection claims may be brought by a "class of one," where the plaintiff alleges that he has been intentionally treated differently from other similarly situated and that there is no rational basis for the difference in treatment.").

The plaintiffs can establish a "class of one" equal protection claim by proving that (a) they were similarly situated to others, (b) they were intentionally treated differently from others similarly situated, and (c) there is no rational basis for the difference in treatment. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)(per curiam). The Supreme Court found that Olech's complaint could "fairly be construed as alleging" differential treatment from similarly situated property owners which, coupled with Olech's allegation that the Village's conduct was irrational and wholly arbitrary, was "sufficient to state a claim for relief under traditional equal protection analysis." Id. at 565.  Such allegations, quite apart from a defendant's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis. Id. 564. The Court of Appeals in Olech held that "a plaintiff can allege an equal protection violation by asserting that state action was motivated solely by a " spiteful effort" to "get" him for reasons wholly unrelated to any legitimate state objective.' "Village of Willowbrook v. Olech 160 F.3d 386, 387 (7th Cir.1998).

Under this standard, plaintiff can establish that he is a member of a class, even if his

claims of racial animus are disregarded.  Fago was similarly situated to numerous HPD officers who have undergone probationary periods before becoming lieutenant.  This list of such similarly situated individuals is expansive. SFID ¶¶123-125.  Fago was treated differently from all other probationary lieutenants because in thirty years, no other probationary lieutenant had been demoted. Id. ¶128.  All of those individuals noted for the disparate treatment between themselves and plaintiff have been convicted of crimes or other serious misdeeds, and there can be no rational basis for the difference in treatment. Id. ¶¶124, 125. One example includes an individual who was given training and allowed to improve after an 'unsatisfactory' rating; another example is of a lieutenant promoted after being charged with conduct unbecoming an officer. Id. ¶125, 158.

In their memorandum, the Police Defendants attempt to misconstrue the facts in order to limit the class of people to whom Fago can be properly compared.  Defendants provide a number of variables and use these to misapply the facts of the case.  This version of the facts is an attempt to mislead and confuse the court.  Plaintiff had a broad pool of similarly situated employees who were treated differently by one or more of the defendants at all times relevant to this action and attempts to limit his testimony cannot be allowed. Id. ¶123-125.

### 2. Defendants Have Provided Nondiscrimnatory Reasons for Their Actions, But They Are Not Legitimate. Defendants Were Improperly Motivated And Acted Arbitrarily.

Defendants have not provided legitimate and nondiscriminatory reasons for their actions, therefore they were improperly motivated and acted arbitrarily, plaintiff meets the burden delineated in McDonnell Douglas and summary judgment is not appropriate for this claim.

After the plaintiff establishes a prima facie case, the defendant must offer a legitimate

and nondiscriminatory reason for its actions. <u>James v. New York Racing Ass'n,</u> 233 F.3d 149,

154 (2d Cir.2000).  If the defendant meets this burden, then the plaintiff must demonstrate that

this rationale is merely a pretext for discrimination. <u>Id.</u>

      Under <u>Reeves v. Sanderson Plumbing Products, Inc.,</u> 530 U.S. 133, 148 (2000), "a

plaintiff's prima facie case, combined with sufficient evidence to find that the employer's

asserted justification is false, may permit the trier of fact to conclude that the employer

unlawfully discriminated." In appropriate circumstances, the trier of fact can reasonably infer

from the falsity of the explanation that the employer is dissembling to cover up a discriminatory

purpose." Moreover, once the employer's justification has been eliminated, discrimination may

well be the most likely alternative explanation, especially since the employer is in the best

position to put forth the actual reason for its decision." <u>Id</u>. at 2102.

      The only reason provided by defendants as justification for Fago's demotion is

unsubstantiated hearsay, false claims and irrelevant history. SFID¶¶107, 121.  McClure's

allegations were determined to be false, and Pawlina's investigation seriously flawed.  <u>Id</u>. All of

Fago's superiors claim to have relied upon this investigation in determining to demote Fago. <u>Id</u>.

¶104-107. The large number of other individuals that had been in Fago's position as a

probationary employee who had had substantiated incidents of unacceptable conduct without

being demoted indicates that the reasons proffered by defendants are inadequate. <u>Id</u>. ¶¶123-125

      Defendants claim the demotion was legitimate because that Fago's behavior was

allegedly unprofessional, yet after his demotion, he was relegated to the rank of sergeant, which

demands an equal level of professionalism and in which he still serves in a supervisory capacity.

<u>Id</u>. ¶114-115.  Defendants also defend their actions by alleging that Fago was violent in the work

place, but after his demotion he was transferred to a position in the Youth Initiative, which

demanded constant interaction with children. Id. ¶116. Logically, the reasons offered by the

defendants to support Fago's demotion are not supported by the facts of this case.  Plaintiff has

established a prima facie case of discrimination and the non-discriminatory basis for these

actions offered by the defendants are not legitimate, therefore, summary judgment of plaintiff's

action against the defendants for their violations of his Equal Protection rights must be denied.

## D. POLICE DEFENDANTS AND THE THREE DEFENDANTS CREATED A HOSTILE WORK ENVIRONMENT

As delineated in Count 1 ¶41 and Count 2 ¶9 of plaintiff's complaint, defendants' actions

created a hostile work environment in violation of his aforementioned constitutional rights.

Evidence exists to indicate that defendants created a racially hostile environment; because of the

issues of material fact associated with this claim, it is not a candidate for summary judgment.

The prohibition of employer conduct which discriminates against any individual "in

respect to his compensation, terms, conditions, or privileges of employment because of such

individual's race, color, religion, sex or national origin" 42 U.S.C. § 2000e-2(a)(1) extends to

the creation of a discriminatorily hostile or abusive environment. Meritor Savings Bank, FSB v.

Vinson, 477 U.S. 57, 64 (1986).  The harassing conduct does not need to result in an emotional

or physical breakdown in order to invoke Title VII, instead it needs only to be "severe or

pervasive enough to create an objectively hostile or abusive work environment". Harris v.

Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

A hostile and abusive work environment "can and often will detract from employees' job

performance, discourage employees from remaining on the job, or keep them from advancing in

their careers….and offends Title VII's broad rule of workplace equality".  Harris, 510 U.S. at 22.

The Supreme Court delineated several factors which a court may consider when determining whether a work environment violates an employee's rights.  Harris stressed that it is not a "mathematically precise test", and that "no single factor is required" but that all the circumstances must be reviewed, including: "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. To make the requisite showing of a hostile work environment, the plaintiff must demonstrate that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did perceive to be so." Faragher, 524 U.S. at 787 (citing Harris, 510 U.S. at 21-22).

In assessing a pattern of alleged misconduct, the court should not require a showing of "a threshold magic number of harassing incidents," Richardson v. New York State Dep't of Correctional Services, 180 F.3d 426, 439 (2d Cir. 1999) (internal quotations omitted), nor should the court base its evaluation solely on "how long the [challenged] innuendos, slurs, verbal assaults or obnoxious course of conduct lasts." Whidbee, 223 F.3d at 69 (quoting Carrero v. New York City Housing Auth., 890 F.2d 569, 578 (2d Cir. 1989)). Rather, it should consider the "offensiveness of the individual actions complained of in determining whether such actions are pervasive." Id. In other words, the challenged conduct must be "of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." Whidbee, 223 F.3d at 70 (quoting Torres v. Pisano, 116 F.3d 625, 632 (2d Cir.), cert. denied, 522 U.S. 997 (1997)).

To survive a motion for summary judgment, a plaintiff alleging a hostile work

environment must present evidence from which a reasonable fact-finder could conclude: (1) that the workplace was permeated by sufficiently severe or pervasive intimidation so as to alter the conditions of the plaintiff's work environment, and (2) that a specific factual basis exists for imputing the unlawful conduct creating the hostile environment to the plaintiff's employer. Mack, 326 F.3d at 122.

In addition to demonstrating victimization by a hostile environment, the plaintiff must also establish a factual basis for holding the employer liable for the alleged misconduct of its agents. See Faragher, 524 U.S. at 804; Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998). This can be done by demonstrating that a "supervisor with immediate or successively higher authority over the employee" engaged in the alleged misconduct. See Mack, 326 F.3d at 123 (quoting Ellerth, 524 U.S. at 765). Alternatively, if a co-worker or employee with no actual or apparent authority over the plaintiff engaged in the alleged misconduct, the plaintiff must demonstrate that "the employer either provided no reasonable avenue of complaint or knew of the harassment and did nothing about it." See Torres, 116 F.3d at 633 (quoting Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir. 1992)).

The defendants created a hostile work environment for plaintiff by harassing him, subjecting him to taunts, making false allegations regarding his character directly, and causing his demotion. The defendant's actions were pervasively humiliating and offensive and unreasonably interfered with plaintiff's work performance. A reasonable mind could easily find that the extent of defendant's behavior made it both subjectively and objectively offensive and created a hostile work environment. The evidence supports the conclusion that Fago's co-workers engaged in misconduct, and also that the employer knew about this behavior but did

nothing to stop it.  By expanding the investigation of the false allegation against Fago, and at the same time ignoring Fago's exculpatory evidence Pawlina, Jones, and Marquis. became an integral part of the pervasively hostile work environment.

Fago received a note stating "Beat up any girls lately? Fuck you asshole".  SFID ¶132. This note was never investigated, and the author never found, despite the fact that it was written days after the Stairwell Incident. Id. The Department Advocate explained that the note was so severe and abusive that it should have been brought to his attention and investigated. Id. at ¶132.

In his memo of March 5, 2002, Pawlina recounted that he had told McClure and Fago that "Any allegations that can be proven will lead me to recommend the most severe discipline, including the possibility of demotion of rank, or termination"  and in addition, "[a]ny false or baseless accusations that can be proven will be treated with the same severity"; however, after Sergeant Calderone's investigation proved that McClure's allegations regarding the Stairwell Incident were untrue, no such similarly severe punishment was given. Id. at ¶46. The Three Defendants were aware that Marquis and his administration were open to the idea of demoting lieutenants based on complaints, in order to promote black and other minorities to the position of lieutenant, and this link substantiates the conclusion that the Three Defendants and the Police Defendants created a pervasively hostile work environment. Id. at ¶86.("complaints could be made and they could be taken by he administration, and a demotion, which has seldom occurred in the police department, maybe less than two ore three in 30 years or so, 40 years, could happen").

McClure has a pattern of harassing plaintiff, in addition to a pattern of making false complaints. Id. at ¶151.  Fago's sexual harassment complaint against McClure was never

investigated, though it should have been. Id. at ¶133. Jobes, Russell, and McClure have also

verbally harassed plaintiff. Id. at ¶ 130. Pawlina dismissed Fago's denials and other valid

exculpatory evidence in favor of unsubstantiated allegations, rumor and hearsay later proven to

be false. Id. at ¶ 58,62, 84. See also, Fago Dep. at 308:4-14 ("it is very stressful and creates a

hostile work environment when you know you are doing our job and you have some facts to

corroborate that the allegations against you are untrue and unfounded and you present them and

they" ignore them.)(Exh. 1).

       Being demoted is embarrassing and mortifying; demoting somebody for wrong reasons,

or based upon a blatantly flawed investigation is malicious and devious. Id. at ¶137. When Fago

was demoted, he told his new supervisor that he was humiliated, and could not face his family

and co-workers; plaintiff even sought the help of a mental health provider. Id. at ¶141.  With his

demotion Fago did not only lose his base pay and rank, but also his uniform, which made his

humiliation obvious to all of his former subordinates who had made false allegations against him

in order to insure his demotion. Id. at ¶143.  Pawlina, Marquis and Jones created a hostile work

environment not only by basing their decisions on a flawed investigation, but also by allowing

their biases to influence personnel decisions and ignoring all of the exculpatory evidence. Id. at ¶

136, 138.  These same defendants ignored all of the evidence indicating collusion on the part of

plaintiff's co-workers.  Id. at ¶91. Pawlina stated as a fact that plaintiff had "a history of violence

in the work place", despite no valid evidence to support this conclusion.  Id. at ¶ 82.  This severe

and false statement had negative ramifications on the future of plaintiff's career. Id. at ¶85.

Defendants did not want to punish plaintiff for any of the alleged discretions, they only sought to

demote and therefore humiliate and embarrass him. Id. at ¶117.

Rudewicz and Miele made defamatory and harassing statements against plaintiff with the specific intent of causing him to be demoted and humiliated.  Id. at ¶140.  Their complaints attempted to link plaintiff's habit of humming with violent behavior of such a severity as to inspire fear. Id. at ¶65, 67, 70, 71. Defendant Buyak stated that plaintiff was insane and capable of going on a roof and shooting people.  Id. at ¶69.  Such statements were clearly made to cause plaintiff emotional harm, as these severe and unfounded statements served no other purpose; the Department Advocate stated that these accusations were so strong that they should have been investigated. Id. at ¶135.

Defendants claim that Pawlina's unethical and improper investigation which allowed Fago's subordinates to make false claims against him and directly cause his severely embarrassing demotion does not qualify as creating a hostile work environment; however, these actions and false allegation were indeed severe and pervasive and also negatively impacted Fago's future as a  police department. Id. ¶81.  Defendants ignore obvious facts that negate their request for summary judgment and, therefore, summary judgment is not appropriate.

### E. FAGO WAS DEPRIVED OF PROCEDURAL DUE PROCESS

In his Complaint at Count Two ¶4, plaintiff explains that defendants violated his Constitutional rights by depriving him of due process of law by demoting him to sergeant without first reviewing his probation and based upon an incomplete investigation and false accusations.  This claim should not be dismissed because genuine issues of material facts exist.

The Fourteenth Amendment guarantees an individual due process of the law where the state deprives an individual of a constitutionally protected liberty or property interest.  Board of Regents v. Roth, 408 U.S. 564, 569 (1972).  If the state deprives a person of a protected interest,

the state must provide such procedures as the circumstances demand.  Mathews v. Eldridge, 424 U.S. 319,333 (1976) (the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).  In order to have a protected property interest, plaintiff must establish that he has a legitimate, constitutionally based, claim of entitlement to the position sought, not merely an unprotected unilateral expectation of employment. Id.

   An interest protected or cognizable under the due process clause must have a basis in existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." (Citations omitted; internal quotation marks omitted.) Hunt v. Prior, 236 Conn. 421, 436 (1996). Application of the ['clear entitlement'] test must focus primarily on the degree of discretion enjoyed by the issuing authority, not on the estimated probability that the authority will act favorably in a particular case." (internal citations omitted) Kelley Property Development, Inc., v. Town of Lebanon, 226 Conn. 314 (1993).

   "Due process is inherently fact-bound because due process is flexible and calls for such procedural protections as the particular situation demands.... The constitutional requirement of procedural due process thus invokes a balancing process that cannot take place in a factual vacuum." (Internal quotation marks omitted.) Thalheim v. Greenwich, 256 Conn. 628, 648 (2001).

   Plaintiff was deprived of his procedural due process rights, and because the facts support this claim, defendants request for summary judgment on this issue should be denied.  Plaintiff did not receive all of the process to which he was due.  Defendants violated these rights when

they acted contrary to Rule IX of the City of Hartford's Personnel Rules and Regulations by failing to provide plaintiff with his bi-monthly performance evaluations during his probationary period. Id. ¶19.  This prohibited Fago from knowing that his performance needed to be improved, thereby hampering his ability to remedy his situation or address the allegations against him. Id.  Plaintiff was never told the exact duration of his probationary period, and therefore was never aware of how long he would be subjected to the whims of Marquis administration. Id. ¶18.

Plaintiff did not receive the two week notice of his demotion required by Rule IX, in fact, the date Fago was notified was less than two weeks prior to the end of a yearly probationary period. Id. ¶21. Instead, plaintiff was notified of the demotion the day it was effective. On that date plaintiff lost all responsibilities and duties related to the position of lieutenant. Id.

The reason why defendants Marquis,  Jones and Pawlina demoted Fago because of the events alleged in Pawlina's report is because they were not looking to discipline, only to demote him. Id. ¶117.  They wanted to demote him because only during his time as a probationary employee could they make unilateral administrative decision without violating the union agreement. Id. at ¶ 122.

Defendants claim that Marquis alone had the authority to demote plaintiff; however this claim is negated by the other defendants.  Both Jones and Pawlina directly influenced Marquis decision and are an integral part of this claim. Id. at ¶ 104, 105, 107, 108. Plaintiff's procedural due process claims are well supported by the facts in this case and this claim is not a candidate for summary judgment.

### F. MARQUIS, JONES AND PAWLINA VIOLATED FAGO'S RIGHT TO SUBSTANTIVE DUE PROCESS

Count Two ¶3 of Plaintiff's complaint alleges that defendants violated his

constitutional right to substantial due process.  Plaintiff fulfills the requisite criteria to meet this claim. "'Where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" Russo v. City of Hartford, 184 F. Supp. 2d 169, 184 (D. Conn. 2002) (finding plaintiff properly alleged substantive due process violation) (quoting Albright v. Oliver, 510 U.S. 266, 273, (1994)).

### 1.      Plaintiff Had a Property Interest.

"[T]o establish a violation of either substantive or procedural due process, plaintiff must initially show that [he] was deprived of a property or liberty interest." Gordon v. Nicoletti, 84 F. Supp.2d 304, 309 (D. Conn. 2000).  In many circumstances a state employee may have a property interest in continued employment or a promotion. See, e.g., Harhay v. Town of Ellington Bd. of Educ., 323 F.3d 206, 212 (2d Cir. 2003) (finding contractual right to reappointment under a collective bargaining agreement to be an important interest as opposed to a trivial and insubstantial interest, and therefore a property interest); Board of Regents of State Colleges v. Roth, 408 U.S. 564, 576 (1972) (discussing property interests in public employment created by tenure provisions or employment contracts). Because courts recognize that a promotion is a type of property interest, plaintiff has met the first requirement of this claim.

### 2.      Defendants' Actions "Shock the Conscience"

Defendants' behavior toward plaintiff "shock the conscience" and constitute a violation of his substantial due process rights. A claim for a substantive due process violation must "shock

the conscience." Rochin v. California, 342 U.S. 165, 172 (1952); see e.g. Russo v. City of Hartford, 184 F. Supp. 2d 169, 196-97 (D. Conn. 2002) (finding allegations that police chief had refused to investigate police officer's allegations of physical threats by supervisors or to take steps to prevent potential harm by fellow police personnel to police officer sufficiently stated a claim for a violation of substantive due process); Jensen v. City of Oxnard, 145 F.3d 1078, 1084 (9th Cir. 1998) (finding that, notwithstanding Collins, plaintiff police officer properly states a claim for substantive due process violation where police officer alleges intentional or reckless acts of a government employee directed against another government employee).

The purpose of the Due Process Clause is to prevent the government 'from abusing [its] power, or employing it as an instrument of oppression.'" De Shaney v. Winnebago County Dept. of Social Services, 489 U.S.189, 196 (1989) quoting Davidson v. Cannon, 474 U.S. 344, 348 (1986). Substantive due process is designed to protect against government actions that are "arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir.1995). The Second Circuit has pointed out that malicious and sadistic abuses of government power which are intended only to oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience. Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 252 (2d Cir. 2001).

Actions intended to injure in some way and unjustifiable by any government interest will most likely be found conscience-shocking. Id. This is a fact-specific inquiry that requires a case by case analysis. Understanding that actions which would shock the conscience in one set of circumstances could be considered completely rational in another set of circumstances, the

Supreme Court has established that the "deliberate indifference" standard will determine if an official's actions "shock the conscience."  Sacremento v. Lewis, 523 U.S. at 850-51; see also Betts v. Brady, 316 U.S. 455, 462 (1942).  Inherent to the word "deliberate" is the idea that the actor must contemplate her actions within a given time frame; split-second decisions that result in harm are not equal to those actions that are considered and implemented over a longer period of time.  Pre-meditated actions are decidedly more egregious and therefore often rise to the level of constitutional violation.  Id.  A government official shocks the conscience and violates one's substantive due process rights when, given the opportunity to deliberate and decide upon a course of action that would intentionally harm an individual, that official carries through with such actions.  Daniels v. Williams, 474 U.S. 327,331 (1986).

Defendants violated plaintiff's substantive due process rights; summary judgment is not appropriate on these claims.  All of the defendants acted deliberately to harm plaintiff and did so without a legitimate purpose.  McClure, Russell, Jobes, Rudewicz, Miele and Buyak colluded together to create a pool of false allegations against Fago. SFID ¶91.  Pawlina deliberately chose to expand his investigation beyond the appropriate and relevant scope and intentionally included hearsay, historical information and unsubstantiated false allegations in his report while excluding all exculpatory evidence solely in order to cause injury to plaintiff. Id. ¶100, 107.  Jones deliberated on several occasions with the other defendants and intentionally chose to ignore the flaws in Pawlina's investigation, side with his friends Jobes, Russell and McClure, and recommend demotion of Fago in order to injure him.  Id. ¶¶87-89,104,105, 157, 161, Jones also 'shocked the conscience' when he altered Fago's evaluation before Pawlina's investigation was complete, and before Fago had ever been given an opportunity to refute defendant's false

allegations. Id. ¶99, 104, 105. Marquis deliberated with his staff and also intentionally chose to ignore the flaws of Pawlina's investigation and decided to demote Fago on no legitimate basis and for no legitimate purpose. Id. ¶104, 107-111. Marquis, Jones and Pawlina further 'shocked the conscience' and acted with deliberate indifference by arbitrarily ignoring Fago's concerns regarding the harassing "Fuck you asshole" note that arrived in his mailbox days after the alleged Stairwell Incident; the Department Advocate in charge of discipline believes this note was so serious and shocking as to require investigation, but none was initiated by defendants. Id. ¶32. There was not legitimate purpose behind these activities, as most of those who reported the false allegations had never reported these historic alleged events previous to this investigation, they could not have served a legitimate purpose on this occasion. Id. ¶70, 72.

Defendants again attempt to ignore the chain of command and the policy and practice of the Marquis by focusing the blame solely on then-Chief Marquis; however, the record is clear that Marquis weighed their opinions and relied heavily on them and Pawlina's flawed investigative packet. Id. ¶88, 89, 104, 107, 108. The defendants' actions most certainly shock the conscience because of their arbitrary, deliberate, oppressive and vindictive nature intended solely to harm the plaintiff by demoting and humiliating him.

### G. POLICE DEFENDANTS AND THE THREE DEFENDANTS RETALIATED AGAINST FAGO IN VIOLATION OF HIS FIRST AMENDMENT RIGHTS

Defendants attempt to confuse and misstate plaintiff's first amendment claims articulated in the Third Count of plaintiff's compliant. This claim meets the criteria necessary to establish a violation of plaintiff's First Amendment rights, and summary judgment is not appropriate. The protected activity encompassed by this claim includes both plaintiff's testimony in the

"Sergeants' case", the filing of sexual harassment complaints, as well as the filing of the complaint in this case, and other testimony made by the plaintiff against the HPD.  See generally Count Three of the Second Amended Complaint. Three Defendants incorrectly attempt to construe this claim as limiting liability to only his testimony in the "Sergeants' case".  Police Defendants similarly attempt to limit the scope of the facts in their favor by ignoring the facts in support of this claim that make summary judgment inappropriate.

To prevail on a First Amendment retaliation claim, the plaintiff must establish: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Garcia v. S.U.N.Y. Health Sciences Center, 280 F.3d 98 (2d Cir. 2001). Plaintiff has sufficiently alleged retaliation for First Amendment activity.

The Supreme Court has stated that the First Amendment "protects state employees not only from patronage dismissals but also from even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her from exercising her free speech rights."  Rutan, 497 U.S. 62, 75 n.8 (1990).  Since the Rutan decision, the Second Circuit "allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass."  Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002).

### 1. **Fago's speech was protected because it was a matter of public concern.**

Whether speech addresses a matter of public concern is determined "by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983).  "To fall within the realm of public concern, moreover, an employee's

speech must 'relate to a ... matter of political, social, or other concern to the community.'"
Locurto v. Giuliani, 269 F. Supp. 2d 368, 385 (2d Cir. 2003) (quoting Connick v. Myers, 461
U.S. 138, 146 (1983)).

If a plaintiff's complaint "implicates system-wide discrimination" they become a matter
of public concern. See Marshall v. Allen, 984 F.2d 787 (7th Cir.1993) (allowing Section 1983
claim where plaintiff was discharged following his support of other employees who had filed suit
for gender discrimination); Auriemma v. Rice, 910 F.2d 1449, 1460 (7th Cir.1990) (in banc)
(finding public interest where there was a "wholesale change in the highest police echelons
allegedly only on a racial basis"), cert. denied, 501 U.S. 1204 (1991). In addition, such a decision
requires a "focus on the motive of the speaker . . . to determine whether the speech was
calculated to redress personal grievances or whether it had a broader public purpose." Lewis v.
Cowen, 165 F.3d 154, 163-64 (2d Cir. 1999). "Speech on a purely private matter, such as an
employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of
public concern." Id. at 164 (citing Connick, 461 U.S. at 147). "Speech is more likely to be of
public concern if the speaker is speaking as a citizen on matters of public interest, and not solely
as an employee on matters only of personal interest." Sacco v. Pataki, 982 F. Supp. 231, 240
(S.D.N.Y. 1997). "Virtually every citizen has a personal interest in matters of public concern;
after all, each citizen is a member of the public and is, in some way, impacted by the resolution
of societal problems. The determinative question is whether that interest arises from the speaker's
status as a public citizen or from the speaker's status as a public employee." Blum v. Schelegel,
18 F.3d 1005, 1012 (2d Cir. 1994). Statements regarding internal employment policies may
raise at once issues that are of both personal and public concern for purposes of state statute

prohibiting employer from discharging employee for exercising rights under First Amendment. <u>Daley v. Aetna Life & Cas. Co.</u>, 249 Conn. 766 (1999).

Plaintiff's testimony in the "Sergeants' case" was protected speech. His testimony, though describing his personal experience, was not about a personal grievance. SFID ¶ 14. Plaintiff was "speaking as a citizen on matters of public interest, and not solely as an employee on matters only of personal interest". This indicates that Fago's testimony was of public concern, and thus protected speech. In addition, Fago's testimony in the <u>Murdock</u>, <u>Perodeau</u>, <u>Stack</u> and <u>Russo</u> cases was similarly protected speech. <u>Id</u>. ¶129.

The filing of the complaint in this case also resulted in retaliation against Fago. <u>Id</u>. ¶ 118, 119. After the filing of this lawsuit, Pawlina initiated disciplinary charges against Fago for the alleged events within his improper investigation; however, the Department Advocate in charge of discipline exonerated Fago of all charges. <u>Id</u>. ¶ 48, 118, 119. The filing of a complaint which implicated that internal employment policies of the Hartford Police Department violated First Amendment, as well as Title VII rights most certainly creates an issue of public concern. Fago has implicated system-wide discrimination within the Hartford Police department, though personal in nature, as discussed in <u>Daley</u>, these concerns are also of vital public importance.

Fago testified against the Hartford Police Department in the <u>Russo</u> cases, 3:97CV2380; 3:00CV01794; 3:00CV02382, <u>Perodeau v. City of Hartford,</u> 3:99CV807, <u>Stack v. City of Hartford</u>, 3:01 CV 0260, and <u>Murdock v. City of Hartford</u>, 3:01 CV 0774 was also protected by the first amendment for all of the reasons discussed above. <u>Id</u>. ¶ 129. Fago's testimony in both the "Sergeants' Case" and <u>Russo</u>, as well as the filing of his own complaint which implicated further system wide discriminatory practices by the HPD were all speeches protected by the First

Amendment.

      Defendant McClure, and potentially other defendants who had a personal relationship with her such as Jones, retaliated against Fago's sexual harassment complaint against her, and for the dismissal of her complaint against him, by making and supporting the false allegations contained in Pawlina's flawed Investigative Packet. Id. ¶35, 77, 110.  Fago's speech in this instance is protected speech because it pointed to system-wide discrimination. Id.  All of the Defendants acted in retaliation against Fago's protected speeches by engaging in the harassing behavior, and summary judgment should not be granted to any of the defendants.

### 2. **Defendants Took Adverse Action Against Plaintiff**

      Both Three Defendants and the Police Defendants took adverse action against Fago; this evidence is more than sufficient to create a genuine issue of material fact.  Three Defendants attempt to confuse the issues in dispute by dismissing the issue that a reasonable jury could find that the temporal connection to the false allegations made by the Three Defendant's supports the conclusions that this behavior was in retaliation for Fago's testimony in the "Sergeants' case". In particular Fago's retaliation claim against McClure extends beyond the "Sergeants' case" into the dismissal of her sexual harassment complaint against plaintiff. ¶77. The Three Defendant's retaliated for Fago's protected speech by making false allegations against Fago with the specific intent of creating a pattern of negative behavior that did not exists, for the malicious purposes of harassing, demoting, and humiliating plaintiff.  SFID ¶91.

      Police Defendants took adverse action against plaintiff in a variety of ways.  Pawlina excluded exculpatory evidence and conducted a flawed investigation that was beyond the proper scope temporally and factually.  This allowed the other defendants to collude and create a false

pattern of behavior. Id. ¶91-93, 100, 107. Pawlina and Jones then improperly altered Fago's interim performance evaluation and Pawlina proffered his investigation as complete and truthful to Marquis and Jones. Id. at ¶80, 82, 87,100.  Jones and Pawlina in turn presented their opinions to Marquis based upon personal bias and the flawed report.  Id. at ¶100, 104, 108, 157, 161. All of these actions culminated in Fago's humiliating demotion. Id. at ¶109.  Police Defendants retaliated after the filing of this lawsuit by initiating disciplinary charges against Fago; however, the Department Advocate in charge of discipline exonerated Fago of all charges.  Id. ¶48, 118, 119.  This retaliation continues to this day, in the form of verbal abuse, and improper interrogations, retaliatory mandatory training sessions, threats of transfer and ignoring and dismissing plaintiffs concerns. Id. ¶129-131.  Because genuine facts exist in dispute regarding this claim, defendants should not be granted summary judgment.

### 3.  There Is A Causal Connection Between The Protected Speech And Defendant's Actions

To establish a causal connection, the courts look to whether there is an inference that defendants had a retaliatory motive. Morales v. Mackalm, 278 F.3d 126 (2d Cir. 2002).  "The causal connection must be sufficient to support the inference 'that the speech played a substantial part' [in the adverse action]." Dawes, supra, 239 at 492, quoting Ezekwo v. NYC Health & Hosp. Corp., 940 F.2d 775, 780-91 (2d Cir. 1991).

The temporal relation between plaintiff's protected activities and defendant's retaliatory behavior demonstrates the causal connection and proves that plaintiff meets this requirement. Two weeks after filing his complaint, and six months after being demoted, defendants Jones and Pawlina initiated an internal investigation of McClure's complaint that could have resulted in

discipline as severe as termination, though defendant Reilly has admitted that "one incident would normally have one penalty." Reilly Dep. at 106:15-16. (Exh. 20); SFID ¶ 48, 118, 119.

       After the filing of his complaint, plaintiff was repeated threatened with transfers which would put him under the supervision of one of the defendants, subjected to mandatory training and dismissed when relating valid concerns. Id.   In addition, Fago has been verbally harassed by defendant Jobes, Russell and McClure since the filing of the lawsuit. Id. ¶ 130. Within two weeks of Fago's testimony against the Russell and Jobes in the "Sergeants' Case",  McClure, Jobes, Russell, Miele and others began lodging false complaints against Fago. Id. ¶ 15, 27.  All of the facts in support of the retaliatory behaviors by the defendants also took place in close proximity with Fago's testimony in other 'whistle-blowing' cases, because all took place after the protected activities and had never happened prior. Id. at 129.

       The defendants again attempt to limit the scope of the facts, ignoring important facts showing the nature of this case, and blatantly twisting other facts. For example, the threatened transfers to work under one of the defendants in this case did not actually need to occur in order to be a retaliatory act because the threat of doing so was harassing and adverse enough to qualify as retaliation.  Fago's protected speeches clearly created a motive for defendants to want to silence him, and the temporal proximity of these events further substantiates this claim.  The activities of the defendants in retaliation for the 'Sergeants' case' , his other "whistle blowing testimony" and the filing of this complaint rise to the level of consistent and continuous harassment against Fago.  Material facts indicate that Fago was retaliated against for his protected activities and defendants should not prevail on their motion for summary judgment of this claim.

**H. NEITHER THE POLICE DEFENDANTS NOR THE THREE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY**

Defendants are not entitled to qualified immunity. The doctrine of qualified immunity provides that: "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Moffit v. Brookfield, 950 F. 2d 880, 885 (2d Cir. 1991),

"The relevant inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  As the Supreme Court has pointed out, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." (Emphasis added; internal quotations and citations omitted) Stephenson v. Doe, 332 F.3d 68, 77-78 (2d Cir. 2003).

"A courts evaluation of a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." Wilson v. Layne, 526 U.S. 603, 609 (1999).  If the court finds that a clearly established right of the plaintiff has been violated, the court must then determine whether the defendant's actions "could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987).  The Supreme Court has held that "a claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated." Mitchell v. Forsyth, 472 U.S. 511, 527-28 (1985).  Qualified Immunity is an affirmative defense, and as such the burden is on defendant to establish its existence.  See In re:

State Police, 88 F.3d 111, 123.

"[A] suit for money damages may be prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so long as the relief is sought . . . from the officer personally." Alden v. Maine, 527 U.S. 706, 757 (1999). Additionally, sovereign immunity "does not bar certain actions against state officers for injunctive or declaratory relief." Id.

The Three Defendants do not have qualified immunity for the violation of Fago's clearly established constitutional rights. Reasonable minds could conclude that McClure, Jobes and Russell, intentionally acted in retaliation for plaintiff's constitutionally protected activities, or because of racial animus. Three Defendant's attempt to narrow the scope of their behavior and eliminate the genuine issues of material fact regarding the collusion, falsity and true motivation for their actions which clearly violate his constitutional rights. When presented with the entire breadth of evidence, reasonable minds would agree that Three Defendants actions do not qualify them for immunity, therefore, summary judgment is not appropriate.

Similarly Police Defendants are not entitled to qualified immunity because they have failed to meet the burden of demonstrating that they can use this defense. Plaintiff's complaint clearly alleges violations by all defendants of his First Amendment and Fourteenth Amendment rights. See Second Amended Complaint. These rights were established at the time of defendants' violations, their actions were such that it was not objectively reasonable for them to believe their actions were lawful at the time, and any claim of qualified immunity is improper. Furthermore, qualified immunity cannot protect defendants from plaintiffs requested injunctive

relief. Reasonable minds will agree that Marquis, Pawlina and Jones violated Fago's rights to

due process and free speech when the improperly demoted him and retaliated against him for his

protected activities. Infra pp. 27-39.

### I. DEFENDANTS' OBJECTIONS TO FAGO'S SECTION 1983 CLAIMS AGAINST DEFENDANTS IN THEIR OFFICIAL CAPACITIES ARE FRIVOLOUS AND WITHOUT MERIT.

Defendants allege that they cannot be sued in their official capacities because they

"are not 'persons'".  This claim is frivolous and without any merit is merely an attempt to

distort the law.

### J. FAGO CAN PREVAIL ON HIS TITLE VII AND SECTION 1983 CLAIMS AGAINST THE CITY OF HARTFORD AND THE THREE DEFENDANTS

"A plaintiff who seeks to recover against a municipality under § 1983 must show that the

violation of his constitutional rights resulted from a municipal policy or custom." Davis v. City

of New York, 75 Fed. Appx. 827, 829 (2d Cir. 2003) (internal quotations and citations omitted).

There are four circumstances in which a policy or custom may be established. The

plaintiff may establish (1) a formal policy, officially promulgated or adopted by the municipal

defendant, Monell v. Department of Social Services., 436 U.S. 658, 690 (1978),  or (2) a specific

action or decision by an official responsible for establishing final policy with respect to the

subject matter, if that action or decision caused the violation of plaintiff's constitutional rights,

Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84 (1986) (plurality opinion), or (3) the

existence of an unlawful practice by subordinate officials so permanent and well settled as to

constitute a 'custom or usage' and proof that this practice was so manifest or widespread as to

imply the constructive acquiescence of the policy-making officials, <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 127, 130 (1988); <u>Sorlucco v. New York City Police Dept</u>., 971 F.2d 864, 871 (2d Cir. 1992), or (4) the failure of the City to train or supervise its employees in a fashion designed to prevent the violation of plaintiff's rights, if such failure amounts to 'deliberate indifference' to the rights of those with whom the municipal employees will come into contact. <u>Gottlieb v. County of Orange</u>, 84 F.3d 511, 518 (2d Cir. 1996); <u>Walker v. New York</u>, 974 F.2d 293, 297 (2d Cir. 1992).

"Actions by an individual with final decision-making authority in a municipality constitute official policy for purposes of a § 1983 claim." <u>Anthony v. City of New York</u>, 339 F.3d 129, 139 (2d Cir. 2003) (<u>citing</u> <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 483-84 (1986). The individual must be responsible for establishing final government policy "in order for municipal liability to attach." <u>Anthony v. City of New York</u>, 339 F.3d 129, 139 (2d Cir. 2003).

"Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law. The relevant legal materials, include state and local positive law as well as custom or usage having the force of law." <u>Jeffes v. Barnes</u>, 208 F.3d 49, 57 (2d Cir. 2000).

In applying the <u>Pembaur</u> standard, the Second Circuit has explained that where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represents government policy.  An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions. <u>Anthony v. City of New York</u>, 339 F.3d 129, 139 (2d Cir. 2003) (quoting <u>Rookard v. Health & Hosps. Corp</u>., 710 F.2d 41, 45 (2d Cir. 1983).  Such a policy may be inferred from circumstantial

proof.  Gagne v. DeMarco, 281 F. Supp. 2d 390, 398 (D. Conn. 2003).

In O'Connor v. Barnes, 1998 U.S. Dist. LEXIS 3386 (N.D.N.Y. Mar. 18, 1998) Judge

Kahn was presented with the question of whether a County Sheriff is a policymaking official. Id.

at 14.  Judge Kahn noted that the Sheriff is responsible for matters of supervision, discipline,

scheduling and training within the Sheriff's Department.  Id. at 14-15.  The municipality argued

that the Sheriff is not a policymaker for the County because he is an elected official and because

the County does not direct or control personnel of the Sheriff's Department. Id. at 115.

Judge Kahn, relying on previous Second Circuit cases which found that a Sheriff is a

policymaker for the County in which he is employed, found the Sheriff to be a policymaker. Id.

(citing to Weber v. Dell, 804 F.2d 796, 803 (2d Cir. 1986) (1987);  Heisler v. Kralik, 981 F.

Supp. 830, 841 (S.D.N.Y. 1997); Wagner v. County of Cattaraugus, 866 F. Supp. 709, 718

(W.D.N.Y. 1994) (County not liable for arrests made without probable cause where there was

"no evidence that the Sheriff ever condoned or acquiesced in these arrests")). Judge Kahn then

went on to find that retaliation was in the scope of the Sheriff's policymaking authority.  Id. at

17-21.

Plaintiff will prevail on his section 1983 claims against all defendants, there are many

wrongdoings for which the city can be held liable, and summary judgment is not appropriate.

Infra 27-39.  Under Monell, the City of Hartford can be liable because a municipal policy or

custom deprived plaintiff of his constitutional rights.  First, a formal policy, officially

promulgated or adopted by the municipal defendant violated plaintiff's rights.  Monell, 436 U.S.

658.  The CBA, or Collective Bargaining Agreement, adopted by the City of Hartford violated

plaintiff's due process rights by refusing him the grievance process and allowing defendants to

escape any ramifications for their actions.  SFID ¶23, 24. Second, a specific action or decision by

an official responsible for establishing final policy with respect to the subject matter caused the

violation of plaintiff's constitutional rights. <u>Pembaur</u>, 475 U.S. 469.  Marquis established a policy

wherein he would demote officers without just cause and based on their race, therefore, as a

policy maker for all practical and legal purposes for the City of Hartford, he violated plaintiff's

constitutional rights. <u>Id</u>. ¶ 25, 126, 127.

Police Defendants claim that Marquis and his subordinates were not final policy makers,

but this is a distortion of the municipal policies and customs and legal and practical fact. Like the

sheriff in <u>Pembaur</u>, Marquis set his own policies and procedures for acting as chief, and had

indicated that he didn't care what chiefs before him had done. <u>Id</u>. ¶128.  Police Defendants

misrepresent the fact that Marquis was the final decision maker and that he relied upon a chain

of command and information arising from his subordinates. <u>Id</u>. ¶ 88, 89, 104, 107, 108.  Police

Defendants attempt to confuse and mislead the court regarding a simple and straight forward

issue.  Fundamentally, and despite defendants' attempts to mislead, Marquis was an official of

the City of Hartford and it was his established policy that violated plaintiff's constitutional

rights.

Third, the existence of an unlawful practice by subordinate officials was so permanent

and well settled as to constitute a 'custom or usage' and proof that this practice was as manifest

and widespread as to imply the constructive acquiescence of the policy-making officials. <u>City of

St. Louis</u>, 485 U.S. 112.  Plaintiff will prevail on the Section 1983 claims against all defendants

because the plaintiff can establish that all defendants violated his constitutional rights through

the policy and customs that were a part of a widespread custom in which false complaints against

white males were more thoroughly investigated than those against other races. Id. ¶86.

Defendants purposely exploited this well-settled practice by making false and unlawful

statements, the higher ranking defendant's continued with this custom, and plaintiff was

unreasonably investigated and demoted.

Fourth, the failure of the City to train or supervise its employees in a fashion designed to

prevent the violation of plaintiff's rights, because failure amounted to 'deliberate indifference'

deprived plaintiff of his rights. Gottlieb, 84 F.3d 511; Walker, 974 F.2d 293. The defendants

were not properly trained or supervised. If they had been properly trained and supervised, they

would have known that false accusations for the purpose of demoting a disliked coworker was

both improper and unethical. Instead, they should have been trained and instructed to confront

such situations with maturity and by addressing the person directly, before involving higher

ranking officers and causing false investigation to be pursued. This lack of training and

supervision amounts to 'deliberate indifference' to the rights of employees who could be harmed

by coworker's improper motives and the manipulation of the investigatory process.

Contrary to the Three Defendant's assertions that they did not cause Plaintiff's demotion,

evidence supports the conclusion that they did so. It was not until after the improper

investigation into the Three Defendant's false complaints that Fago's superiors changed the

marking on his evaluation from satisfactory to unsatisfactory—indicating that were it not for

these false allegations and the subsequent improper investigation, plaintiff would have had a

final satisfactory review and would have the rank of lieutenant today. See generally SFID ¶49-

79. The Three Defendants attempt to dismiss the role of the chain-of-command and their

particular influence in Marquis's decision to demote plaintiff. Id. at ¶ 88, 89, 104, 107.

However, with the facts available, the reasonable minds of a jury could easily find that the Three Defendants were both personally and directly involved in plaintiff's demotion.

The Three Defendants cannot demonstrate that they did not proximately cause Fago's demotion. McClure used an accidental brush in a crowded hallway to make the false claim that she fear for her physical safety. Id. ¶27-35. McClure purposefully escalated this casual brush into a physical confrontation because only if she did so would it have become an incident that had to be thoroughly investigated. Id. ¶ 36-38. While her fear of physical threats would have to be investigated, a bump in the hall would not be. Id. McClure knew this, and thus intentionally wrote a false report for the purpose of causing an investigation wherein the other Three Defendants would have the opportunity to make additional false statements. Id. ¶Attempts by the Three Defendants to minimalize their manipulation of this system are both false and misleading. This factual disparity could only be resolved before a jury.

McClure volunteered the 'information' that other members of the Hartford Police Department had had conflicts with Fago several times in her initial interview with Pawlina, and she specifically mentioned defendants Jobes, Miele, Rudewicz, Buyak and Russell at least twice during this interview. Id. ¶ 40-43. After sending out interrogatories to all patrol sergeants and patrol lieutenants, only Miele and Jobes identified themselves as 'victims' of Fago's behavior. Id. ¶ 55. The persistence of McClure in attempting to impress upon Pawlina the idea that Fago had been engaging in a pattern of behavior, along with the fact that Jobes and Miele were the only people to positively identify themselves as victims indicates collusion on the part of defendants to attempt to create a false pattern of negative behavior by Fago. Id. ¶ 91. In Pawlina's interviews, McClure, Jobes and Russell continued to put false allegations and

untimely allegations against Fago onto the IAD Investigative Record. Id. ¶ 63-79.

Three Defendants attempt to confuse the issue by claiming that they only expressed opinions, and that doing so was their duty because they had to comply with a superior officer's request. Evidence supports the fact that the defendants worked together to maliciously disseminate false information regarding Fago. Defendants took common everyday actions by Fago—accidentally bumping a chair, or a brush in a hallway, or humming a tune, and attempted to inflate them into a pattern of harassing behavior. Reasonable minds could find that Three Defendants and the others to make false allegations against Fago, did so specifically in order to try to get him demoted. Because reasonable minds could find that the Three Defendant's proximately caused Fago's constitutional injuries, summary judgment should not be entered.

Similarly, Three Defendant's argument that the decisions of Pawlina and Marquis were 'superseding events' that somehow obviate Three Defendants for the liability associated with their actions is a misleading attempt to obscure and distort the facts of this case. A jury could interpret the evidence to indicate that the Three Defendants and Miele, Buyak, and Rudewicz colluded together to present a set of facts to Pawlina that would necessitate an investigation. Marquis relied on this investigation when he decided to demote Fago. He also relied upon the opinions of Pawlina and Jones, both of whom based their recommendations on Pawlina's Investigation. Id. ¶88, 89, 104, 107, 108.

Police Defendants further attempt to needlessly complicate the standards required to be met by plaintiffs by claiming that the City did not act with "deliberate indifference" in failing to properly supervise and train their employees. Plaintiff meets the first standard noted by defendants: the City should have known that the HPD employees would be confronted with

racial discrimination and retaliation for "whistle-blowing" for these activities because these are not rare or unforeseen events. See e.g. recent article regarding defendant Miele and racial profiling (Exh. 30). Defendant's second point is also met: plaintiff's situation could easily have been avoided with proper training on racism and sexism in the work place and supervision of those individuals repeated involved in these scenarios. For example, Marquis was completely unaware of the sexual harassment claims filed by McClure and Fago, and therefore was ignorant of any retaliatory aspect of McClure's accusations. SFID ¶110. Defendant's last criterion is also met; the wrong choices by all of the defendants deprived Fago of his constitutional rights.

### K. FAGO'S INTENTIONAL INFLICTION OF EMOTIONAL HARM CLAIM WILL PREVAIL.

To prevail on his claim for intentional infliction of emotional distress the plaintiff must prove the following: (1) that defendant intended or should have known that emotional distress was a likely result of their conduct; (2) that the conduct was extreme and outrageous (3) that the conducted caused plaintiff distress (4) and that the plaintiff suffered severe emotional distress. Drew v. K-Mart Corp., 37 Conn. App. 239, 251 (1995). To sustain a claim for intentional infliction of emotional distress, the plaintiff must show that the defendants' conduct exceeds "all bounds usually tolerated by decent society." DeLaurentis v. City of New Haven, 220 Conn. 225, 597 (1991).

Evidence supports the finding that the Three Defendants intentionally inflicted emotional harm on Fago. In their motion, Three Defendants attempt to minimize their actions and plaintiff's ensuing emotional harm in order to make themselves appear innocent of this offense. Evidence supports the finding that Three Defendant's conspired together to make false allegations against plaintiff in order to subject him to the extreme embarrassment and

humiliation of demotion. Before Fago's demotion, no other lieutenant had ever been demoted.
SFID ¶128. Yet, because of the Three Defendant's behavior, an accidental brush in the hallway
became the springboard for a malicious investigation into false rumors. A reasonable jury could
conclude that McClure's purported fear, stemming from an accidental hallway brush, was a
deliberate lie, that her meeting with Pawlina was orchestrated in order to escalate a minor
incident into a major one. Fago became the first lieutenant demoted by the HPD in recent
memory, and the severe impact of this on his emotional state cannot be denied. These events
amount to much more than an adverse employment action—they were personal attacks on the
plaintiff's character and mental state. Though unsubstantiated by any other witnesses or facts,
these false charges were believed, plaintiff was demoted, and his sanity, good name, and clear
record discredited. None of the case law cited by Three Defendants relates to this type of severe
and outrageous conduct. Three defendants acted extremely and outrageously and cannot be
granted summary judgment on this issue. Being demoted is "mortifying" and "embarrassing". Id.
¶137. Demoting someone for the wrong reasons is "diabolical and devious". Id. "If you want to
embarrass the bejesus out of somebody, promote them and then just say 'You're done.'" Id. In
being demoted, Fago lost his base pay, his rank, as well as his uniform—making it obvious to all
of his coworkers that he had been demoted and humiliated. Id. ¶143. Fago told his supervisor,
Rae Ann Palmer that he was humiliated by the situation; he also told her that he was upset about
the impact on his financial future and his career, and his status in the police department. Id. ¶141.

Plaintiff fears having any additional contact with defendant McClure as it could give her
the opportunity to conjure up more false statements regarding his character. Id. ¶33. Fago's
sexual harassment claim against McClure was not properly investigated or even acknowledged.

Id. ¶133.  Despite his statements in his meeting with McClure and Fago, Pawlina and the other supervisors failed to discipline McClure for her false allegations. Id.¶ 134.

Defendants Buyak, Miele and Rudewicz claim that their statements were not outrageous and that they did not intend to inflict distress on Fago, and that Fago's stress was not severe. The factual record proves the opposite.

In his April 10, 2002, IAD interview, Buyak made defamatory statements such as: "I deem [Fago] . . . a loose cannon.  He's the type of guy who I think someday will go on the roof of a building with a weapon and start taking shots at people.  I see him as unstable.  And have always seen him as unstable." Id. ¶ 69.  During his April 11, 2002, IAD interview, Miele made defamatory statements such as referring to Fago as "a dangerous guy," Id. ¶ 71. During his IAD interview, Rudewicz also referred to Fago as "a very calculating person" and "devious." Id. ¶ 67.  To make these false allegations of pathological behavior in an official IAD interview is extreme and outrageous.  These comment would be considered extreme even if stated as casually in the hallway, but because it was said in an official investigation it was obviously intended to inflict severe emotional harm and to defame the plaintiff, lead to his demotion and further emotional harm and embarrassment.  None of these statements had any basis in fact, and defendants never have offered any valid facts in support of these statements.  Plaintiff has continued to see a both psychologist and a psychiatrist because of these events and the continuing retaliation and harassment by defendants. Id. ¶137.

## L. BUYAK, MIELE MCCLURE, JOBES, RUSSELL AND RUDEWICZ SHOULD BE HELD LIABLE FOR THEIR DEFAMATORY STATEMENTS

Defendants once again attempt to misconstrue both the law and the facts in raising this

defense. Defendants claim that the statements made were opinions and cause no pecuniary harm, and therefore, cannot constitute defamation.  This defense is without merit and summary judgment is not appropriate for this claim.

Defamation is "that which tends to injure 'reputation' in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory, or unpleasant feelings or opinions against him." DeVito v. Schwartz, 66 Conn. App 228, 234 (2001) "In sum, pursuant to the principles previously outlined, if the defamatory material is defamation per se, the jury may award the plaintiff general damages without any further proof thereof, special damages if proven and punitive damages as a matter of discretion. Where defamation per se has been established, a plaintiff should receive at least nominal damages…" Id. at 236.

"While all libel was once actionable without proof of special damages, a distinction arose between 'libel per se' and 'libel per quod.'" (Citation omitted.) Battista v. United Illuminating Co., 10 Conn. App. 486, 491 (1987) , cert. denied, 204 Conn. 802-03 (1987). "A libel per quod is not libelous on the face of the communication, but becomes libelous in light of extrinsic facts known by the recipient of the communication." (Citation omitted.) Id. Only in an action per quod must a plaintiff "plead and prove actual damages in order to recover." (Citation omitted.) Id.  On the other hand, "a plaintiff may recover general damages where the defamation in question constitutes libel per se."  Because the defamatory meaning of the words are "apparent on the face of the statement", libel per se is actionable without proof of actual damages. (Citation omitted.) Id. at 492.

In a per se defamatory action "the law conclusively presumes the existence of injury to the plaintiff's reputation. He is required neither to plead nor to prove it.'" Id., quoting Urban v. Hartford Gas Co., 139 Conn. 301, 308 (1952). The plaintiff can recover for "the injury to his reputation and for the humiliation and mental suffering which the libel caused him." Battista, 10 Conn. App. 492. An alleged defamatory statement is actionable without proof of special damage, "if it charges 'improper conduct or lack of skill or integrity in one's profession or business and is of such a nature that it is calculated to cause injury to one in his profession or business.'" Charles Parker Co. v. Silver City Crystal Co., 142 Conn. 605, 612 (1955)

Defendants defamed plaintiff by making false allegations regarding his behavior, character and sanity. Defendants cannot characterize their defamation as being true, privileged, or statements of opinion; to do so is a misleading distortion of the facts.

Characterizing Fago as a bully, and "crazy", as well as taking innocent actions on the part of defendant and deliberately twisting them in order to create a pattern of negative behavior that did not exist most certainly qualifies as defamation. Fago's reputation was irreparably injured, his respect diminished and he was subjected to severe humiliation and mental suffering. Because defendant's actions and words were intentionally calculated to injure him in his profession, more particularly lead to his demotion, they are actionable without proof of damages. The statements made by the defendants were not privileged, the IAD interviews cannot be considered quasi-judicial proceedings. Even if this were a credible defense, the policy behind this is that "the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements." In this case Three Defendants and Pawlina did not have the 'public interest' in mind. In addition, the statements

made by McClure and Rudewicz before the commencement of Pawlina's investigation clearly fall outside of the scope.

Nor were the statements made by defendants "pure opinion". Three defendants alleged a series of facts and attempted to create a pattern of behavior that did not exist. Defendants conspired together to malign Fago's reputation as a member of the Hartford Police Department and his status as a Lieutenant. None of these statements can honestly be defined as 'pure opinion' without a severe distortion of the facts that cannot be allowed. Ample evidence supports plaintiff's claims against defendants for their defamation of his good character and this count of his complaint is not a candidate for summary judgment.

Defendants cite Craig v. Stafford Const., Inc., 78 Conn. App. 549 (Conn. App. 2003), to support the idea that an IAD investigation is a 'quasi judicial' proceeding. The Supreme Court is reviewing this case to decide if this was the proper characterization of this proceeding (cert. granted 266 Conn. 916 (2003)). Even if the court does not over turn this lower court ruling, the determination that an IAD investigation is quasi-judicial cannot be extended to include the investigation done by Pawlina merely because some of his facts arose from such proceedings.

**IV. CONCLUSION**

For the above stated reasons, both of Defendants' Motions for Summary Judgment should be denied.